UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:26-cv-20609-WILLIAMS/LETT

PRESIDENT DONALD J. TRUMP, et al.,

Plaintiffs,

v.

INTERNAL REVENUE SERVICE, et al.,

Defendants.

**BRIEF OF AMICI CURIAE CITIZENS FOR RESPONSIBILITY
AND ETHICS IN WASHINGTON AND PUBLIC CITIZEN**

## TABLE OF CONTENTS

INTEREST OF AMICI CURIAE ................................................................................................... 1

INTRODUCTION .......................................................................................................................... 1

ARGUMENT .................................................................................................................................. 2

    I.    The President's prosecution of a civil action for damages in federal court raises separation of powers concerns. ............................................................................ 2

    II.    The President's civil suit against federal agencies creates an insurmountable conflict of interest for the government's attorneys. ....................................................... 3

    III.    Any monetary settlement with the President in this case would violate the Constitution's Domestic Emoluments Clause. ............................................................... 7

    IV.    This Court has inherent authority to protect judicial integrity and prevent abuse of the court system. ............................................................................................ 11

CONCLUSION ............................................................................................................................. 12

## INTEREST OF AMICI CURIAE[1]

Citizens for Responsibility and Ethics in Washington (CREW) is a nonpartisan, nonprofit, watchdog organization dedicated to ensuring ethics, accountability, and transparency in government. Monitoring and identifying potential conflicts of interest in the Executive Branch are among CREW's core functions. CREW's staff includes nationally recognized experts on government ethics laws and regulations. CREW also has unique expertise in the U.S. Constitution's Emoluments Clauses, having served as counsel for the plaintiffs in litigation challenging President Trump's alleged violations of the Clauses during his first term. *See In re Trump,* 958 F.3d 274 (4th Cir. 2020), *cert. granted, judgment vacated sub nom. Trump v. D.C.*, 141 S. Ct. 1262 (2021) (deeming case moot due to Trump leaving office); *CREW v. Trump*, 953 F.3d 178 (2d Cir. 2019), *cert. granted, judgment vacated*, 141 S. Ct. 1262 (2021) (same).

Public Citizen is a nonprofit consumer-advocacy organization with members in all 50 states. Public Citizen appears before Congress, administrative agencies, and courts on a wide range of issues. Prominent among Public Citizen's concerns is combating corruption, and the appearance of corruption, of governmental processes, including actual and perceived fairness of our judicial system. To ensure that our government works for the people, Public Citizen advocates for strong ethics laws to prevent conflicts of interest and self-dealing.

Amici submit this brief because this unprecedented lawsuit, brought by a sitting president seeking billions of dollars from agencies of the Executive Branch he heads for alleged statutory violations committed by those agencies during his first term, implicates core principles of legal ethics and political self-dealing.

## INTRODUCTION

President Trump appears in this Court "in his personal capacity" as a plaintiff seeking an unprecedented $10 billion or more as damages for the disclosure of his and his company's tax information during his first term in office. He has named as defendants in this case the U.S. Department of the Treasury and the Internal Revenue Service (IRS)—two agencies of the Executive Branch that President Trump heads. President Trump's presence on both sides of the litigation creates substantial constitutional and ethical concerns, and risks enmeshing this Court in

---

[1] The brief was not authored in whole or part by counsel for a party. No party or counsel for a party, and no person other than the amicus curiae or its counsel, contributed money intended to fund the brief's preparation or submission.

an unlawful and collusive transfer of funds from the U.S. Treasury to the President's personal coffers. This Court should prevent that from happening. The Court can and should exercise its inherent authority to preserve the status quo for the remainder of President Trump's term by staying this litigation and should enjoin the parties from terminating the lawsuit through an unconstitutional monetary settlement while the President remains in office.

## ARGUMENT

**I.   The President's prosecution of a civil action for damages in federal court raises separation of powers concerns.**

As the Supreme Court has recognized, a federal court's exercise of judicial authority over a sitting President implicates the separation of powers. *See Trump v. United States*, 603 U.S. 593 (2024); *Trump v. Vance*, 591 U.S. 786 (2020); *Trump v. Mazars USA, LLP*, 591 U.S. 848 (2020); *Clinton v. Jones*, 520 U.S. 681 (1997); *Nixon v. Fitzgerald*, 457 U.S. 731 (1982); *United States v. Nixon*, 418 U.S. 683 (1974); *see also United States v. Burr*, 25 F. Cas. 30 (C.C.D. Va. 1807) (Marshall, Cir. J.). The cases that have come before the Supreme Court involved situations in which the President was the unwilling target of a criminal or civil action brought by a prosecutor or plaintiff or was subject to a demand for information or evidence made under the auspices of a court. Although here the President comes to federal court as a plaintiff and invokes the judicial power to seek over $10 billion in redress "in his personal capacity," his proactive decision to appear as a party does not eliminate the separation of powers concerns that would arise if this litigation were to move forward. Because "[t]he President is the only person who alone composes a branch of government," "there is not always a clear line between his personal and official affairs." *Mazars USA*, 591 U.S. at 868. Rather, "'[t]he interest of the man' is often 'connected with the constitutional rights of the place.'" *Id*. (quoting The Federalist No. 51 (James Madison)). Thus, in *Mazars USA*, the Supreme Court held that separation-of-powers concerns presented by Congress's subpoena of President Trump's personal financial records "do[] not vanish simply because the subpoenas seek personal papers or because the President *sued in his personal capacity*." *Id.* (emphasis added).

As a plaintiff invoking the judicial power "in his personal capacity," the President is subject to the Court's "inherent authority to protect [its] proceedings and judgments in the course of discharging [its] traditional responsibilities." *Degen v. United States*, 517 U.S. 820, 823 (1996). At the same time, the Supreme Court's precedents that seek to balance the duty of the courts to

2

decide cases with the obligation for courts not to "impair the effective performance of [the President's] office," *Jones,* 520 U.S. at 702; *see Vance*, 591 U.S. at 809–10, present unique concerns when the President is the plaintiff. On one hand, even as a plaintiff, the President occupies a "unique position in the constitutional scheme" that calls for special solicitude. *Jones*, 520 U.S. at 698 (quoting *Fitzgerald*, 457 U.S. at 749). On the other hand, giving special treatment to a President who invokes the court's jurisdiction in his personal capacity to then dictate how the court must conduct its proceedings could unduly infringe on judicial independence, in contravention of the separation of powers. *See Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 848 (1986) (stating that Article III "serves both to protect the role of the independent judiciary within the constitutional scheme of tripartite government, and to safeguard litigants' right to have claims decided before judges who are free from potential domination by other branches of government." (citation modified)).

In this case, the President is suing Executive Branch agencies, and counsel for those agencies are unlikely to challenge the President's attempts to control the progress of this lawsuit. *See infra* Section II. The separation-of-powers risks inherent in allowing this litigation to move forward while President Trump remains in office are heightened. To avoid those constitutional concerns, the Court should stay the litigation while the President remains in office.

**II.     The President's civil suit against federal agencies creates an insurmountable conflict of interest for the government's attorneys.**

President Trump brings this civil action against the IRS and the Treasury Department in his "personal capacity," while also identifying himself in the case caption as "President Donald J. Trump." Compl. ¶ 1. The President's two hats in this litigation—his personal capacity as plaintiff and his role as chief Executive—make it impossible for attorneys in the Department of Justice (DOJ) to fulfill their ethical duties to zealously represent the interests of the defendant agencies against President Trump's claims.

**A.** To carry out his constitutional responsibility to "take Care that the Laws be faithfully executed," U.S. Const., art. II, § 3, "[t]he President may discuss potential investigations and prosecutions with his Attorney General and other Justice Department officials," *Trump*, 603 U.S. at 620. And "the Attorney General, as head of the Justice Department … provides vital assistance to him in the performance of his constitutional duty to preserve, protect, and defend the Constitution." *Id*. (citation modified). Further, "[t]he President's 'management of the Executive

3

Branch' requires him to have 'unrestricted power to remove the most important of his subordinates'—such as the Attorney General—'in their most important duties.'" *Id.* at 621 (quoting *Fitzgerald*, 457 U.S. at 750).

The Attorney General is both appointed by and removable by the President. 28 U.S.C. § 503. By statute, "the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested, and securing evidence therefor, is reserved to officers of the Department of Justice, under the direction of the Attorney General," *id.* § 516, who must "supervise all litigation to which the United States, an agency, or officer thereof is a party," *id.* § 519. Along with her litigation duties, the Attorney General provides advice "on questions of law" to both the President, *id.* § 511, and the "head of an executive department," *id.* § 512, such as the Treasury Department.

Moreover, President Trump has made clear his active role in supervising and controlling federal agencies. In Executive Order 14215, President Trump stated his understanding that the Constitution "provides for subordinate officers to assist the President in his executive duties," and "[i]n the exercise of their often-considerable authority, these executive branch officials remain subject to the President's ongoing supervision and control." § 1, 90 Fed. Reg. 10447 (Feb. 18, 2025). That executive order also provides that "[t]he President and the Attorney General, subject to the President's supervision and control, shall provide authoritative interpretations of law for the executive branch" and prohibits every federal employee from "advanc[ing] an interpretation of the law as the position of the United States that contravenes the President or the Attorney General's opinion on a matter of law," including through "positions advanced in litigation, unless authorized to do so by the President or in writing by the Attorney General." *Id.* § 7. And the order dictates that "it shall be the policy of the executive branch to ensure Presidential supervision and control of the entire executive branch." *Id.* § 1. The commands of this executive order apply to DOJ and to the defendant agencies in this case.

President Trump has also made clear that he intends to apply his approach in controlling the agencies in this very case. By statute, the authority to compromise civil cases under the internal revenue laws falls to the Treasury Secretary or the Attorney General or her designee. 26 U.S.C. § 7122(a). When asked if he was going to "tell [Treasury Secretary Bessent and Attorney General Bondi] to pay [him]" $10.5 billion because he is "their boss," President Trump responded, "what

4

I would do, tell 'em to pay me."[2] He also stated that it was "interesting" being on "both sides of a lawsuit," and that he intends to "work out a settlement with myself."[3]

Thus, the Attorney General and DOJ have a statutory duty to defend the interests of the defendant agencies against the President's claims in this case, but they are also directly accountable to the President for how they carry out that responsibility. Indeed, Attorney General Bondi has warned that DOJ attorneys who do not zealously advocate for the administration's priorities may be "subject to discipline and potentially termination" for "depriv[ing] the President of the benefit of *his* lawyers."[4] She has further stated that DOJ "work[s] at the directive of Donald Trump" and "will never stop fighting for him and for our country."[5]

In this case, however, the interest of President Trump and "our country" are not aligned because, if President Trump prevails in this lawsuit or enters into monetary settlement, the damages he seeks will be paid out of the U.S. Treasury and, ultimately, by American taxpayers.[6] Because the President effectively occupies both sides of this unprecedented litigation, DOJ necessarily suffers from an unavoidable conflict of interest as counsel for the defendant agencies.

**B.** Under federal law, DOJ attorneys are bound by the same professional responsibility rules that govern all other lawyers appearing before this Court. *See* 28 U.S.C. § 530B ("An attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State."). In Florida, and in other states, "[a] lawyer … is a representative of clients" and an advocate who "zealously asserts the client's position under the rules of the adversary system." Fla. Rules of Professional Conduct, Ch. 4,

---

[2] *Read the full transcript: President Donald Trump interviewed by 'NBC Nightly News' anchor Tom Llamas,* NBC News (Feb. 4, 2026), https://perma.cc/52BX-GSXU.

[3] Forbes Breaking News, *'I'm Supposed To Work Out A Settlement With Myself': Trump Addresses Lawsuit Against IRS*, YouTube (Feb. 1, 2026), https://tinyurl.com/4p324c59.

[4] Memorandum from the Office of the Att'y Gen. to all Dep't Employees Re: General Policy Regarding Zealous Advocacy on Behalf of the United States (Feb. 5, 2025) (emphasis added), https://perma.cc/8C3W-A5BZ.

[5] The Justice Department, *Attorney General Pamela Bondi Welcomes President Donald J. Trump to the Justice Department*, YouTube (Mar. 18, 2025) (29:35), https://youtu.be/tl9V_JNFa0c.

[6] *See The Financial Stability Oversight Council's Annual Report to Congress*: *Hearing before the S. Comm. on Banking, Housing, and Urb. Affairs*, 119th Cong. (Feb. 5, 2026) (testimony of Secretary Bessent at 2:02:16), https://tinyurl.com/3nyr3nae.

5

Preamble (2018). To prevent conflicts that would limit a lawyer's ability to act as a zealous advocate, Rule 4-1.7 provides that "a lawyer must not represent a client if: (1) the representation of 1 client will be directly adverse to another client; or (2) there is a substantial risk that the representation of 1 or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer." With respect to the substantial-risk prong, "[t]he critical questions are the likelihood that a conflict will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client." Fla. Rules of Professional Conduct, Rule 4-1.7, Comment (2018).

Given the unprecedented nature of a sitting President filing a civil action for damages from the federal agencies he oversees, the Rules do not directly address the ethical obligations of DOJ attorneys tasked with defending the government against the President's claims. The ethics rule governing organizational clients, though, "applies to governmental organizations." Fla. Rules of Professional Conduct, Rule 4-1.13, Comment. While the rule recognizes that "[d]efining precisely the identity of the client and prescribing the resulting obligations of such lawyers may be more difficult in the government context" and, therefore, does not address that question, *id.*, it nonetheless offers useful guidance. Rule 4-1.13 recognizes that corporate entities "cannot act except through its officers, directors, employees, shareholders, and other constituents." *Id*. Generally, an organizational lawyer must accept decisions made by those decisionmakers "even if their utility or prudence is doubtful." *Id.*

In this unprecedented case, where President Trump as plaintiff cannot be separated from President Trump as head of the Executive Branch, it is impossible for counsel at DOJ (or any other federal agency) to act as zealous advocates for the defendant agencies. This case thus presents a "substantial risk" that DOJ attorneys' representation of the IRS and the Treasury Department will be "materially limited" by their responsibilities to the President and by their own personal interests in continued federal employment, in violation of Florida Rule 4-1.7(b)(2). *Cf. Vance*, 591 U.S. at 805 (recognizing that federal prosecutors are accountable to and removable by the President).

Finally, the conflict of interest presented in this case is structural and cannot be waived. Under Rule 4-1.7(b), an attorney presented with a conflict of interest may represent a client if "(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent

6

representation to each affected client; (2) the representation is not prohibited by law; (3) the representation does not involve the assertion of a position adverse to another client when the lawyer represents both clients in the same proceeding before a tribunal; and (4) each affected client gives informed consent, confirmed in writing or clearly stated on the record at a hearing." But given the President's "unique position in the constitutional scheme," *Fitzgerald*, 457 U.S. at 749; *see Mazars USA*, 591 U.S. at 868 (noting that "[t]he President is the only person who alone composes a branch of government"), no federal officer is sufficiently independent of the President to provide the informed consent needed to waive the conflict. For the same reason, it is unlikely that any DOJ lawyer subject to the supervision of the Attorney General or her delegatee could form a reasonable belief that they "will be able to provide competent and diligent representation" to the federal agency defendants, particularly in light of "the President's ongoing supervision and control" over "positions advanced in litigation" by the federal government. Exec. Order 14215, 90 Fed. Reg. at 10447, 10449.

Given the intractable conflict of interest, the Court should stay this litigation until President Trump is no longer in office.

### III. Any monetary settlement with the President in this case would violate the Constitution's Domestic Emoluments Clause.

President Trump's claims—seeking a jaw-dropping $10 billion in damages for the leaking of his tax returns by government contractor Charles Littlejohn—are subject to formidable threshold defenses that the United States has vigorously litigated in similar cases concerning Littlejohn's leaks. *See, e.g.*, U.S. Mot. to Dismiss 2d Am. Compl. at 1-2, *Griffin v. IRS*, 22-cv-24023, ECF No. 58 (S.D. Fla. Nov. 27, 2023) (seeking dismissal because, among other things, Littlejohn was not a government employee);[7] U.S. Mot. to Dismiss at 1, *Safe Harbor Int'l, LLC v. IRS*, 8:25-cv-139, ECF No. 31 (D. Md. July 23, 2025) (same). Yet President Trump has indicated that his administration will forgo raising *any* defenses in this case. Rather than zealously guarding the public fisc, the President has vowed that he will "work out a settlement with myself" in which he could receive a "substantial amount" of taxpayer money vastly exceeding any damages

---

[7] The United States ultimately settled *Griffin*, but the plaintiff "did not receive any money as part of the settlement." Brian Faler, *Hedge fund billionaire drops suit vs. IRS over tax leak as agency apologizes*, Politico (June 25, 2024), https://tinyurl.com/fnfxbtcd.

7

authorized by law.[8] Such a nakedly collusive award of federal funds to the incumbent President would violate the Constitution's Domestic Emoluments Clause.

**A.** The Domestic Emoluments Clause, also known as the Presidential Emoluments Clause, is a prophylactic anti-corruption provision. It provides for the President to receive "a Compensation" fixed by Congress during his term in office and forbids him from "receiv[ing] within that Period any other Emolument from the United States, or any of them." U.S. Const. art. II, § 1, cl. 7. The constitutional text—"any" other emolument—is "both sweeping and unqualified." *Applicability of Emoluments Clause to Employment of Government Employees by Foreign Public Universities*, 18 Op. O.L.C. 13, 17 (1994). It broadly prohibits the President's receipt of any "profit, gain, or advantage" from the federal government personally or through businesses he owns. *See D.C. v. Trump*, 315 F. Supp. 3d 875, 904 (D. Md. 2018) ("[T]he term 'emolument' … extends to any profit, gain, or advantage, of more than *de minimis* value, received by him, directly or indirectly, from foreign, the federal, or domestic governments. … In the case of the Domestic Clause, receipt of any emolument is flatly prohibited."), *vacated as moot*, 141 S. Ct. 1262 (2021). "[E]xecutive branch precedent and practice" has been "overwhelmingly consistent" with this "expansive view of the meaning of the term 'emolument.'" *Id.* at 901, 902 (citing sources); *see also* John Mikhail, *The 2018 Seegers Lecture: Emoluments and President Trump*, 53 Val. U.L. Rev. 631, 666 (2019) ("When the Constitution was written, 'emolument' was a flexible term that generally meant 'profit,' 'gain,' 'advantage,' or 'benefit.' It was commonly used in ordinary English to refer to advantages or benefits of different types. Not only government salaries, but also payments on contracts, interest on loans, and profits from ordinary commercial transactions were all referred to as 'emoluments.'").

"The Framers of the Constitution forbade the President from receiving any emolument other than a fixed compensation, in part because they feared the consequences of allowing a President to convert his or her office into a vehicle for personal profit." *Griffin v. United States*, 935 F. Supp. 1, 3 (D.D.C. 1995). As Alexander Hamilton explained, "examples would not be wanting, even in this country, of the intimidation or seduction of the Executive by the terrors or allurements of [] pecuniary arrangements." *The Federalist No. 73* (Alexander Hamilton). Because "[n]either the Union, nor any of its members, will be at liberty to give … any other emolument"

---

[8] White House, *President Trump Gaggles with Press on Air Force One En Route Palm Beach, FL*, Youtube (Jan. 31, 2026), https://tinyurl.com/mr3p3ac8 (at 02:40).

8

to the President, Hamilton wrote, he will "have no pecuniary inducement to renounce or desert the independence intended for him by the Constitution." *Id.*

The Framers' concerns are directly implicated here, where President Trump is asking his own administration to award him a massive windfall payment of taxpayer funds to settle legally and factually dubious claims, contrary to how the government has defended similar suits. *See, e.g.*, U.S. Mot. to Dismiss 2d Am. Compl., *Griffin v. IRS*, 22-cv-24023, ECF No. 58 (S.D. Fla. Nov. 27, 2023); U.S. Mot. to Dismiss, *Safe Harbor Int'l, LLC v. IRS*, 8:25-cv-139, ECF No. 31 (D. Md. July 23, 2025). Adding to the impropriety, President Trump seeks $10 billion in damages—an astounding sum that is more than five times greater than any other payment from the Treasury's Judgment Fund from January 2020 through September 2025.[9] Yet because he has alleged no actual damages, the most that President Trump could recover is $1,000 per unauthorized disclosure by a government employee. *See* 26 U.S.C. § 7431(c)(1)(a). His claim to $1,000 in statutory damages for every time a reader viewed a news report about the tax returns, *see* Compl. ¶ 104, Prayer for Relief, is legally baseless. *See, e.g.*, *Miller v. United States*, 66 F.3d 220, 223–24 (9th Cir. 1995); *Snider v. United States*, 468 F.3d 500, 509 (8th Cir. 2006). If Defendants chose not to assert these formidable defenses and agreed to pay a gratuitous settlement, they would be conferring on the President precisely the type of "profit, gain, or advantage" that the Domestic Emoluments Clause prohibits. *Trump*, 315 F. Supp. 3d. at 904.[10] Were the law otherwise, presidents would be free to manufacture frivolous legal claims against the government and then direct their administrations to "settle" for enormous sums, thus allowing a president to "convert his or her office into a vehicle for personal profit." *Griffin*, 935 F. Supp. at 3.[11]

---

[9] Richard Rubin et al., *Trump Lawsuit Against IRS Puts Him on Both Sides of the Same Case*, Wall St. Journal (Feb. 1, 2026), https://tinyurl.com/desf6zrc.

[10] That President Trump said he would donate to charity any money he receives through a settlement does not avoid the emoluments violation of a payment made to him, regardless of whether he then donated it. And even if the settlement were paid directly to a charity, such a charitable payment made at his behest would constitute an "indirect[]" gain or advantage to him, and would also be a "direct[]" gain or advantage if he or his businesses were to use the payment to claim a tax deduction. *See Trump*, 315 F. Supp. 3d at 904.

[11] President Trump cannot evade the constitutional bar by claiming a vested right to payment before entering office. *Cf. President Reagan's Ability to Receive Ret. Benefits from the State of California*, 5 Op. O.L.C. 187, 187–90 (1981) (concluding that the Domestic Emoluments Clause did not prohibit President Reagan from receiving retirement benefits from California where "he

9

**B.** Furthermore, the Domestic Emoluments Clause restricts the conduct of both the President and any person who could enable him to "receive" prohibited emoluments. U.S. Const. art. II, § 1, cl. 7.[12] The Clause thus prohibits *any* federal official—including officials at DOJ, IRS, the Treasury Department, and judges—from taking action that enables the President to "receive" a collusive, gratuitous monetary settlement.

Defendants and their counsel have an affirmative duty to consider potential Emoluments Clause violations in effectuating any settlement with President Trump. Under the Constitution's Oath or Affirmation Clause, "all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution." U.S. Const. art. VI, cl. 3. Officers under the oath are "conscientiously bound to abstain from all acts[] which are inconsistent with" the Constitution. Joseph Story, 1 *Commentaries on the Constitution* § 374, at 255; *see also Whether the CFPB May Continue to Draw Funds from the Federal Reserve System Under 12 U.S.C. § 5497 When the Federal Reserve System Is Operating at A Loss*, 49 Op. O.L.C. __, 2025 WL 3251685, at *22 (Nov. 7, 2025) ("The Oath or Affirmation Clause effectively charges each covered official with considering the constitutionality of their actions."); *Meredith Corp. v. FCC*, 809 F.2d 863, 874 (D.C. Cir. 1987) ("Federal officials are not only bound by the Constitution, they must also take a specific oath to support and defend it. … The [FCC's] failure to [consider a properly raised constitutional claim] seems to us the very paradigm of arbitrary and capricious administrative action."). Moreover, the Standards of Ethical Conduct for Employees of the Executive Branch requires employees "to place loyalty to the Constitution, laws, and ethical principles above private gain," 5 C.F.R. § 2635.101(a), and to "endeavor to avoid any actions creating the appearance that they are violating the law or ... ethical standards," *id.* § 2635.101(b)(14).

During President Trump's first term, the Office of the Inspector General of the General Services Administration (GSA) issued a scathing report faulting the agency for willfully "ignoring" potential violations of the Constitution's Emoluments Clauses in approving a federal

---

acquired a vested right" to the benefits "6 years before he became President" and they were "not gratuities which the state [was] free to withdraw").

[12] In contrast, the Foreign Emoluments Clause prohibits covered officials only from "accept[ing]" prohibited emoluments from foreign governments. U.S. Const. art. I, § 9, cl. 8.

10

lease with a Trump-owned entity.[13] As the Inspector General found, "the decision to exclude the emoluments issues from GSA's consideration of the lease was improper because GSA, like all government agencies, has an obligation to uphold and enforce the Constitution."[14] Defendants and their counsel must not repeat the same mistake here.

For these reasons, the Court should enjoin the parties from entering into a monetary settlement in this case in violation of the Constitution.

### IV. This Court has inherent authority to protect judicial integrity and prevent abuse of the court system.

Federal courts are "vested, by their very creation," with an inherent power "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (citation modified). That authority includes "the power to control admission to its bar and to discipline attorneys who appear before it." *Id.* In addition, the "court's discretion permits it to nip any potential conflict of interest in the bud." *In re Gopman*, 531 F.2d 262, 266 (5th Cir. 1976) (citation modified); *see Richardson v. Hamilton Intern. Corp.*, 469 F.2d 1382 (3d Cir. 1972) ("[I]t is that court which is authorized to supervise the conduct of the members of its bar."); *State Compensation Ins. Fund v. Drobot*, 192 F. Supp. 3d 1080, 1090 (C.D. Cal. 2016) (noting that even if movant lacked standing to move for disqualification, the court would "rais[e] the disqualification issue on its own when it found out about the conflict"). This authority flows from the courts' fundamental obligation "to preserve the integrity of the adversary process." *United States v. Prevezon Holdings Ltd.*, 839 F.3d 227, 241 (2d Cir. 2016) (citation modified). Finally, the court's power over "its management of the case" includes the power to control "the conduct of the entire proceeding, including the timing and scope of discovery" and "deferral of trial." *Jones*, 520 U.S. at 707–08; *see also Vance*, 591 U.S. at 810 (recognizing a court's inherent authority to quash or modify a subpoena to protect separation of powers).

---

[13] Off. of Inspector Gen., Gen. Servs. Admin, *Evaluation of GSA's Management and Administration of the Old Post Office Building Lease*, JE19-002, at 10 (Jan. 16, 2019), https://perma.cc/NMF8-NKNY.

[14] *Id.* at 1; *see also id.* at 17 ("As an executive agency of the United States, both GSA and its employees have an obligation to ensure that agency actions comply with the law. . . . Like any other federal agency, it is not only appropriate that GSA address potential violations of the Constitution that arise with its activities, GSA cannot ignore them. GSA did not fulfill that obligation.").

Here, for the reasons set forth above, this unprecedented lawsuit pitting the President as a "private" citizen against the Executive Branch that the President oversees raises significant ethical and constitutional concerns that cannot be avoided until the end of President Trump's term. The Court accordingly should (1) stay this litigation until President Trump is no longer in office and (2) enjoin the parties from entering into a monetary settlement of this case while President Trump is in office.

## CONCLUSION

For the foregoing reasons, the Court should (1) stay this litigation until President Trump is no longer in office and (2) enjoin the parties from entering into a monetary settlement of this case while President Trump is in office.

February 12, 2026

Respectfully submitted,

/s/Lauren C. Bingham
Lauren C. Bingham
Florida Bar No. 105745
Lbingham@citizensforethics.org
Kayvan A. Farchadi*
D.C. Bar No. 1672753
kfarchadi@citizensforethics.org
Nikhel S. Sus*
D.C. Bar No. 1017937
nsus@citizensforethics.org
CITIZENS FOR RESPONSIBILITY
AND ETHICS IN WASHINGTON
P.O. Box 14596
Washington, DC 20044
(202) 408-5565

Nandan Joshi*
D.C. Bar No. 456750
njoshi@citizen.org
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Motion to appear pro hac vice forthcoming

*Counsel for Amici Curiae Citizens for Responsibility and Ethics in Washington and Public Citizen*