# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 26-cv-20609-WILLIAMS/LETT

PRESIDENT DONALD J. TRUMP, et al.,

        Plaintiffs,

  v.

INTERNAL REVENUE SERVICE, et al.,

        Defendants.

## BRIEF OF AMICI CURIAE
## FORMER GOVERNMENT OFFICIALS
## AND PUBLIC INTEREST ORGANIZATIONS

**TABLE OF CONTENTS**

**STATEMENT OF INTEREST** ....................................................................................... **1**

**INTRODUCTION** ............................................................................................................ **2**

**ARGUMENT** ................................................................................................................... **3**

I. The President's control of both sides of this case raises serious concerns about collusive litigation tactics. ...................................................................................................... 3

II. Plaintiffs' complaint has significant legal flaws. ............................................... 6

    A. The first claim under the Internal Revenue Code has various legal flaws, including threshold defects. .................................................................. 6

        1) The claim is time-barred. .......................................................... 7

        2) The claim is not properly brought against the United States. ................... 9

        3) The damages sought are legally and factually unsupported, and unprecedented. .................................................................... 12

    B. The second claim under the Privacy Act is also legally flawed and includes threshold defects. ................................................................. 14

        1) This Court lacks jurisdiction over the claim. ........................................... 14

        2) The claim is time-barred. ......................................................... 15

        3) Plaintiffs fail to state a claim for damages under the Privacy Act. ......... 15

III. The Court should exercise its inherent authority to proactively manage this unusual case. ............................................................................................................... 17

**CONCLUSION** ............................................................................................................... **19**

## STATEMENT OF INTEREST

Amici are four former government officials with combined decades of experience in federal tax law, each of whom joins this brief only in their personal capacity, and two public-interest organizations.[1] They have sought leave to submit this brief to aid the Court in its management of this important case.

**John Koskinen** served as the 48th Commissioner of the Internal Revenue Service. He was confirmed to the position by the Senate in 2013, and he served in the position until 2017. Prior to his service as IRS Commissioner, he served in a number of positions in the public and private sector, including as the non-executive chairman of the Federal Home Loan Mortgage Corporation (Freddie Mac) from 2008 to 2012.

**Kathryn Keneally** served as the Assistant Attorney General for the U.S. Department of Justice's Tax Division. She was confirmed to the position by the Senate in 2012, and she served in the position until 2014. Prior to her service in the Department of Justice, she practiced tax law in private practice for thirty years and served as chair of the American Bar Association's Section of Taxation's Committees on Civil and Criminal Tax Penalties and Standards of Tax Practice.

**Nina Olson** served as the National Taxpayer Advocate from 2001 to 2019. In that role, she led the Taxpayer Advocate Service, an independent organization within the Internal Revenue Service. Prior to serving in that role, she had over two decades of experience representing individual taxpayers at all levels of income.

**Gilbert Rothenberg** served as the Chief of the U.S. Department of Justice, Tax Division, Appellate Section. He joined the Department as a line attorney in the Appellate Section in 1975 and served in the Section until his retirement in 2019.

**Common Cause** is a nonpartisan, grassroots organization dedicated to upholding the core values of American democracy by working to create open, honest, and accountable government that serves the public interest. Common Cause has over 1.5 million members nationwide and local organizations in 23 states.

**Project On Government Oversight (POGO)** is a nonpartisan, independent watchdog that investigates, exposes, and champions reforms on systemic corruption, abuse of power, and waste.

---

[1] No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money intended to fund this brief. No person other than amicus curiae, its members, and its counsel contributed money to fund this brief.

1

POGO envisions a federal government that is effective and accountable—governed by just laws, operating with integrity, and committed to serving the public. Government ethics and public trust in the federal government are at the heart of POGO's mission.

## INTRODUCTION

The President, his sons, and their family business filed this lawsuit to seek a payment of "at least" $10 billion in taxpayer money from the U.S. Treasury. The causes of action that they invoke under the Internal Revenue Code and Privacy Act are important mechanisms for ordinary people to seek redress for harm that they have suffered from government action. Congress's creation of those statutory causes of action shows that Congress recognized the utmost importance of tax-return confidentiality and privacy rights. When properly invoked, those causes of actions are powerful tools for holding government accountable.

But this lawsuit risks the misuse of those causes of action. This case is extraordinary because the President controls both sides of the litigation, which raises the prospect of collusive litigation tactics. Collusive litigation threatens the integrity of the judicial process by risking the Court's entanglement in an illegitimate proceeding. And although the complaint has significant defects—it was filed too late, against the wrong party, and for an unsupported and excessive sum of damages—the conflicts of interest make it uncertain whether the Department of Justice will zealously defend the public fisc in the same way that it has against other plaintiffs claiming damages for related events.

To maintain the integrity of the judicial process in the face of these highly irregular circumstances, the Court should consider exercising its inherent judicial authority to proactively manage this case from the outset. First, the Court should consider issuing an order for the parties: to show cause why this Court has jurisdiction over this case, to explain how they will address the fundamental conflict-of-interest problems with this case, to show why this case should not be stayed until after President Trump leaves office, and to show why the unjustified $10 billion damage figure should not be stricken from the pleadings. Second, the Court should consider appointing amici who have expertise on issues of tax law and separation-of-powers issues to present fulsome legal arguments on all future issues that arise in this case. Third, the Court should consider allowing participation of those amici in hearings. To treat this case like business as usual would threaten the integrity of the justice system and the important taxpayer and privacy protections at the heart of this case.

2

## ARGUMENT

I.   **The President's control of both sides of this case raises serious concerns about collusive litigation tactics.**

The sitting President, along with his sons and their family business, is seeking $10 billion from the very government that he leads. The President controls both sides of the litigation, as the President confirmed in his own words. In response to press questions about this case, the President remarked: "I'm supposed to work out a settlement with myself."[2] In another interview, the President stated: "Essentially, the lawsuit's been won. I guess I won a lotta money. . . . [T]here's never been anything like it."[3] This anomalous situation raises significant questions about whether this lawsuit presents a justiciable case or controversy within this Court's Article III jurisdiction, raises fundamental conflict-of-interest problems, and makes possible a collusive settlement that undermines the public interest.

The Article III requirement of a case or controversy "limit[s] the business of federal courts to questions presented in an adversary context." *Flast v. Cohen*, 392 U.S. 83, 95 (1968). Adverseness is "a safeguard essential to the integrity of the judicial process." *United States v. Johnson*, 319 U.S. 302, 305 (1943). It ensures that "courts [are not] misled into doing grievous wrong to the public." *Chicago & G.T. Ry. Co. v. Wellman*, 143 U.S. 339, 346 (1892).

A case lacks the constitutionally required adverseness when the same person is on both sides of the controversy. *E. Tennessee, V. & G. R. Co. v. S. Tel. Co.*, 125 U.S. 695, 695 (1888) ("there is no longer any real controversy" when one party is "practically both plaintiff and defendant"); *S. Spring Hill Gold-Min. Co. v. Amador Medean Gold-Min. Co.*, 145 U.S. 300, 301 (1892) (a court "cannot . . . consent to determine a controversy in which the plaintiff in error has become the *dominus litis* on both sides," including "an agreed case gotten up by collusion"); *Moore v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 47, 48 (1971); *Lord v. Veazie*, 49 U.S. 251, 255 (1850) (a suit in which "there is no real conflict of interest between" the parties and where "the plaintiff and defendant have the same interest" is "in contempt of the court, and highly reprehensible"). A lawsuit must be dismissed when it is "collusive [in that] it is not in any real sense adversary." *United States v. Johnson*, 319 U.S. 302, 305 (1943).

---

[2] White House, *President Trump Gaggles with Press on Air Force One En Route Palm Beach, FL*, at 02:40 (Jan. 31, 2026), https://www.youtube.com/live/IvgGnWcxRhE.

[3] *Read the extended transcript: President Donald Trump interviewed by 'NBC Nightly News' anchor Tom Llamas*, NBC News (Feb. 4, 2026), https://perma.cc/988K-AGAM.

President Trump controls both sides of this litigation. On the Plaintiffs' side, he is the lead plaintiff, alongside his family members and his family business. The Trump Organization is reportedly in a trust managed by his children, but not a blind trust—and the President appears to retain ultimate control and access to its assets.[4]

On the government side, the President has increasingly asserted control over litigation decisions by the Department of Justice. In an executive order, the President claimed the power to make "authoritative interpretations of law for the executive branch" that "are controlling on all employees in the conduct of their official duties." Exec. Order No. 14215, § 7, 90 Fed. Reg. 10447, 10448 (Feb. 24, 2025). He prohibited any executive branch employee from advancing any contrary legal interpretation, including through "positions advanced in litigation." *Id.* at 10449. A memo by Attorney General Pam Bondi warned that Department of Justice lawyers who do not perform zealous advocacy may be "subject to discipline and potentially termination" for "depriv[ing] the President of the benefit of *his* lawyers."[5] That troubling conception of the Justice Department's role—that government lawyers serve the President individually—collapses the distinction between the President's personal interests and the public interest.

The President has asserted control of the Justice Department from top to bottom. The President sent instructions to the Attorney General via a social media post—which he reportedly intended to be a private message—about specific prosecutorial decisions.[6] The President has sought control throughout the ranks of the Justice Department by claiming his administration, based on a mere invocation of Article II, can override civil-service protections and fire line-level attorneys without cause.[7] These actions are part of the President's assertion of a maximalist view

---

[4] Dan Alexander, *Trump Organization Admits President Still Controls His Business In New Filing*, Forbes (May 6, 2025), https://perma.cc/8G8D-G65D; Michelle Conlin & Heather Timmons, *Trump will not be involved in managing family business as president, company says*, Reuters (Jan. 10, 2025), https://perma.cc/7XR4-HC6R.

[5] Memorandum for All Department Employees from the Attorney General, *Re: General Policy Regarding Zealous Advocacy on Behalf of the United States* (Feb. 5, 2025) (emphasis added), https://perma.cc/8C3W-A5BZ.

[6] Josh Dawsey et al., *Inside the Justice Department Where the President Calls the Shots*, Wall Street Journal (Oct. 8, 2025), https://perma.cc/8V49-RYNQ.

[7] Eric Katz, *Trump admin. tells judge it can fire at least some career feds at any time for any reason*, Government Executive (July 17, 2025), https://perma.cc/F9NY-5J7H; Def. Memo. in Support of Mot. to Dismiss 4, *Gordon v. Executive Office of the President*, No. 1:25-cv-02409-JMC (D.D.C. Nov. 25, 2025), ECF No. 17-1 (quoting termination notices of an Assistant U.S.

of his Article II authority under a unitary executive theory, which posits that he alone is vested with all of the power of the executive branch. *E.g.*, Br. for Petitioners 2, *Trump v. Slaughter*, No. 25-332 (U.S. Oct. 10, 2025). The President thus effectively controls the government's defense of this case.[8]

This case is not the first time that the President has sought direct personal payment from the federal government. He previously demanded $230 million in compensation under the Federal Tort Claims Act based on purported violations of his rights during past criminal investigations. In public statements about those claims, the President acknowledged that "I'm suing myself" and that "I'm the one that makes the decision and that decision would have to go across my desk and it's awfully strange to make a decision where I'm paying myself."[9] In another set of public statements about those claims, the President stated: "You know, I brought a lawsuit, and I'm winning the lawsuit. There's only one problem. I'm the one who has to settle it. In other words, I am suing, and I'm the one that's supposed to settle it."[10]

The President's effective control of both sides of this litigation raises real doubts about whether his lawsuit presents the adverseness that is constitutionally required for this Court to exercise judicial power. As Peter Keisler, an Acting Attorney General in the George W. Bush administration, stated: "This creates the risk of the most collusive lawsuit of all time, because it is

---

Attorney and other career Justice Department employees that purported to terminate them "[p]ursuant to Article II of the United States Constitution and the laws of the United States").

[8] The President also has control over Justice Department leaders with authority to settle this case. Under 26 U.S.C. § 7122(a), the Attorney General or her delegate has the authority to settle this case. By regulation, the Deputy Attorney General or Associate Attorney General have the authority to approve settlements over $4 million. 28 U.S.C. §§ 0.160(a)(3), 0.161. Deputy Attorney General Todd Blanche was formerly President Trump's personal lawyer. At his confirmation hearing, Blanche stated that his "attorney-client relationship with President Trump remains." Devlin Barrett, *Senate Confirms Trump Attorney Todd Blanche as No. 2 Justice Dept. Official*, N.Y. Times (Mar. 5, 2025), https://perma.cc/4KP8-HW4X. Associate Attorney General Stanley Woodward represented the President's co-defendant in a criminal case. Devlin Barrett & Tyler Pager, *Trump Said to Demand Justice Dept. Pay Him $230 Million for Past Cases*, N.Y. Times (Oct. 21, 2025), https://perma.cc/UPG7-2YB9.

[9] Barrett & Pager, *supra* n.8.

[10] Ashleigh Fields, *Trump quips about seeking DOJ settlement: "I hereby give myself $1 billion*," The Hill (Dec. 20, 2025), https://perma.cc/UC49-VG62.

ultimately the president suing a defendant whom he says has to do whatever he directs."[11] Because of the likelihood of collusive litigation tactics and fundamental conflict-of-interest issues raised by this case, the Court must take special caution to ensure that justice is served impartially.

## II.    Plaintiffs' complaint has significant legal flaws.

The complaint includes claims under the Internal Revenue Code and the Privacy Act. When such claims are raised in a meritorious way and adjudicated through a regular judicial process, those causes of action are important tools for ordinary people to seek redress for harm that they have suffered from government failures or misconduct.

But Plaintiffs' complaint has significant legal flaws, even aside from the anomaly that the President controls both sides of the litigation. These legal flaws include threshold issues that render this suit baseless. These issues would typically be raised in a motion to dismiss—as the Department of Justice has done in related cases brought by other plaintiffs—and would ordinarily preclude the Department from even considering settlement. But because of the lack of true adverseness between the parties, there is no assurance that the Department will zealously contest these issues.

### A.    The first claim under the Internal Revenue Code has various legal flaws, including threshold defects.

Plaintiffs' first claim is under the Internal Revenue Code's cause of action for damages for an unauthorized disclosure of tax returns. 26 U.S.C. § 7431(a)(1). Congress's creation of this private cause of action for taxpayers reflects Congress's understanding of the importance of tax-return confidentiality to taxpayers' trust in the federal government and in the IRS.

But Plaintiffs' assertion of this cause of action has fundamental defects. First, the claim had to be brought within two years of his discovery of the disclosure. Charles Littlejohn's leaking of tax returns became known more than two years ago, and others subject to the same leaks brought their cases much earlier. Second, to plead a claim for damages against the United States, the disclosure must have been by an officer or employee of the United States. But as the Justice Department is already arguing in other cases arising from the Littlejohn leaks, he was a contractor who acted without any direction from a government employee. Finally, even if Plaintiffs could overcome those threshold issues, the assertion of $10 billion in damages is not only unfounded and unsupported by the case law, but it is also excessive by orders of magnitude.

---

[11] Richard Rubin et al., *Trump Lawsuit Against IRS Puts Him on Both Sides of the Same Case*, Wall St. Journal (Feb. 1, 2026), https://perma.cc/7ZGX-2RT4.

### 1)   The claim is time-barred.

Plaintiffs were required to bring this claim within two years of discovering the unauthorized disclosure of their tax returns. That two-year clock started running in September 2020, when the New York Times ran the first of many articles about the leaked tax returns. Even if those well-publicized articles were not enough to trigger discovery, Plaintiffs certainly knew of the claim when Charles Littlejohn pleaded guilty more than two years ago.

Congress required that any action for damages for an unauthorized disclosure of tax returns must be filed "within 2 years after the date of discovery by the plaintiff of the unauthorized inspection or disclosure." 26 U.S.C. § 7431(d). Discovery does not require actual knowledge; the statute of limitations begins to run "when a plaintiff knows or reasonably should know" of the unauthorized disclosure. *Aloe Vera of Am., Inc. v. United States*, 699 F.3d 1153, 1159 (9th Cir. 2012). Both courts of appeal that have addressed the issue have concluded that this time limitation is jurisdictional because it restricts the scope of the government's waiver of sovereign immunity. *Aloe Vera of Am., Inc. v. United States*, 580 F.3d 867, 871 (9th Cir. 2009); *Gandy v. United States*, 234 F.3d 281, 283 (5th Cir. 2000).

The complaint as pleaded shows that Plaintiffs knew or reasonably should have known more than two years ago about the unauthorized disclosure of their tax returns. They reasonably should have known in September 2020, which is when a New York Times article—cited in the complaint itself—said that the newspaper "has obtained tax-return data extending over more than two decades for Mr. Trump and the hundreds of companies that make up his business organization."[12]

Even if that article were not enough, the two-year clock would have certainly started in September or October 2023. The Justice Department filed a criminal information against Littlejohn in September 2023, identifying him as a contractor who unlawfully provided news organizations with the tax returns of a public official and thousands of the nation's wealthiest people. Information ¶¶ 1–3, *United States v. Littlejohn*, 23-cr-00343 (D.D.C. Sept. 29, 2023), ECF No. 1. At his October 12, 2023 plea agreement hearing, Littlejohn identified "Donald J. Trump" as the "high-ranking government official" at issue and identified the New York Times and ProPublica as the

---

[12] Russ Buettner et al., *Long-Concealed Records Show Trump's Chronic Losses and Years of Tax Avoidance*, N.Y. Times (Sept. 27, 2020), https://perma.cc/9SDS-PKSM (cited in Compl. ¶ 73)

news organizations to which he disclosed the tax returns. Transcript 10, *Littlejohn* (Oct. 23, 2023), ECF No. 13. President Trump's personal attorney, Alina Habba, attended that hearing and identified herself on the record "on behalf of President Trump who was a victim." *Id.* at 14.[13] At the latest, then, this suit had to be filed by October 2025.

Other plaintiffs affected by Littlejohn's leaks filed suit against the United States, under 26 U.S.C. § 7431(a)(1), and against Littlejohn's employer Booz Allen Hamilton, under § 7431(a)(2), well before Plaintiffs did. One suit was filed in late 2022. Compl., *Griffin v. IRS*, No. 22-cv-24023 (S.D. Fla. Dec. 13, 2022). Another was filed in April 2024. Compl., *Warren v. Booz Allen Hamilton*, No. 8:24-cv-01252 (D. Md. Apr. 29, 2024).[14] Yet another was filed in March 2025, alleging that the plaintiff discovered the necessary facts only when Littlejohn's prosecution began in September 2023. Compl. ¶ 59, *MacNeil v. Booz Allen Hamilton, Inc.*, No. 25-cv-00963 (D. Md. Mar. 24, 2025).

There is no reason that Plaintiffs could not have filed this complaint by October 2025, within two years of Littlejohn's plea agreement. The complaint alleges that the President "did not discover" the unauthorized disclosure of his tax returns until January 24, 2024, when he received formal notice of the Littlejohn prosecution from the IRS. Compl. ¶ 76. Plaintiffs assert that the two-year time limit in 26 U.S.C. § 7431(d) did not start running until they received this formal IRS notice under § 7431(e). Compl. ¶ 86. But there is no support for this interpretation of the statute. To be sure, the statute of limitations and notification provision are in neighboring subsections. 26 U.S.C. § 7431(d), (e). But subsection (d) contains no textual reference to subsection (e), and proximity alone does not create a linkage. The IRS notifies a taxpayer under subsection (e) only if a leaker is criminally charged, which may never happen for various reasons, including the exercise

---

[13] The Court may consider these publicly available filings and transcript from the criminal case when assessing its jurisdiction on a Federal Rule of Civil Procedure 12(b)(1) standard. *See Morrison v. Amway Corp.*, 323 F.3d 920, 924–25 & n.5 (11th Cir. 2003) (explaining that "the district court is free to independently weigh facts," including "extrinsic evidence such as testimony and affidavits," when considering jurisdictional challenges).

[14] In *Warren*, the district court denied a motion to dismiss on the statute-of-limitations issue. But that was because the pleadings left it a "close question" whether the two-year clock started at the publication of a ProPublica article in December 2021 or in September 2023, when the Littlejohn prosecution began. *Warren v. Booz Allen Hamilton, Inc.*, No. 24-CV-01252-LKG, 2025 WL 580362, at *5–6 (D. Md. Feb. 21, 2025). No party argued that the two-year clock started later than the September 2023 criminal information against Littlejohn.

of prosecutorial discretion. Under Plaintiffs' apparent theory, if a taxpayer discovers an unauthorized disclosure but there is no prosecution, the statute of limitations would never commence. An IRS notice under subsection (e) could be one reason that a taxpayer learns of an unauthorized disclosure for purposes of subsection (d). But if, as here, the taxpayer had other avenues for earlier discovery and should have learned of the disclosures through those avenues, then the later commencement of prosecution does not restart the two-year clock. Plaintiffs' claim is plainly time-barred.

### 2)   The claim is not properly brought against the United States.

Not only is the first claim time-barred, but it is also not properly brought against the United States. Plaintiffs assert the claim against the United States under a statutory cause of action for damages to remedy an unauthorized disclosure of tax returns by an "officer or employee of the United States." 26 U.S.C. § 7431(a)(1). But the complaint does not plausibly plead that Charles Littlejohn was a federal employee or was acting under a federal employee's direction. In fact, publicly available records show that Littlejohn was a federal contractor not acting under the direction of any federal employee.

Count 1 claims a violation of 26 U.S.C. §§ 6103 and 7431(a)(1). Compl. ¶¶ 88–114. Section 6103 requires that tax returns shall be confidential, subject to enumerated exceptions. Disclosure of tax returns in violation of § 6103's confidentiality requirement is a crime. 26 U.S.C. § 7213. In addition to the criminal penalty, § 7431 provides a private cause of action for damages for breach of the confidentiality requirement. Plaintiffs sue under § 7431(a)(1), which allows a taxpayer to bring a civil action against the United States for a knowing or negligent disclosure of a tax return by "any officer or employee of the United States."[15]

Plaintiffs claim that they were harmed by alleged disclosures by Charles Littlejohn, who they allege was "jointly employed by the IRS and/or one of its contractors." Compl. ¶¶ 7, 22. But the complaint itself is internally inconsistent as to Littlejohn's employment status with the United States. The complaint alleges that Littlejohn had access to tax returns under 26 U.S.C. § 6103(n). Compl. ¶¶ 21, 48. That statute is the authority by which tax returns may be shared with contractors.

---

[15] Plaintiffs do not bring the claim under § 7431(a)(2), which addresses an unauthorized disclosure by "any person who is not an officer or employee of the United States." In any case, any claim for damages under subsection (a)(2) would have to be brought against that person, not against the United States.

*See* 26 U.S.C. § 6103(n) (authorizing disclosure of tax returns as necessary for "processing, storage, transmission, and reproduction" of tax returns, "programming, maintenance, repair, testing, and procurement of equipment," and "other services, for purposes of tax administration); 26 C.F.R. § 301.6103(n)-1. A different statutory exception, 26 U.S.C. § 6103(h)(1), authorizes disclosure to IRS employees for tax administration purposes. The allegation that Littlejohn's access to tax returns was under subsection (n), not (h)(1), undermines the plausibility of the allegation elsewhere in the complaint that Littlejohn was an employee.

In any event, Littlejohn's deposition in a related civil case confirms that he was not a federal employee. Littlejohn Dep. 307:22–308:14, *Griffin v. IRS*, 22-cv-24023 (S.D. Fla.), ECF No. 119-1 ("Q: Right. You were not ever an employee of the IRS, correct? A. Never. Q: Okay. Have you ever been an employee of the United States? A. No."). Plaintiffs' complaint cites that deposition for other purposes, but without acknowledging that key passage. Compl. ¶¶ 10, 23, 28–30, 36–42, 53–54, 58–59, 65, 77, 120. Instead, the complaint takes other language from that deposition out of context. The complaint alleges that Littlejohn "work[ed] at the IRS," Compl. ¶ 23 (quoting Littlejohn Dep. 204:17), and did so "full-time," *id.* ¶ 28 (quoting Littlejohn Dep. 264:7), but the complaint elides the fact that Littlejohn's "full-time" work "at the IRS" was as a contractor. The Court may consider the entirety of the deposition transcript, which is incorporated into the complaint through multiple references, as part of the pleadings. *See SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010). The deposition testimony directly addressing Littlejohn's employment status further undermines the plausibility of the allegation that Littlejohn was a federal employee.

Court records from the Justice Department's criminal prosecution of Littlejohn confirm that he "was working on an IRS contract." Information ¶¶ 1–3, *United States v. Littlejohn*, 23-cr-00343 (D.D.C. Sept. 29, 2023), ECF No. 1. The criminal information alleged that Littlejohn had access to tax returns under 26 U.S.C. § 6103(n), which is the authority by which tax returns may be shared with contractors. *Id.* ¶ 2. Littlejohn's plea agreement mirrored those statements. Plea Agreement ¶ 2(a), *Littlejohn* (Oct. 12, 2023), ECF No. 8; *see also* Factual Basis for Plea ¶¶ 1–3, *Littlejohn* (Oct. 12, 2023), ECF No. 9. None of those documents, or the Justice Department's sentencing memorandum, ever stated that Littlejohn was an IRS employee. Sentencing Mem., *Littlejohn* (Jan. 16, 2024), ECF No. 23. The government's appellate brief in the criminal matter, filed just last summer, also described him as a "private contractor" at the IRS. Appellee's Br. 1,

*United States v. Littlejohn*, No. 24-3019 (D.C. Cir. July 9, 2025), ECF No. 2124574. In addition, IRS's public apology states: "Charles Littlejohn was a government contractor providing services to the IRS at the time he made the illegal disclosures. He violated the terms of his contract . . . ." IRS Statement (June 25, 2024), https://perma.cc/3DNH-9M8E; *see also* Press Release, *IRS Contractor Pleads Guilty to Disclosing Tax Return Information to News Organizations*, U.S. Dep't of Justice (Oct. 12, 2023), https://perma.cc/Z9KQ-554G.[16]

Accordingly, the Department of Justice has argued in response to claims brought by other plaintiffs that the United States has not waived its sovereign immunity for damages for Littlejohn's disclosures because Littlejohn "was a contractor—and not an officer or employee of the United States." U.S. Mot. to Dismiss 1, *Safe Harbor Int'l, LLC v. IRS*, No. 25-cv-00139 (D. Md. July 23, 2025), ECF No. 31. The Department argued that the claim against the United States "falls outside § 7431(a)(1)'s limited waiver of sovereign immunity" and that the sole damages remedy was "a suit against the contractor under 26 U.S.C. § 7431(a)(2)." *Id.* at 11. Finally, the Department argued that this defect was jurisdictional. *Id.* at 5; *see also* U.S. Reply 2, *Safe Harbor* (D. Md. Nov. 26, 2025), ECF No. 60 (characterizing contractor/employee issue as "facial challenge to the Court's subject matter jurisdiction"). If the Justice Department were to take a different position in this case, where the unauthorized disclosure came from the same source as in those other cases, then that would only confirm that there is a serious conflict of interest preventing the Department from defending this case in an even-handed manner.

Littlejohn's employee status cannot be inferred based on the complaint's allegations about IRS's indicia of control over Littlejohn. "Because § 7431 represents a waiver of sovereign immunity, it must be 'strictly construed, in terms of its scope, in favor of the sovereign.'" *Snider v. United States*, 468 F.3d 500, 509 (8th Cir. 2006) (quoting *Lane v. Pena*, 518 U.S. 187, 192 (1996)). Where the United States waived its sovereign immunity only as to claims based on actions by an "officer or employee of the United States," 26 U.S.C. § 7431(a)(1), the waiver cannot be expanded to cover contractors based on a functional inquiry into the degree of control an agency exercises over the contractor.

---

[16] All these documents may be considered on a Rule 12(b)(1) standard, *see supra* n.13, because whether Littlejohn was a federal employee bears on the jurisdictional issue of whether the United States has waived its sovereign immunity. *Aloe Vera*, 580 F.3d at 871.

**3)      The damages sought are legally and factually unsupported, and unprecedented.**

Plaintiffs' complaint seeks a staggering sum of "at least" $10 billion in damages based on the theory that they are entitled to $1,000 in statutory damages for every time that a reader viewed a New York Times or ProPublica news report about the tax returns. Compl. ¶ 104, Prayer for Relief C. That allegation is plainly flawed—it means that Plaintiffs estimate 10 million unauthorized disclosures. However, the courts that have addressed this issue agree that secondary disclosure of information does not give rise to liability. Moreover, Plaintiffs have no right to punitive damages because § 7431(c)(1) precludes punitive damages against the United States absent proof of actual damages, and they have shown no actual damages. For these reasons, even if Plaintiffs were able to overcome the threshold issues above, damages would be nowhere near what they seek.

The statute provides for damages as the greater of (A) "$1,000 for each act of unauthorized inspection or disclosure," or (B) the sum of the actual damages and, for willfulness or gross negligence, punitive damages. 26 U.S.C. § 7431(c)(1). The plain text of the statute authorizes statutory damages for "each act" of unauthorized disclosure, and the "act" refers to an unauthorized action taken by an "officer or employee of the United States." *See* 26 U.S.C. § 7431(a)(1), (c)(1)(A). Each time that a member of the public accesses a news report is not a new unauthorized "act" by a federal employee.

Courts that have analyzed this statutory language agree that statutory damages are limited to $1,000 for each unauthorized disclosure that a federal employee made to another person, not every downstream disclosure by that other person to others. The Ninth Circuit considered this exact issue in the context of an unauthorized disclosure by a federal employee to the Los Angeles Times. *Miller v. United States*, 66 F.3d 220, 223 (9th Cir. 1995). The court rejected the plaintiff's claim that each of the 181,734 copies of the resulting Los Angeles Times article was a separate act of disclosure meriting $181,734,000 in damages. *Id.* Remarking that Congress could not have intended such a "bizarre remedy," the court held that the plaintiff was entitled to $1,000 in damages for a single disclosure by a federal employee to a reporter. *Id.* at 224. Likewise, the Eighth Circuit held that "the proper limitation of liability is the initial act of disclosure, not secondary disclosures made by others such as the media." *Snider*, 468 F.3d at 509; *Ward v. United States*, 973 F. Supp. 996, 1003 (D. Colo. 1997) (plaintiff not entitled to recover $1,000 in statutory damages for each listener to radio show on which disclosure made). After all, the alternative reading advanced by Plaintiffs would mean that "[i]n the modern era of mass communication, one statement on the

worldwide computer network or to a television reporter could result in disseminations that could break our nation's treasury." *Miller*, 66 F.3d at 223–24. In addition, Plaintiffs' interpretation would result in an unreasonable reading of the time-bar in 26 U.S.C. § 7431(d), which requires commencement of a suit within two years of a plaintiff's discovery of an unauthorized disclosure. If each re-publication were a new disclosure, then the statute of limitations could be continually renewed years after the original disclosure.

Plaintiffs are also wrong in suggesting that each item of taxpayer information that was disclosed constitutes a separate act of disclosure. "A return, of course, will contain multiple items of information, and likewise 'return information' clearly encompasses multiple items of information. Yet, § 7431(c)(1)(A) treats the disclosure of either—'a return or return information'—as one act subject to one award of statutory damages of $1,000." *Minda v. United States*, 851 F.3d 231, 236 (2d Cir. 2017). Plaintiffs cannot claim $10 billion in damages by multiplying each piece of taxpayer information disclosed by each time a news article repeated the original disclosure.

Furthermore, punitive damages are not available. Because § 7431(c)(1) allows either (A) statutory damages, or (B) actual damages plus punitive damages, when available, "a plaintiff receiving statutory damages for an unauthorized disclosure cannot also recover punitive damages." *Snider*, 468 F.3d at 510. Section 7431(c)(1) thus precludes punitive damages against the United States absent proof of actual damages. *Siddiqui v. United States*, 359 F.3d 1200, 1204 (9th Cir. 2004); *see also Barrett v. United States*, 917 F. Supp. 493, 504 (S.D. Tex. 1995), *aff'd*, 100 F.3d 35 (5th Cir. 1996). Recovery of actual damages requires proof of cause in fact and proximate cause—neither of which Plaintiffs show in their complaint. *Castillo v. United States*, No. 21CV00007 (DF), 2022 WL 902855, at *9 (S.D.N.Y. Mar. 28, 2022); *Nat'l Org. for Marriage, Inc. v. United States*, 24 F. Supp. 3d 518, 529 (E.D. Va. 2014).

Plaintiffs do not even attempt to calculate their actual damages, asserting instead that such damages—coincidentally—also amount to $10 billion. Plaintiffs likely avoided this calculation because there is no measurable harm to them. It is not certain how the President, who has been reelected since the Littlejohn leaks, was seriously harmed. Also, some of the news articles that Plaintiffs complain about were based on sources of tax information other than the Littlejohn

leaks.[17] Plaintiffs would need to prove actual harm traceable to the Littlejohn leaks, accounting for the fact that there have been other entirely independent sources of negative publicity about the President's financial behavior. It is entirely implausible that actual damages—if any at all, and even if combined with punitive damages—could approach $10 billion.

In addition to lacking legal and factual support, Plaintiffs' $10 billion claim is unprecedented. As the Wall Street Journal reported, "[a] $10 billion payment would be greater than the Trump family's current net worth" of roughly $6.8 billion.[18] It would also be "more than five times as much as any other payment from the Judgment Fund from January 2020 through September 2025 and more than three times all payments made in 2024, according to federal data."[19]

**B.    The second claim under the Privacy Act is also legally flawed and includes threshold defects.**

Plaintiffs' second claim, which is under the Privacy Act's cause of action for damages for an intentional and willful violation, also has fundamental defects. First, this Court lacks jurisdiction over this claim because the Internal Revenue Code forecloses Privacy Act claims for damages that stem from the unlawful disclosure of tax information. Second, the claim is time-barred because it was not brought within two years of Plaintiffs' discovery of the violation. Third, Plaintiffs fail to plead that they sustained actual damages caused by the alleged violation.

**1)    This Court lacks jurisdiction over the claim.**

As a threshold matter, this Court lacks subject matter jurisdiction. The Internal Revenue Code plainly forecloses Privacy Act claims for damages related to the unauthorized disclosure of

---

[17] For instance, the complaint cites a December 2022 New York Times article that was based on House Democrats' release of the President's tax records, with no mention of the Littlejohn leaks. Compl. ¶ 73 (citing Jim Tankersley et al., *Trump Tax Returns Undermine His Image as a Successful Entrepreneur*, N.Y. Times (Dec. 30, 2022), https://perma.cc/5P7V-P6WY. A ProPublica article included in the complaint was based not on Littlejohn leaks, but on property tax documents that ProPublica obtained using New York's Freedom of Information Law. Compl. ¶ 75 (citing Heather Vogell, *Never-Before-Seen Trump Tax Documents Show Major Inconsistencies*, ProPublica (Oct. 16, 2019), https://perma.cc/MKH3-YGWG).

[18] Rubin, et al., *supra* n.11.

[19] *Id.* The total sum of all payments from the Judgment Fund in fiscal year 2025 appears to be about $4.3 billion. *See* U.S. Dep't of Treasury, *Judgment Fund Payment Search*, https://fiscalcrm.my.site.com/jfpaymentsearch/s/ (sum of Column V, "Payment Amount," in "All Payments Fiscal Year 2025.csv" file available for download under "Download Payment Data").

tax information. *See* 26 U.S.C. § 7852(e) ("[5 U.S.C. § 552a(g)] shall not be applied, directly or indirectly, to the determination of the existence or possible existence of liability (or the amount thereof) of any person for any tax, penalty, interest, fine, forfeiture, or other imposition or offense to which the provisions of this title apply."). As the Justice Department has argued in other cases arising from the Littlejohn leaks, courts have routinely held that individuals may not seek damages under both the Internal Revenue Code and the Privacy Act for the same alleged disclosure. U.S. Mot. to Dismiss 5–8, *Griffin v. IRS*, 22-cv-24023 (S.D. Fla. April 25, 2023), ECF No. 23; *see also Gardner v. United States*, 213 F.3d 735, 741–42 (D.C. Cir. 2000) (discussing how courts interpret the relationship between § 6103 and the Privacy Act); *Gulden v. United States*, No. 06-cv-2327, 2007 WL 3202480, at *3 (M.D. Fla. Oct. 29, 2007) ("The Internal Revenue Code preempts inconsistent remedies provided for in the Privacy Act."), *aff'd*, 287 F. App'x 813 (11th Cir. 2008).

### 2) The claim is time-barred.

The Privacy Act claim is time-barred for the same reasons that the Internal Revenue Code claim came too late. Privacy Act claims must be brought "within two years from the date on which the cause of action arises." 5 U.S.C. § 552a(g)(5). "The Seventh, Ninth, Tenth, and D.C. Circuits have held that the statute of limitations for a Privacy Act claim begins to run when the plaintiff knows or has reason to know of the alleged violation." *Lockett v. Potter*, 259 Fed. Appx. 784, 786–87 (6th Cir. 2008). As explained above in Section II.A.1, Plaintiffs' clock began as early as 2020, and no later than fall 2023. *See Hill v. N.Y. Post*, No. 08 Civ. 5777, 2010 WL 2985906, at *3 (S.D.N.Y. July 29, 2010) (explaining that claim brought "against the unnamed BOP staff for revealing private information regarding [plaintiff] contained in his records . . . accrued . . . upon the publication of the articles describing [plaintiff's] affair"). Failure to file suit within the specified time "[deprives] the federal courts of subject matter jurisdiction over the action." *Diliberti v. United States*, 817 F.2d 1259, 1262 (7th Cir. 1987); *see also Harrell v. Fleming*, 285 F.3d 1292, 1293–94 (10th Cir. 2002); *Weber v. Henderson*, 33 F. App'x 610, 611 (3d Cir. 2002) (per curiam); *Akutowicz v. United States*, 859 F.2d 1122, 1126 (2d Cir. 1988); *Davis v. Gross*, No. 83-5223, 1984 U.S. App. LEXIS 14279, at *2–3 (6th Cir. May 10, 1984).

### 3) Plaintiffs fail to state a claim for damages under the Privacy Act.

Even if this Court could consider the Privacy Act claim, the claim is inadequately pleaded. To plead a claim for damages under the Privacy Act, a plaintiff must allege that an agency's

"intentional or willful" violation caused him to suffer an "adverse effect" and sustain "actual damages." 5 U.S.C. § 552a(g)(1)(d), (4). Plaintiffs have not done so here.

Even if Plaintiffs' allegations about the agencies' "willful" failure to safeguard their information were sufficient, they have not pled facts showing "actual damages" as a "result" of that Privacy Act violation. 5 U.S.C. § 552a(g)(4). Actual damages are "limited to proven pecuniary or economic harm," which are a form of "special damages" that "must be *specially* pleaded and proven." *FAA v. Cooper*, 566 U.S. 284, 295, 299 (2012) (emphasis added). The failure to establish monetary harm is fatal to retrospective claims for monetary relief under the Privacy Act. *Id.* at 295 (explaining that "the Privacy Act's remedial provision authorizes plaintiffs to recover . . . but only if they prove at least some 'actual damages'") (quoting 5 U.S.C. 552a(g)(4)(A)); *Corbett v. TSA*, 568 F. App'x. 690, 702 (11th Cir. 2014).

Plaintiffs do not allege that they suffered pecuniary or economic harm from any alleged failure by the IRS to protect their tax information under the Privacy Act. The complaint merely alleges that "[a]s a result of Defendants' repeated violations of the Privacy Act, Plaintiffs incurred substantial financial and other damages, including having to defend against a meritless civil suit brought by the New York Attorney General based on wrongful interpretation of unauthorized disclosures of their confidential tax returns and related tax information." Compl. ¶ 123. On its face, that allegation does not specify the nature of the "financial damages." *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (allegations that "are no more than conclusions[] are not entitled to the assumption of truth"); *see also* Reply in Support of U.S. Partial Mot. to Dismiss 10, *Biden v. IRS*, No. 23-cv-2711, 2024 WL 2833469 (D.D.C. May 10, 2024), ECF No. 21 (arguing that plaintiff's allegations were insufficient to allege actual damages because he provided "no calculation or estimate of the monetary value of the damage he claims has occurred"). Nor does the complaint state whether the "other damages" stemming from "having to defend against a meritless civil suit" are pecuniary and thus recoverable. Compl. ¶ 123; *see Cooper*, 566 U.S. at 299 (explaining that only pecuniary damages are recoverable under 5 U.S.C. 552a(g)(4)(A)). Any facts about Plaintiffs' damages should be within their control and thus within their ability to plead with specificity, as the Privacy Act requires. *See id*. at 301. This basic pleading failure provides another reason to dismiss the second claim. *See Brown v. DOJ*, 169 F. App'x 537, 541 (11th Cir. 2006) (holding that dismissal was proper because Privacy Act claim was "devoid of any allegations" of actual damages); *Griffin v. IRS*, 730 F. Supp. 3d 1312, 1322 (S.D. Fla. 2024) (dismissing claim because

"the mere mention of [actual] damages, without more, is insufficient to support a claim under the Privacy Act").

Relatedly, the complaint does not allege that the New York Attorney General's lawsuit was the "result" of the alleged Privacy Act violation. 5 U.S.C. § 552a(g)(4)(A); *see Skinner v. DOJ*, 584 F.3d 1093, 1097 (D.C. Cir. 2009) (requiring Privacy Act plaintiff to allege "proximate causation" to make out damages claim). As the Justice Department argued in another case, Plaintiffs do not "explain how the alleged failure to maintain adequate safeguards" affected them or plead that they would not have suffered their alleged harms "but for the alleged safeguards violation." Reply in Support of U.S. Partial Mot. to Dismiss 10, *Biden v. IRS*. Moreover, this Court may take judicial notice of the opinions issued in *People v. Trump*, which explain that the New York Attorney General launched an investigation in March 2020 based on congressional testimony by Michael Cohen, a former senior executive and attorney for the Trump Organization, and filed suit in 2022 after reviewing documents that were compelled by a Special Proceeding. *See* 237 N.Y.S.3d 443, 447–48 (App. Div. 2025) (Moulton, J., concurring). To the extent that Defendants' alleged violation resulted in any tax information leaks that informed the New York litigation, it was hardly the cause of that suit.

### III.     The Court should exercise its inherent authority to proactively manage this unusual case.

Given the highly irregular nature of this case, this Court should consider exercising its inherent judicial authority to proactively manage the case from the outset. "[A] district court possesses inherent powers that are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Dietz v. Bouldin*, 579 U.S. 40, 45 (2016) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630–31 (1962)). The Court should consider using that authority to issue an order for the parties: to show cause why this Court has jurisdiction, to explain how they will address the fundamental conflict-of-interest problems with this case, to show why this case should not be stayed until after President Trump leaves office, and to show why the unjustified $10 billion damage figure should not be stricken from the pleadings. The Court should also consider appointing amici with expertise on issues of tax law and separation-of-powers issues to present fulsome legal arguments on all arguments the Department of Justice may abandon as well as future issues that arise in this case. Finally, the Court should consider authorizing amicus participation in any hearings.

First, considering the numerous jurisdictional issues raised above—including the lack of adverseness that may defeat Article III jurisdiction—the Court should issue an order to show cause why it has jurisdiction over this case. The presumption is that "federal courts lack jurisdiction unless the contrary appears affirmatively from the record." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006) (quoting *Renne v. Geary*, 501 U.S. 312, 316 (1991)). Thus, a federal court must inquire into jurisdiction "whenever the possibility that jurisdiction does not exist arises." *Fitzgerald v. Seaboard Sys. R.R., Inc.*, 760 F.2d 1249, 1251 (11th Cir. 1985). A court should do so "at the earliest possible stage in the proceedings." *Am. C.L. Union of Fla., Inc. v. City of Sarasota*, 859 F.3d 1337, 1340 (11th Cir. 2017). The Court may order briefing on key legal issues sua sponte. *See Winenger v. Lowry*, No. 24-12732, 2025 WL 2452165, at *1 (11th Cir. Aug. 26, 2025) (affirming district court's dismissal of claim when "the district court *sua sponte* entered an order" raising a question whether the plaintiff had stated a cognizable claim, directed the parties to address the issue, then dismissed the claim); *see also, e.g.*, Order to Show Cause, *Manzini v. Cypress*, No. 24-cv-24670 (S.D. Fla. Jan. 13, 2025), ECF No. 9. In addition, the Court should order the parties to explain how they will address the fundamental conflict-of-interest problems with this case[20] and to show why this case should not be stayed until after President Trump leaves office. Finally, the Court should order the parties to show cause why the $10 billion dollar figure should not be stricken as plainly excessive.[21]

Second, this Court should appoint amicus to present fulsome argument on the various issues in this case. "[D]istrict courts possess the inherent authority to appoint 'friends of the court' to assist in their proceedings." *In re Bayshore Ford Trucks Sales, Inc.*, 471 F.3d 1233, 1249 n.34 (11th Cir. 2006). This Court has typically done so when amicus participation will "'contribute to the court's understanding of the matter in question' by proffering timely and useful information." *United States v. Santiago-Ruiz*, No. 17-60022-CRIM, 2017 WL 11454398, at *2 (S.D. Fla. Dec. 4, 2017) (citation omitted). Here, where there is a significant risk that the parties themselves will not adequately develop the issues before the Court, amicus participation will aid in this Court's

---

[20] *See* Rubin et al, *supra* n.11 (explaining that when Hunter Biden brought a tax-disclosure suit against the government while his father was President, "[t]he career attorneys at DOJ were allowed to handle the case in the normal way, raising defenses for the United States").

[21] *Cf.* Order, *Trump v. N.Y. Times Co.*, No. 8:25-cv-2487 (M.D. Fla. Sept. 19, 2025), ECF No. 5 (sua sponte striking complaint filed by President Trump).

proceedings. *See, e.g.*, *United States v. Strandlof*, 2009 WL 5126540, at *3 (D. Colo. Dec. 18, 2009) (given inadequate briefing on novel issue of First Amendment law, court decided to "invite amicus curiae briefs" subject to certain procedural and disclosure requirements).[22] Indeed, inviting amicus participation in these circumstances would be akin to the appellate courts' practice of appointing independent amici to get the benefit of an adversarial process where the original parties agree. *See, e.g.*, *Dep't of Health & Hum. Servs. v. Fla.*, 565 U.S. 1048 (2011) ("Robert A. Long, Esquire, of Washington, D.C., is invited to brief and argue this case, as *amicus curiae*, in support of the position that the Anti-Injunction Act, 26 U.S.C. § 7421(a), bars the suit brought by respondents to challenge the minimum coverage provision of the Patient Protection and Affordable Care Act, 26 U.S.C. § 5000A.").[23]

Finally, the Court should allow amici to participate in any arguments or hearings in this case. *See Resort Timeshare Resales, Inc. v. Stuart*, 764 F. Supp. 1495, 1500–01 (S.D. Fla. 1991) ("[I]t is solely within the discretion of the court to determine the fact, extent, and manner of participation by the *amicus*." (citation omitted)).

## CONCLUSION

The Court should consider issuing an order for the parties: to show cause why this Court has jurisdiction over this case, to explain how they will address the fundamental conflict-of-interest problems with this case, to show why this case should not be stayed until after President Trump leaves office, and to show why the unjustified $10 billion damage figure should not be stricken from the pleadings. The Court should consider appointing amici who have expertise on issues of tax law and separation-of-powers issues to present fulsome legal arguments on all future issues that arise in this case. The Court should consider allowing participation of those amici in hearings.

---

[22] If the Court were to invite amicus participation to address future issues in this case, the amici submitting this brief do not necessarily suggest that they should be the Court's choice. The Court should extend amicus invitations based on criteria such as relevant subject matter expertise, availability, and the extent to which amici's participation would promote the neutrality and legitimacy of the judicial process.

[23] *See* Katherine Shaw, *Friends of the Court: Evaluating the Supreme Court's Amicus Invitations*, 101 Cornell L. Rev. 1533, 1535 & n.5 (2016) (noting that the Supreme Court does not keep records of its amicus invitations and that its rules do not reference them, but that such appointments are made once per year, on average).

Dated: February 5, 2026

Respectfully submitted,

/s/ Gerald E. Greenberg
GERALD E. GREENBERG
Florida Bar No. 440094
ggreenberg@gsgpa.com
DANIEL R. WALSH
Florida Bar No. 0124282
dwalsh@gsgpa.com
GELBER SCHACHTER & GREENBERG, P.A.
One Southeast Third Avenue, Suite 2600
Miami, Florida 33131
Telephone: (305) 728-0950
E-service: efilings@gsgpa.com

TSUKI HOSHIJIMA* ^
thoshijima@democracyforward.org
Massachusetts Bar No. 693765
JYOTI JASRASARIA*
D.C. Bar No. 1671527
jjasrasaria@democracyforward.org
POOJA A. BOISTURE* ^
New York Bar No. 5104559
pboisture@democracyforward.org
AYESHA KHAN*
D.C. Bar No. 426836
akhan@democracyforward.org
ROBIN F. THURSTON*
D.C. Bar No. 1531399
rthurston@democracyforward.org
SKYE L. PERRYMAN*
D.C. Bar No. 984573
sperryman@democracyforward.org
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Telephone: (202) 448-9090

*Pro hac vice forthcoming

^ Not admitted to practice law in the District of Columbia;
practicing under the supervision of Democracy Forward
lawyers who are members of the District of Columbia
Bar.

Counsel for Amici Curiae Former Government Officials,
Common Cause, and Project on Government Oversight