# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 1:26-cv-20609-WILLIAMS/LETT

PRESIDENT DONALD J. TRUMP, et al.,
Plaintiffs,

v.

INTERNAL REVENUE SERVICE, et al.,
Defendants.

## MEMORANDUM OF COURT-APPOINTED *AMICI CURIAE*

**TABLE OF CONTENTS**

**Pages**

INTERESTS OF *AMICI CURIAE* ................................................................................ 1

INTRODUCTION ........................................................................................................ 1

ANALYSIS................................................................................................................... 2

I.   Adversity Between the Parties Is Essential to Article III Jurisdiction. ................................... 2

II.  Determining Whether Adversity Exists Requires a Fact-Specific Analysis of the Relationship Between the Parties and the Effect of the Court's Order. ................................... 3

    A.   The Relationship Between the Parties................................................................ 4

    B.   Effects of the Court's Order ............................................................................. 6

III. Considerations Relevant to Determining Adversity in this Case............................................. 8

    A.   The Relationship Between the Parties................................................................ 9

    B.   The Effect of the Court's Order ...................................................................... 14

    C.   Potential Additional Areas of Inquiry ............................................................. 15

CONCLUSION........................................................................................................... 16

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Gray*,
    17 Ky. 98 (1824) .................................................................................................................4

*Am. Legion v. Am. Humanist Ass'n*,
    588 U.S. 29 (2019) ............................................................................................................3

*American Wood-Paper Co. v. Heft*,
    75 U.S. 333 (1869) ............................................................................................................4

*Baker v. Carr*,
    369 U.S. 186 (1962) ..........................................................................................................8

*Carson v. Monsanto Co.*,
    72 F.4th 1261 (11th Cir. 2023) ......................................................................................5, 8

*Cleveland v. Chamberlain*,
    66 U.S. 419 (1861) ............................................................................................................4

*Dasma Invs., LLC v. Realty Assocs. Fund III, L.P.*,
    459 F. Supp. 2d 1294 (S.D. Fla. 2006) ............................................................................5

*E. Tenn., Va. & Ga. R.R. Co. v. S. Tel. Co.*,
    125 U.S. 695 (1888) ......................................................................................................4, 14

*Eastman v. Wright*,
    23 Mass. 316 (1828) .........................................................................................................4

*Flast v. Cohen*,
    392 U.S. 83 (1968) ....................................................................................................2, 3, 7

*Gardner v. Goodyear Dental Vulcanite Co.*,
    131 U.S. app. ciii, 21 L. Ed. 141 (1873) ..........................................................................5

*Globe & Rutgers Fire Ins. Co. v. Hines*,
    273 F. 774 (2d Cir. 1921) .................................................................................................4

*Gould v. Control Laser Corp.*,
    866 F.2d 1391 (Fed. Cir. 1989) ........................................................................................5

*Griffin v. IRS*,
    730 F. Supp. 3d 1312 (S.D. Fla. 2024) ...........................................................................12

*Hard Yaka LLC v. Hard Yaka Ventures GP, LLC,*
2025 WL 3171638 (D. Nev. Nov. 13, 2025) ........................................................4, 13

*Hatfield v. King,*
184 U.S. 162 (1902)..............................................................................................3, 15

*Hollingsworth v. Perry,*
570 U.S. 693 (2013).....................................................................................................15

*INS v. Chadha,*
462 U.S. 919 (1983)...........................................................................................7, 8, 14

*Lord v. Veazie,*
49 U.S. 251 (1850)...................................................................................................6, 7

*Marbury v. Madison,*
5 U.S. 137 (1803)...........................................................................................................2

*Mistretta v. United States,*
488 U.S. 361 (1989)......................................................................................................2

*Moore v. Charlotte-Mecklenburg Bd. of Educ.,*
402 U.S. 47 (1971)........................................................................................................6

*Muskrat v. United States,*
219 U.S. 346 (1911)..................................................................................................3, 6

*Myers v. United States,*
272 U.S. 52 (1926)...................................................................................................9, 10

*Nixon v. Fitzgerald,*
457 U.S. 731 (1982).....................................................................................................9

*S. Spring Hill Gold-Min. Co. v. Amador Medean Gold-Min. Co.,*
145 U.S. 300 (1892)..................................................................................................4, 13

*Safe Harbor Int'l LLC v. Booz Allen Hamilton,*
2026 WL 900051 (D. Md. Apr. 2, 2026)...............................................................12

*SEC v. Fed. Labor Rel. Auth.,*
568 F.3d 990 (D.C. Cir. 2009)....................................................................................6

*Seila Law LLC v. CFPB,*
591 U.S. 197 (2020)..................................................................................................9, 13

*Steel Co. v. Citizens for a Better Env't,*
523 U.S. 83 (1998)........................................................................................................3

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021)..................................................................................................3

*Trump v. Mazars USA, LLP*,
   591 U.S. 848 (2020)..............................................................................................9, 13

*TVA v. EPA*,
   278 F.3d 1184 (11th Cir. 2002) .............................................................................6

*United States v. Interstate Com. Comm'n*,
   337 U.S. 426 (1949)...................................................................................... *passim*

*United States v. Johnson*,
   319 U.S. 302 (1943)............................................................................................5, 14

*United States v. Nixon*,
   418 U.S. 683 (1974)...................................................................................... *passim*

*United States v. Windsor*,
   570 U.S. 744 (2013).....................................................................................6, 7, 8, 14

*Veritas Vincit, LLC v. Brown*,
   2024 WL 3543414 (E.D. Tex. July 25, 2024) ............................................................5

*Warth v. Seldin*,
   422 U.S. 490 (1975).................................................................................................2

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952)................................................................................................9

**Statutes**

5 U.S.C. § 552a..........................................................................................................16

26 U.S.C. § 7217........................................................................................................16

26 U.S.C. § 7431.....................................................................................................12, 16

26 U.S.C. § 7803..........................................................................................................9

**Other Authorities**

Andrew Duehren, Alan Rappeport & Maggie Haberman, *Trump Is Removing
   I.R.S. Chief 2 Months After He Was Confirmed*, N.Y. Times (Aug. 8, 2025),
   https://www.nytimes.com/2025/ 08/08/us/politics/trump-billy-long-irs-
   commissioner.html, [https://archive.ph/B4ayA]......................................................9

Devlin Barrett & Tyler Pager, *Trump Said to Demand Justice Dept. Pay Him $230 Million for Past Cases*, N.Y. Times (Oct. 21, 2025), https://www.nytimes.com/2025/10/21/us/politics/trump-justice-department-compensation.html [https://archive.ph/8YS9I] ........................................................... 11

Evan Perez, *Justice Department fires immigration lawyer who argued case of mistakenly deported man*, CNN Politics (Apr. 15, 2025), https://www.cnn.com/2025/04/15/politics/doj-fires-immigration-lawyer-who-argued-abrego-garcia-case-source-says [https://perma.cc/J2E4-SVM5] ................................. 10

Executive Order 14215, 90 Fed. Reg. 10447 (Feb. 18, 2025) ........................................ 10

Forbes Breaking News, *'I'm Supposed To Work Out A Settlement With Myself': Trump Addresses Lawsuit Against IRS* (YouTube, Feb. 1, 2026), https://youtu.be/wxyTtLB1USY ............................................................................ 11

2 Joseph Chitty, *Reports of Cases on Practice and Pleading* (1823) ............................... 4

Ken Dilanian, *Pam Bondi reshapes the DOJ around Trump's priorities*, NBC News (Mar. 14, 2025), https://www.nbcnews.com/politics/justice-department/s-trumps-justice-department-now-rcna195289, [https://perma.cc/354A-JGWL] ................................................................................ 10

Letter from John Jay, Chief Justice, U.S. Sup. Ct., et al., to George Washington, President of the U.S. (Aug. 8, 1793), https://founders.archives.gov/documents/Washington/05-13-02-0263, [https://perma.cc/2G6U-28L4] .............................................................................. 2

Memorandum from Pamela Bondi, U.S. Att'y Gen., General Policy Regarding Zealous Advocacy on Behalf of the United States (Feb. 5, 2025) ........................... 10

Oliver Barbour, *A Summary of the Law of Parties to Actions at Law and Suits in Equity* (1864) ........................................................................................................ 4

*Read the full transcript: President Donald Trump interviewed by 'NBC Nightly News' anchor Tom Llamas*, NBC News (Feb. 4, 2026), https://www.nbcnews.com/politics/trump-administration/trump-interview-nbc-news-extend-transcript-tom-llamas-super-bowl-2026-rcna257410, [https://perma.cc/T4SR-KVZH] ......................................................................... 11

Sam Levine, *Federal prosecutor in Virginia fired after refusing to lead Comey case*, The Guardian (Jan. 12, 2026), https://www.theguardian.com/us-news/2026/jan/12/us-attorney-virginia-fired-james-comey, [https://perma.cc/3RJ7-2RZY] .......................................................................... 11

U.S. Const. art. III ................................................................................... *passim*

U.S. Dep't of Just., Just. Manual § 1-18.200, 28 C.F.R. § 50.23(a) ............................... 16

3 William Blackstone, *Commentaries on the Laws of England* .......................................................3

13 *Wright & Miller's Federal Practice & Procedure* § 3530 (3d ed. 1998)..................................6

## INTERESTS OF *AMICI CURIAE*

In its Order dated April 24, 2026, the Court indicated that it "has concerns about whether it has subject matter jurisdiction in this case" and appointed undersigned counsel "to assist the Court in identifying the applicable law governing an analysis of this issue." Dkt. No. 43. *Amici* accordingly submit this memorandum in support of neither party in an effort to aid the Court in determining whether jurisdiction lies in this case.

## INTRODUCTION

The Framers "vested" the "judicial Power of the United States" in the federal courts, but they limited those courts' jurisdiction. U.S. Const. art. III, § 1. Article III of the United States Constitution constrains the circumstances in which the federal courts may act and the types of matters they may consider. This case implicates the boundaries of this Court's Article III jurisdiction, and in particular the constitutional requirement that a federal court may decide only actual "[c]ases" or "[c]ontroversies." *Id.* § 2, cl. 1.

On January 29, 2026, President Donald J. Trump, his sons Donald Trump Jr. and Eric Trump, and The Trump Organization LLC filed the complaint in this case, alleging that the Treasury Department and the Internal Revenue Service ("IRS") failed to safeguard and protect their confidential tax returns from unauthorized inspection and disclosure by Charles E. Littlejohn. Compl. ¶¶ 7–8, Dkt. No. 1. The complaint seeks at least $10 billion in compensatory damages, punitive damages, and attorney's fees. *Id.* at 26.

This case is unprecedented: A sitting president seeks monetary damages for alleged harm to his personal interests from an executive agency that he controls. That presents significant Article III subject matter jurisdiction concerns.

While this scenario is novel, the governing legal principles are not. The question at hand is whether the circumstances of this litigation present the kind of real and genuine dispute that is suitable for judicial resolution in an Article III court. And the Constitution and the applicable case law indicate that the Court should answer that question by conducting a fact-specific inquiry focused on (1) the relationship between the parties, and in particular whether they are sufficiently independent of one another, and (2) whether the Court could enter a judgment in this case that would have any concrete effect.

*Amici* set out these considerations, and their relevance to the circumstances presented here, in the analysis that follows. Part I sets out the fundamental principle of adversity, which is a prerequisite to Article III jurisdiction. Part II elucidates the key factors the Supreme Court has held are critical to assessing adversity, including in the context of a dispute between the President and other executive actors. Part III sets out the relevant facts as currently known and identifies additional information the Court may choose to obtain to inform its resolution of the jurisdictional issue.

## ANALYSIS

### I.         Adversity Between the Parties Is Essential to Article III Jurisdiction.

Article III limits the jurisdiction of the federal courts to "[c]ases" and "[c]ontroversies." U.S. Const. art. III, § 2, cl. 1. At its core, this requirement establishes "the proper—and properly limited—role of the courts in a democratic society." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "Embodied in the words 'cases' and 'controversies' are two complementary but somewhat different limitations." *Flast v. Cohen*, 392 U.S. 83, 94–95 (1968). First, the requirement of a "case" or "controversy" defines the judicial function. It "limit[s] the business of federal courts to questions presented . . . in a form historically viewed as capable of resolution through the judicial process." *Id.* at 95; *see Marbury v. Madison*, 5 U.S. 137, 177–78 (1803) (Federal courts are empowered to "say what the law is," but only in "particular cases," and only where the law supplies a rule of decision). Second, the "case" or "controvers[y]" requirement guards against intrusion on the other branches. It bars courts from rendering advisory opinions on legislative or executive questions—even when another branch expressly requests it. *See Flast*, 392 U.S. at 96 (discussing "rule against advisory opinions"); Letter from John Jay, Chief Justice, U.S. Sup. Ct., et al., to George Washington, President of the U.S. (Aug. 8, 1793), https://founders.archives.gov/documents/Washington/05-13-02-0263 [https://perma.cc/2G6U-28L4] (declining to provide an advisory opinion requested by George Washington on the interpretation of treaties signed by the United States). In doing so, Article III defines the judicial power in a manner that reinforces the broader separation of powers. *See Mistretta v. United States*, 488 U.S. 361, 385 (1989) (Article III "ensure[s] the independence of the Judicial Branch by precluding debilitating entanglements between the Judiciary and the two political Branches, and prevent[s] the Judiciary from encroaching into areas reserved for the other Branches.").

2

The adversity requirement furthers both conceptions of the case-or-controversy requirement. Historically, courts have understood the judicial power to extend to only "the right to determine actual controversies arising between adverse litigants." *Muskrat v. United States*, 219 U.S. 346, 361 (1911); *see TransUnion LLC v. Ramirez*, 594 U.S. 413, 423–24 (2021) (courts are limited to deciding "'a real controversy with real impact on real persons'" and cannot "adjudicate hypothetical or abstract disputes" (quoting *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 87 (2019) (Gorsuch, J., concurring))).[1] Enforcing the adversity requirement thus helps ensure courts remain within that traditional bailiwick. At the same time, by confining courts' power, the adversity requirement helps prevent the Judiciary from encroaching on the other branches and offending the separation of powers. *See Flast,* 392 U.S. at 95.

Because adversity implicates Article III jurisdiction, federal courts have an ongoing and independent obligation to determine that genuine adversity exists. *See Hatfield v. King*, 184 U.S. 162, 165 (1902) ("[I]t is the duty of a court to make such inquiry, in order that it may not be imposed on by an apparent controversy to which there are really no adverse parties."); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (confirming that jurisdiction is a "question the court is bound to ask and answer for itself, even when not otherwise suggested, and without respect to the relation of the parties to it").

II.     **Determining Whether Adversity Exists Requires a Fact-Specific Analysis of the Relationship Between the Parties and the Effect of the Court's Order.**

The appearance of purportedly opposing parties in a case caption does not guarantee sufficient adversity to satisfy Article III. *See United States v. Interstate Com. Comm'n*, 337 U.S. 426, 430 (1949). Courts must undertake a fact-specific assessment of both the relationship between the putatively adverse parties and the potential impact of a judicial order. If the plaintiff and the defendant are under common control, or if the Court's order would have no concrete effect, the dispute lacks sufficient adversity for purposes of Article III.

---

[1]  As Blackstone reported, a "case" under English law also presupposed disputing parties. 3 William Blackstone, *Commentaries on the Laws of England* *25 ("In every court there must be at least three constituent parts, the actor, *reus*, and *judex*: the actor, or plaintiff, who complains of an injury done; the *reus*, or defendant, who is called upon to make satisfaction for it; and the *judex* or judicial power, which is to examine the truth of the fact, to determine the law arising upon that fact, and, if any injury appears to have been done, to ascertain and by its officers to apply the remedy.").

### A.      The Relationship Between the Parties

Adversity is obviously absent where one party is, in fact, on both sides of the suit. Indeed, it is well established that courts "do not engage in the academic pastime of rendering judgments in favor of persons against themselves." *Id*. at 430. And that proposition holds even when "the same person sues and defends in different capacities." *Globe & Rutgers Fire Ins. Co. v. Hines*, 273 F. 774, 777 (2d Cir. 1921).[2]

Importantly, a functional test applies. The Supreme Court has emphasized that "courts must look behind names that symbolize the parties" to assess justiciability, including in suits involving government actors. *Interstate Com. Comm'n*, 337 U.S. at 430 (finding adversity because, notwithstanding executive officials' appearance as plaintiff and defendant, the railroads were the real party in interest to the suit, and ensured proper adversity by "vigorously defend[ing] the legality" of the Commission's order "at every stage of the litigation").

Similarly, adversity is also absent when one party is the *dominus litis*, or the "master of the suit," and controls the conduct of the litigation on both sides. Most often, that principle applies following a change in control (either control of one of the parties or over the *res* of the claim) after the suit is filed, at which point courts have found it necessary to dismiss the suit. *See, e.g.*, *S. Spring Hill Gold-Min. Co. v. Amador Medean Gold-Min. Co.*, 145 U.S. 300, 301 (1892) (dismissing the suit after learning that the control of the companies on both sides of the suit "had come into the hands of the same persons").[3] But the concept is a broader one. It

---

[2]   The proposition that one party cannot simultaneously occupy both sides of a dispute also finds support outside the Article III context. *See* 2 Joseph Chitty, *Reports of Cases on Practice and Pleading* 539 (1823) (describing a 1787 case from the King's Bench as standing for the proposition that "[a] party cannot be both the plaintiff and defendant in an action at law"); Oliver Barbour, *A Summary of the Law of Parties to Actions at Law and Suits in Equity* 18 (1864) ("No one can be both a plaintiff and defendant in the same action."); *Eastman v. Wright*, 23 Mass. 316, 321 (1828) (holding that "it is a first principle, that in whatever different capacities a person may act, he never can contract with himself, nor maintain an action against himself"); *Allen v. Gray*, 17 Ky. 98, 98 (1824) (holding that "[t]he same person can not be plaintiff and defendant in a common law action").

[3]   *See also Cleveland v. Chamberlain*, 66 U.S. 419, 425 (1861) (dismissing suit after defendant acquired ownership of the debt at issue); *American Wood-Paper Co. v. Heft*, 75 U.S. 333, 336 (1869) (dismissing suit after plaintiff acquired the patent relied on by defendant); *E. Tenn., Va. & Ga. R.R. Co. v. S. Tel. Co.*, 125 U.S. 695, 695–96 (1888) (dismissing suit after one party sold its interest to the other); *Hard Yaka LLC v. Hard Yaka Ventures GP, LLC*, 2025 WL 3171638, at *4 (D. Nev. Nov. 13, 2025) (finding no justiciable controversy where plaintiff, as

generally provides that adversity is absent when one party has the capacity to control the other. *Gould v. Control Laser Corp.*, 866 F.2d 1391, 1394 (Fed. Cir. 1989) ("Actual control [] is not necessary to" find that adversity is lacking, "rather, the ability to control the opposing party suffices.").

Evidence of collusion or coordination between the parties can indicate that they are subject to common control. A party may become the functional *dominus litis* of the suit if it pays or otherwise in practice controls lawyers on both sides. *See United States v. Johnson*, 319 U.S. 302, 304 (1943); *Gardner v. Goodyear Dental Vulcanite Co.*, 131 U.S. app. ciii, ciii–civ, 21 L. Ed. 141 (1873); *Carson v. Monsanto Co.*, 72 F.4th 1261, 1266 (11th Cir. 2023). In *Johnson*, for example, the Court held that it lacked jurisdiction over a lawsuit where the parties had colluded to present an issue to the Court. 319 U.S. at 305. The nominal plaintiff had brought the lawsuit at the defendant's request, and the defendant had financed the litigation. *Id.* at 304. As a result of the parties' cooperation, the defendant exercised complete control over the lawsuit, and the Court found the suit was "not in any real sense adversary." *Id.* at 305.

The Supreme Court has looked to principles of control in the context of a suit between a sitting President and a component of the Executive Branch. In *United States v. Nixon*, 418 U.S. 683 (1974), the Court held that a dispute between two executive-branch actors—the President and the Special Prosecutor appointed to investigate Watergate matters—could be heard by a federal court. The Court found adequate adversity because the Special Prosecutor was sufficiently independent. *See id.* at 697. The regulation establishing his office vested in him "plenary authority to control the course of investigations and litigation," *id.* at 694 n.8, including "explicit power to contest the invocation of executive privilege," *id.* at 695. The Court also emphasized that, under binding regulations, the Attorney General could not discharge the Special

---

"managing member" of the defendant partnership, had the power to veto any action requiring a majority vote of the members, including participating in litigation); *Veritas Vincit, LLC v. Brown*, 2024 WL 3543414, at *7–8 (E.D. Tex. July 25, 2024) (dismissing claims where an entity closely associated with the plaintiffs purchased the defendant corporation, noting that the Court was not required to "blind itself to the plain facts of this case" because "[t]o permit such an apparent artifice of form over substance to rule the day would effectively destroy the Constitution's limitation on federal courts' authority to adjudicate only genuine cases or controversies"); *Dasma Invs., LLC v. Realty Assocs. Fund III, L.P.*, 459 F. Supp. 2d 1294, 1304 (S.D. Fla. 2006) (Jordan, J.) (no jurisdiction where same individual was the "only member and registered agent" of the plaintiff, and "majority shareholder and sole officer" of a defendant).

Prosecutor or restrict his authority absent a finding that the Special Prosecutor had engaged in specified "extraordinary improprieties." *Id.* at 694 n.8 (internal quotation marks omitted). Although "it [wa]s theoretically possible for the Attorney General to amend or revoke" that regulation, the Court noted that "he ha[d] not done so," *id.* at 696, and the Special Prosecutor remained insulated.

*Nixon*'s reasoning is thus in keeping with the general principle that opposing parties in a lawsuit are not adverse if they are under common control. And the decision makes clear that, even in the context of a suit between the President and an executive official, both the formal legal status of the parties and the degree of their practical independence from one another are relevant to adversity. *See also SEC v. Fed. Labor Rel. Auth.*, 568 F.3d 990, 997–98 (D.C. Cir. 2009) (Kavanaugh, J., concurring) (explaining that the independence of governmental agencies may overcome the ordinary concern that intra-Executive disputes fail to present a "case" or "controversy" for purposes of Article III); *TVA v. EPA*, 278 F.3d 1184, 1197 (11th Cir. 2002) (finding adversity in a suit between the Tennessee Valley Authority ("TVA") and the Environmental Protection Agency because the TVA "possesse[d] unique independence as a federal agency" due to its structure as an independent corporation).

### B.    Effects of the Court's Order

Adversity also cannot exist where the parties' interests are so aligned that the Court's order would have no concrete effect. A court exercises judicial power when it "resolve[s] conflicting interests." 13 *Wright & Miller's Federal Practice & Procedure* § 3530 (3d ed. 1998). But when the parties' interests are "one and the same," such that an entry of judgment would be "mere form," the dispute does not give rise to a "real and substantial controversy" of the sort courts may consider. *Lord v. Veazie*, 49 U.S. 251, 255–56 (1850); *see also Moore v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 47, 48 (1971) (per curiam) (finding no Article III jurisdiction where parties sought "precisely the same result"); *Muskrat*, 219 U.S. at 361–62, 363 (dismissing action where defendant had "no interest adverse to the claimants" and any judgment "amounts in fact to no more than an expression of opinion").

That does not mean that the parties must disagree on the merits of the case. Even if the parties agree on how the case should be resolved, the court retains jurisdiction to hear the dispute so long as its decision would "have real meaning" regarding the availability of relief. *United*

6

*States v. Windsor*, 570 U.S. 744, 758 (2013) (quoting *INS v. Chadha*, 462 U.S. 919, 939–40 (1983)). In *Chadha*, for example, the Executive Branch agreed with Chadha's contention that the statute he challenged was unconstitutional. 462 U.S. at 939. But the Court found that a decision would still have concrete effect, reasoning that "if we rule for Chadha, he will not be deported; if we uphold [the challenged law], the [Executive] will execute its order and deport him." *Id.* at 939–40. The Executive's "refusal" to "provide the relief sought" without a court order created a conflict in interests the Court could adjudicate and thus "preserve[d] a justiciable dispute." *Windsor*, 570 U.S. at 759.

*Windsor* reflects the same principle. There, the Court concluded that the government's decision not to defend the constitutionality of the Defense of Marriage Act did not destroy Article III jurisdiction because the parties remained adverse in a concrete sense: The IRS refused to provide Windsor a refund in the absence of a court order compelling payment. *Id.* at 756–58. As a result, even though the Executive agreed the statute was unconstitutional, a judicial order would still resolve conflicting interests and have a real-world impact, either "eliminat[ing] the injury to the national Treasury if payment is made, or to the taxpayer if it is not." *Id.* at 753–55.

The *Nixon* Court also relied on the fact that its decision would have concrete effect, though it was an easy case on that score. The Court's decision was bound to result in either "the production or nonproduction of specified evidence." 418 U.S. at 696–97. And the President's and the Special Prosecutor's interests were at odds: The Special Prosecutor sought the evidence based on an "asserted need for the subpoenaed material in the underlying criminal prosecution," whereas the President resisted production because it would infringe on his "privilege against disclosure." *Id.* at 697. "Whatever the correct answer on the merits," the Court held that this "conflict" between the parties "assure[d] there [was] . . . concrete adverseness." *Id.* (citation omitted).

At times, the Supreme Court has described this requirement as prohibiting suits that are "friendly," "feigned," or "collusive in nature." *Flast*, 392 U.S. at 100. Evidence of collusion can indicate the parties are subject to common control, as discussed above. And if the parties are colluding such that their interests are really one and the same, that suggests the court's judgment may not have any meaningful effect on their respective rights and obligations. *See Lord*, 49 U.S. at 254–55; *cf. Flast*, 392 U.S. at 100 (describing the rule against collusive suits as "closely related" to the Article III standing requirement). But precedent makes clear that coordination

7

alone does not defeat adversity so long as the parties are independent and retain real, conflicting interests in the dispute such that the court could enter a meaningful judgment. *See Windsor*, 570 U.S. at 755–63.

*Carson* provides an example. There, after the district court dismissed a subset of the plaintiff's claims, the parties entered a settlement agreement under which the plaintiff would appeal the dismissed claim and dismiss his other claims with prejudice. 72 F.4th at 1268 (Jordan, J., concurring). Under the terms of the agreement, Monsanto also paid the plaintiff $100,000 and specified that if he won the appeal, it would pay him an additional sum of more than twice that amount. *Id.* The court found a live controversy remained because both parties "ha[d] a real interest in the legal positions they advance[d]" on appeal. *Id.* at 1266 (majority opinion). Despite the settlement agreement—and despite indications Monsanto was trying to manipulate the Eleventh Circuit's docket to manufacture a circuit split—the fact that the parties had conflicting "financial stake[s]" that the appeal would resolve ensured adversity continued to exist. *Id.* at 1265.

Notably, where sufficient adversity exists for purposes of Article III but the parties agree on key questions, "prudential considerations" may still counsel against hearing the case. *Windsor*, 570 U.S. at 760. Party consensus undermines the adversarial system, which "sharpens the presentation of issues," and "upon which [] court[s] so largely depend[] for illumination of difficult constitutional questions." *Baker v. Carr*, 369 U.S. 186, 204 (1962). But the absence of an adversarial presentation on a specific legal question presents a prudential concern, not an Article III defect. *Windsor*, 570 U.S. at 760; *Chadha*, 462 U.S. at 940. And courts can address the issue by appointing an *amicus* to take positions that the parties will not. *Windsor*, 570 U.S. at 760; *Chadha*, 462 U.S. at 940.

## III.   Considerations Relevant to Determining Adversity in this Case

Because this lawsuit is unprecedented, there is no blueprint for resolving how these questions should be answered. Instead, the Court must carefully weigh the facts relevant to the assessment just described, taking account of the novel context. To assist the Court in this inquiry, *amici* lay out the relevant facts as currently known and identify additional information the Court may choose to pursue to inform its resolution of the jurisdictional issue.

### A.      The Relationship Between the Parties

The Plaintiffs in this case are the President of the United States, Donald J. Trump, suing in his individual capacity; his sons, Donald Trump, Jr. and Eric Trump; and the Trump family's corporation, The Trump Organization, LLC. The Defendants in this case are the Department of the Treasury and the IRS, an executive agency that sits within Treasury.

As a baseline, when evaluating the relationship between the President and the Defendants, it is critical to note that the President enjoys a "unique position in the constitutional scheme." *Nixon v. Fitzgerald,* 457 U.S. 731, 749 (1982); *see also Trump v. Mazars USA, LLP*, 591 U.S. 848, 868 (2020) ("The President is the only person who alone composes a branch of government."); *Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020) ("The entire 'executive Power' belongs to the President alone."). The Presidency concentrates executive authority "in a single head in [w]hose choice the whole Nation has a part, making him the focus of public hopes and expectations. In drama, magnitude and finality his decisions so far overshadow any others that almost alone he fills the public eye and ear." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 653 (1952) (Jackson, J., concurring). The President's unique position, particularly with respect to other executive actors, is undoubtedly significant to the context-specific examination of control required to determine whether true adversity is present.

With respect to these Defendants specifically, the President's capacity for control is extraordinary. As a member of the President's cabinet, the Secretary of the Treasury "is and must be the President's alter ego in the matters of that department where the President is required by law to exercise authority." *Myers v. United States*, 272 U.S. 52, 133 (1926) (recognizing that cabinet officials may be removed at the will of the president). Likewise, the IRS Commissioner is appointed by the President to a five-year term, and "[t]he Commissioner may be removed at the will of the President." 26 U.S.C. § 7803(a)(1)(B), (D). And President Trump has shown he is willing to exercise that authority. In August 2025, two months after IRS Commissioner Billy Long's confirmation, President Trump removed him without providing a reason.[4]

The President also has tremendous control over the Department of Justice ("DOJ"). Like the Secretary of the Treasury, the Attorney General is a cabinet official whom the President may

---

[4]   Andrew Duehren, Alan Rappeport & Maggie Haberman, *Trump Is Removing I.R.S. Chief 2 Months After He Was Confirmed*, N.Y. Times (Aug. 8, 2025), https://www.nytimes.com/2025/08/08/us/politics/trump-billy-long-irs-commissioner.html [https://archive.ph/B4ayA].

remove at will. *Myers*, 272 U.S. at 133. Additionally, since taking office, President Trump has significantly expanded the President's oversight and control over the Attorney General and DOJ, including in ways that blur the line between fidelity to the President's policy priorities and fidelity to the President himself. For example, Executive Order 14215, titled "Ensuring Accountability for All Agencies," 90 Fed. Reg. 10447 (Feb. 18, 2025), provides that "the President and the Attorney General, *subject to the President's supervision and control*, shall provide authoritative interpretations of law for the executive branch." *Id.* § 7, 90 Fed. Reg. at 10448 (emphasis added). It also specifies that the President's "opinions on questions of law are controlling on all employees in the conduct of their official duties." *Id.*

DOJ has taken public positions consistent with that Executive Order. Then–Attorney General Pam Bondi issued memoranda to DOJ attorneys limiting their discretion and emphasizing that they must act consistently with the President's priorities and legal views. In a February 5, 2025 memorandum, she stated that when DOJ attorneys "refuse to advance good-faith arguments by declining to appear in court or sign briefs," they "undermine[] the constitutional order and deprive[] the President of the benefit of *his lawyers*" and may face consequences.[5] In public statements, the Attorney General expressed an expectation that DOJ attorneys demonstrate personal loyalty to President Trump.[6] In legal filings, the current administration has taken the position that it has unreviewable authority to terminate high-level officials deemed insufficiently aligned with the Executive. *See* Transcript of Oral Argument at 5:9–12, *Trump v. Slaughter*, No. 25-332 (U.S. Dec. 8, 2025) ("We don't believe there are permissible restrictions on [removal of] principal officers of the United States who exercise the executive power."). Some terminations of DOJ attorneys have already occurred on this basis.[7]

---

[5]  Memorandum from Pamela Bondi, U.S. Att'y Gen., General Policy Regarding Zealous Advocacy on Behalf of the United States (Feb. 5, 2025) (emphasis added).

[6]  *See* Ken Dilanian, *Pam Bondi reshapes the DOJ around Trump's priorities*, NBC News (Mar. 14, 2025), https://www.nbcnews.com/politics/justice-department/s-trumps-justice-department-now-rcna195289 [https://perma.cc/354A-JGWL] (quoting then–Attorney General Bondi's statement in an interview that DOJ lawyers perceived to "despise Donald Trump" would be "root[ed] out" and "will no longer be employed").

[7]  Evan Perez, *Justice Department fires immigration lawyer who argued case of mistakenly deported man*, CNN Politics (Apr. 15, 2025), https://www.cnn.com/2025/04/15/politics/doj-fires-immigration-lawyer-who-argued-abrego-garcia-case-source-says [https://perma.cc/J2E4-

There is also reason to believe that the President is, in fact, exercising his control over the Defendants in this litigation. President Trump's own statements suggest that he believes he has control over the Defendants and the DOJ lawyers charged with defending this case. On January 31, 2026, two days after President Trump filed the Complaint, a reporter asked him, "what it's like to be on both sides of a lawsuit."[8] He responded, "It's very interesting. I have another one where, you know, I virtually won the Mar-a-Lago break-in suit, and, you know, I have to work out some kind of a settlement. I'm supposed to work out a settlement with myself."[9] When asked on February 4, 2026 whether he could direct the Attorney General and the Treasury Secretary to pay him, President Trump responded: "[W]hat I would do, tell 'em to pay me, but I'll give 100% of the money to charity. I don't want any of that money."[10]

The contrast between Defendants' conduct here and the government's conduct in related litigation also suggests that the President may have control over DOJ's litigation conduct. The parties are engaged in settlement negotiations in this case, *see* Dkt. No. 40, even though DOJ has asserted substantial defenses in other cases stemming from Mr. Littlejohn's disclosures of tax information—including cases litigated during President Trump's current term. For example, DOJ has argued that, because Mr. Littlejohn was a government contractor rather than an officer or employee of the United States, sovereign immunity was not waived. *See* Mot. to Dismiss 1, *Safe*

---

SVM5] (attorney terminated after conceding an error); Sam Levine, *Federal prosecutor in Virginia fired after refusing to lead Comey case*, The Guardian (Jan. 12, 2026), https://www.theguardian.com/us-news/2026/jan/12/us-attorney-virginia-fired-james-comey [https://perma.cc/3RJ7-2RZY] (attorney terminated after declining to lead a prosecution sought by President Trump).

[8] Forbes Breaking News, *'I'm Supposed To Work Out A Settlement With Myself': Trump Addresses Lawsuit Against IRS*, at 00:20–00:23 (YouTube, Feb. 1, 2026), https://youtu.be/wxyTtLB1USY.

[9] *Id.* at 00:23–00:34; *see also* Devlin Barrett & Tyler Pager, *Trump Said to Demand Justice Dept. Pay Him $230 Million for Past Cases*, N.Y. Times (Oct. 21, 2025), https://www.nytimes.com/2025/10/21/us/politics/trump-justice-department-compensation.html [https://archive.ph/8YS9I] (describing President Trump's claims against DOJ).

[10] *Read the full transcript: President Donald Trump interviewed by 'NBC Nightly News' anchor Tom Llamas*, NBC News (Feb. 4, 2026), https://www.nbcnews.com/politics/trump-administration/trump-interview-nbc-news-extend-transcript-tom-llamas-super-bowl-2026-rcna257410 [https://perma.cc/T4SR-KVZH].

11

*Harbor Int'l, LLC v. IRS*, No. 25-cv-139 (D. Md. July 23, 2025), Dkt. No. 31; Mot. to Dismiss 6, *Griffin v. IRS*, No. 22-cv-24023 (S.D. Fla. Nov. 27, 2023), Dkt. No. 58. In both cases, a district court denied the government's motions to dismiss on that basis. *Safe Harbor Int'l LLC v. Booz Allen Hamilton*, 2026 WL 900051, at *9–11 (D. Md. Apr. 2, 2026); *Griffin v. IRS*, 730 F. Supp. 3d 1312, 1318 (S.D. Fla. 2024) (Scola, J.). But DOJ has continued to proactively assert this defense in the case that remains pending. *See* Answer ¶ 37, *Safe Harbor Int'l, LLC v. IRS*, No. 25-cv-139 (D. Md. Apr. 22, 2026), Dkt. No. 68.

DOJ has also successfully argued in a related case that the plaintiff's Privacy Act claim failed because he did not sufficiently plead damages traceable to any alleged violation of the Act. *Griffin*, 730 F. Supp. 3d at 1321. Similar defenses appear facially plausible here: The $10 billion in damages sought may not be recoverable under § 7431(c) even if the Court were to find in Plaintiffs' favor.[11] In addition to these potential defenses, other *amici* have noted that the claims here may be time-barred under 26 U.S.C. § 7431(d) because they are based on conduct that occurred more than two years ago. *See* Compl. ¶¶ 73–75; Former Officials' Brief 7–9. Although Defendants' failure to assert these defenses would be appropriate if, in the exercise of independent litigation judgment, Defendants and their attorneys determined that an early settlement was in the government's best interest, and if they were engaging in arm's-length negotiations to achieve that outcome, the circumstances raise the specter that Defendants and their attorneys may instead be operating at the President's direction.

Although President Trump sues here in his individual rather than official capacity, that does not affect the control analysis. The personal nature of the lawsuit is a notable point of distinction from *United States v. Nixon*, where the Supreme Court treated the dispute as one between the Special Counsel and the President in his official capacity. *See* 418 U.S. at 697 (characterizing the suit as between two "officers of the Executive Branch"). But as discussed in Part II, *supra*, the inquiry into the relationship between the nominal parties is a practical and functional one that looks beneath the formalities of the caption to examine one party's *capacity* to exercise control over the other. *See, e.g.*, *Interstate Com. Comm'n*, 337 U.S. at 430 (observing that "courts must look behind names that symbolize the parties"). Whether President Trump sues in his individual or official capacity, he remains the President of the United States and holds the

---

[11] *See* Br. of Amici Curiae Former Government Officials and Public Interest Organizations 6–17, Dkt. No. 33 ("Former Officials Brief").

power of that office. *See Mazars*, 591 U.S. at 868 ("The President is the only person who alone composes a branch of government. As a result, there is not always a clear line between his personal and official affairs."); *Seila Law*, 591 U.S. at 213 ("The entire 'executive Power' belongs to the President alone."). And the fact that President Trump is a Plaintiff in his personal capacity does not diminish his ability to control the Defendants here in his official capacity as President; rather, President Trump enjoys ample actual and practical authority to control the Defendants. These indications of control are in stark contrast with *Nixon*, where the legal and practical independence of the Special Prosecutor, enshrined in regulation and evidenced by the litigation conduct of the parties, was central to the Supreme Court's decision that the dispute before it was justiciable.

Beyond the question of the relationship between the President and the Defendants, the presence of other plaintiffs, aside from the President, also bears consideration. The inclusion of additional parties can create adversity. In *Interstate Commerce Commission*, for example, the Supreme Court found Article III jurisdiction in part because, notwithstanding the appearance of the same executive official on both sides of the dispute, private intervenors were "the real parties in interest." 337 U.S. at 432. They were "authorized to interpose all defenses to the Government's charges and claims" and had "vigorously defended the legality of the allowances and the validity of the Commission order at every stage of the litigation." *Id.*; *see also Hard Yaka*, 2025 WL 3171638, at *4 (dismissing claims between non-adverse parties on jurisdictional grounds but considering plaintiffs' separate claims against genuinely adverse intervening defendants on the merits).

For at least two reasons, it is not clear that the presence of the additional plaintiffs in this matter should have a similar effect. First, the other plaintiffs in this dispute may not be wholly independent from the President. The complaint does not distinguish among their interests or present separate claims capable of clear division. And the record does not provide any basis for determining whether the separately named plaintiffs are functionally subject to one *dominus litis*—like the entities in *S. Spring Hill Gold-Min. Co.*, 145 U.S. at 301, and similar cases cited in Part II, *supra*. Second, and perhaps most critically, unlike in *Interstate Commerce Commission*, the additional parties here are plaintiffs rather than defendants. Their participation in the lawsuit thus does not ensure that the Plaintiffs' claims will be subjected to a "vigorous[] defen[se]" in the

13

same way that the participation of an independent defendant would. *Interstate Com. Comm'n*, 337 U.S. at 432.

### B.      The Effect of the Court's Order

The second key question is whether this Court could enter an order in this case that has "real meaning" for the parties. *Windsor*, 570 U.S. at 758 (citation omitted). The Court likely needs to reach this question only if it concludes that the President does not have sufficient control over the Defendants; otherwise, the nature of the parties' relationship would, in itself, defeat adversity. *See, e.g.*, *Johnson*, 319 U.S. at 303–05 (dismissing case for lack of adversity because defendant had financed plaintiff's suit even though defendant refused to pay plaintiff damages); *E. Tenn., Va. & Ga. R.R. Co. v. S. Tel. Co.*, 125 U.S. 695, 695–96 (1888) (dismissing appeal where the same party controlled both sides of the litigation even though defendant had refused to relinquish the disputed right-of-way without a court order).

Based on the course of the litigation so far, it remains possible that the Court's order could have concrete effect. Defendants have not yet taken a position on whether they will pay damages. If they refuse to do so, that would leave the Court with an issue to adjudicate, even if Defendants would "welcome" a judgment in the President's favor or agree with his position on some or all the underlying issues. *Windsor*, 570 U.S. at 758–59; *see also Chadha*, 462 U.S. at 939. In that situation, as in *Windsor*, a judgment in this case would "order[] the United States to pay money that it would not disburse but for the court's order," and the President's "ongoing claim for funds that the United States refuses to pay" would thus "establish[] a controversy sufficient for Article III jurisdiction." 570 U.S. at 758.

Accordingly, to the extent the Court reaches this part of the analysis, the adversity inquiry likely cannot be concluded at this time. At this early stage, it is insufficiently clear that the Court would be unable to enter an order with real effect. Defendants have not taken any positions in this litigation yet. This case was filed on January 29, 2026. To date, the only public engagement from the parties has been Plaintiffs' (admittedly unusual) step of filing of a request for an extension of time for Defendants to answer or move to dismiss, which referenced ongoing settlement negotiations. Dkt. No. 40. Because Defendants have not yet indicated whether they will defend against this suit and how, any effort to conclusively evaluate whether this Court can enter a meaningful order would be premature.

14

If the Court allows the case to proceed, it may choose to seek the input of an *amicus* on the merits. As discussed above, so long as the dispute remains adverse in an Article III sense, the Court is well within its power to appoint an *amicus* to argue points the parties do not dispute. Notably, however, if the Court concludes that adversity is lacking—either at the outset or later on, based on parties' future litigation conduct—appointment of an *amicus* would not cure that deficiency. Article III "demands that an 'actual controversy' persist throughout all stages of litigation." *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013) (citation omitted). And the participation of an actor with no "direct stake in the outcome" cannot supply adversity, even if they undertake to represent the public interest. *Id.* at 705–06 (citation omitted). Under that reasoning, appointment of an *amicus* to argue Defendants' position—without statutory authorization, without institutional position, without a client, and without authority to settle, appeal, or bind anyone—could not cure any Article III deficiency resulting from the absence of adversity between the parties.[12]

### C.        Potential Additional Areas of Inquiry

Given the Court's ongoing, independent obligation to examine its jurisdiction, it is well within the Court's authority to develop a further factual record to address the questions raised by *amici*. *See Hatfield*, 184 U.S. at 165, 168 (1902) (remanding for fact-finding on suspicion that "the plaintiff has been controlling the litigation on both sides").

Because the relationship between the parties is essential to the adversity inquiry, it could be useful for the Court to obtain additional information about the degree to which Defendants and their lawyers are insulated from the President. The Court might request information from the parties about what measures, if any, they have taken to ensure that Defendants and the DOJ lawyers assigned to this case are free to exercise independent litigation judgment and act solely in the best interests of Defendants. It is particularly important to evaluate whether they have any protection if they take steps that could result in the defeat of the President's claims. Any such measures must be considered against the backdrop of the President's public assertions of direct control over the government defendants and their attorneys, as well as his previous public statements regarding his control over this particular matter.

---

[12]  Undersigned *amici* understand that their assigned task is to address the question of subject matter jurisdiction, not to identify or argue defenses to the Complaint.

The Court may also wish to inquire into the independence of the other Plaintiffs aside from the President. To the extent this Court finds their participation relevant, it may wish to determine whether the President and his co-plaintiffs have distinct interests in this litigation or whether the President is the real party in interest. The Court might also seek information about whether the President retains any control over or interest in The Trump Organization, LLC, in case its presence in the suit poses the same or similar adversity problems as his own.

The Court may consider further inquiring into the circumstances surrounding Defendants' litigation conduct to determine whether the atypical treatment of this case can be attributed to some factor other than the President's ability to control Defendants. The Court might ask why DOJ's approach to litigating this case appears to depart from its approach in similar cases, as well as what steps Defendants are taking to ensure that settlement discussions are conducted at arm's length and without risk of collusion. The Court may also find it appropriate to inquire whether, if the parties settle this suit, DOJ intends to comply with applicable regulatory requirements and to account for limitations on the relief available under the causes of action asserted. *See, e.g.*, U.S. Dep't of Just., Just. Manual § 1-18.200, 28 C.F.R. § 50.23(a) ("[I]n any civil matter in which the Department is representing the interests of the United States or its agencies, it will not enter into final settlement agreements or consent decrees that are subject to confidentiality provisions, nor will it seek or concur in the sealing of such documents."); 26 U.S.C. § 7431(c) (providing only for damages, costs and fees); 5 U.S.C. § 552a (providing for damages and limited forms of equitable relief); 26 U.S.C. § 7217(a) (making it unlawful for executive officials "to request, directly or indirectly, any officer or employee of the Internal Revenue Service to conduct or terminate an audit or other investigation of any particular taxpayer with respect to the tax liability of such taxpayer").

## **CONCLUSION**

*Amici* remain at the Court's disposal to provide additional analysis of issues raised in the parties' submissions or by other developments in the case.

16

Dated:    May 14, 2026

Respectfully submitted,

SELENDY GAY PLLC

By:    /s/ *Faith E. Gay*

Faith E. Gay (Fla. Bar #129593)
Philippe Z. Selendy* (N.Y. Bar #2630598)
Corey Stoughton* (N.Y. Bar #4152633)
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY  10104
Tel: 212-390-9000
fgay@selendygay.com
pselendy@selendygay.com
cstoughton@selendygay.com

John Gleeson* (N.Y. Bar #1820992)
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY  10001
Tel: 212-909-6000
jgleeson@debevoise.com

David A. O'Neil* (D.C. Bar #1030615)
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Ave. NW
Washington, DC  20004
Tel: 202-383-8000
daoneil@debevoise.com

Donald B. Verrilli, Jr.* (D.C. Bar #420434)
MUNGER TOLLES & OLSON LLP
601 Massachusetts Ave. NW, Suite 500 E
Washington, DC  20001
Tel: 202-220-1100
donald.verrilli@mto.com

*Court-Appointed Amici Curiae*

* *pro hac vice* application forthcoming

17