**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 26-20609-CV-WILLIAMS**

PRESIDENT DONALD J. TRUMP, *et al.*,

      Plaintiffs,

v.

INTERNAL REVENUE SERVICE, *et al.*,

      Defendants.

_____/

## **ORDER**

**THIS MATTER** is before the Court on Plaintiffs' response to the Court's May 29, 2026, Order on the non-party movants' Motion for Relief from Judgment or Order, or, in the Alternative, for Leave to Appear as *Amici Curiae* (DE 89).[1]

On May 27, 2026, thirty-five non-party movants filed a Motion for Relief from Judgment or Order (DE 63), in which they requested this Court to set aside its dismissal pursuant to Rule 60 because the case, and its purported settlement, is "a fraud on the Court." (*Id.* at 6). The non-party movants highlighted the atypical way the litigation had unfolded and argued that the purported settlement reached in this matter "is a product of collusion." (*Id.* at 9). In light of those serious allegations and the Court's own view of the unusual circumstances of the case, the Court entered an Order on May 29, 2026, (the "***May 29 Order***") (DE 65), directing Plaintiffs to detail their position as to various issues, "including (1) the charges of collusion and whether the Parties are truly adverse; (2) the assertion that the dismissal in this case was premised on deception by the Parties; and

---

[1] Throughout this Order, the Court uses the CM/ECF pagination rather than the document pagination.

(3) the question of whether the case should be reopened because the Court was the 'victim of a fraud.'" (DE 65 at 3). On June 12, 2026, Plaintiffs responded to the May 29 Order. (DE 89). The non-party movants filed a reply on June 19, 2026. (DE 94).

In the very first paragraph of the Complaint, Plaintiffs introduce their claims stating, "President Trump served as the 45th President of the United States, and is the 47th President of the United States." (DE 1 ¶ 1). They then go on to state that "President Trump brings this suit in his personal capacity." (*Id.*) After a review of the record, and the Parties' statements, the Court declines to adopt or accept the credulous exercise of divorcing President Trump's current job title from an understanding of what happened here.

But perhaps the most startling misstatement[2] advanced by Plaintiffs is their characterization of this case as "ordinary." (DE 89 at 9). The Parties here are not private actors to a mine-run dispute, recounting their proficiency in the art of the deal they negotiated. Lead Plaintiff and Defendants are public servants—the pinnacle of the Executive Branch—sworn to uphold the law, faithfully perform the duties of their office, and protect the interests of the American public. The issue before the Court is whether, instead, they ignored ethical norms, court rules, and legal authority to manipulate the judicial process. The issue is whether they did so to gild their efforts to gain unprecedented access to the public fisc with the patina of legitimacy. There is nothing "ordinary" about this case; it is the very definition of *sui generis.*

---

[2] Plaintiffs also—with no apparent sense of irony—criticize the non-party movants' political motivations, their previous disinterest in the case, and their purported inappropriate promotion of "abstract grievance[s]." (DE 89 at 10).

## I.   BACKGROUND[3]

On September 29, 2023, the Department of Justice ("*DOJ*") charged Charles Edward Littlejohn ("*Mr. Littlejohn*") with illegal disclosure of "[tax] information associated with Public Official A and thousands of the nation's wealthiest people," in violation of 26 U.S.C. § 7213(a)(1). Information, *United States v. Littlejohn*, No. 23-cr-00343, DE 1 (D.D.C. 2023).[4] It was subsequently revealed that Mr. Littlejohn worked as a contractor for Booz Allen Hamilton Inc. ("*Booz Allen*") which, in turn, maintained a contract with the Internal Revenue Service ("*IRS*") to perform certain work for the agency.[5] During his plea hearing on October 12, 2023, Mr. Littlejohn identified President Donald Trump ("*President Trump*") as the "high-ranking government official" at issue, whose tax

---

[3] The Court *sua sponte* takes judicial notice of articles reporting on relevant events attendant to this case, dockets of other cases, and statements the Parties made. *See* FED. R. EVID. 201(c); *Griffin v. Verizon Commc'ns Inc.*, 746 F. App'x 873, 876 (11th Cir. 2018) ("Courts typically take judicial notice of record documents from other judicial proceedings."). The Court incorporates these sources to provide an overview of the architecture of this litigation. Moreover, the Department of Justice has directed courts to look to unsworn public statements as binding party admissions. *See Floyd v. Dep't of Just.*, No. 26-cv-01399, DE 62 at 4, n.1 (E.D. Va. filed June 5, 2026) ("Because the Acting Attorney General's statements were recorded, this Court can take judicial notice of them.") (citing FED. R. EVID. 201(b)(2)); *see also Citizens for Resp. and Ethics in Wash. v. Dep't of Just.*, No. 26-cv-01789, DE 15 at 4, n.1 (D.D.C. filed June 5, 2026) (same). The Court will do so here.

[4] The illegal disclosures of tax information all transpired during President Trump's first term. During this period, Charles Rettig was Commissioner of the IRS and Steven Mnuchin was the Secretary of the Treasury Department. *See Nomination of Charles P. Rettig to be Comm'r of Internal Revenue, 115th Cong.* (2018), https://www.congress.gov/nomination/115th-congress/1620; *Nomination of Steven T. Mnuchin to be Sec'y of the Treasury*, 115th Cong., 1st Sess., Vote No. 63 (Feb. 13, 2017), https://www.senate.gov/legislative/LIS/roll_call_votes/vote1151/vote_115_1_00063.htm. Mr. Littlejohn's prosecution, however, was undertaken in 2023 during the administration of President Joseph R. Biden.

[5] Richard Rubin, *IRS Leaker Sought Job With Aim of Releasing Trump Tax Returns, DOJ Says*, WALL ST. J. (Jan. 16, 2024, at 22:13 ET), https://www.wsj.com/us-news/law/irs-leaker-sought-job-with-aim-of-releasing-trump-tax-returns-doj-says-93944811.

information was illegally disclosed to news organizations like the New York Times and ProPublica. *Transcript of Plea Agreement Hearing* at 10, *United States v. Littlejohn*, No. 23-cr-00343, DE 13 (D.D.C. Oct. 23, 2023). The following exchange took place during the October 12, 2023, plea colloquy:

> **THE COURT:** Before I go on to accept or not accept this plea, **are there any victims or their representatives here today** that would like to exercise their rights to be reasonably heard under the Crimes Victims' Right Act?
>
> **MS. ALINA HABBA:** Yes, Your Honor.
>
> **THE COURT:** Please come up.
>
> **MS. ALINA HABBA:** Thank you, Your Honor, for the opportunity to be heard. As an attorney, I find that I should probably state I am not licensed in this state, in the District of Columbia. **I'm here on behalf of President Trump who was a victim**, as we just heard, of this atrocity.

*Id.* at 14.

On January 29, 2024, Mr. Littlejohn was sentenced to sixty months of incarceration, followed by thirty-six months of supervised release. *See United States v. Littlejohn*, No. 23-cr-00343, DE 35.

Subsequent to Mr. Littlejohn's disclosures, various parties sued Mr. Littlejohn, Booz Allen, the IRS, and the United States Department of the Treasury ("***Treasury Department***") for damages pursuant to 26 U.S.C. § 7431.[6] This statute confers a private right of action on individuals whose tax returns were improperly inspected or disclosed. *See* 26 U.S.C. § 7431. However, any action arising under this statute must be brought "within 2 years after the date of discovery by the plaintiff of the unauthorized inspection

---

[6] These cases include: (1) *Griffin v. Internal Revenue Serv.*, No. 22-cv-24023 (S.D. Fla. filed Dec. 13, 2022); (2) *Warren v. Booz Allen Hamilton, Inc.*, No. 24-cv-01252 (D. Md. filed Apr. 29, 2024); (3) *Safe Harbor Int'l, LLC v. Internal Revenue Serv.*, No. 25-cv-00139 (D. Md. filed Jan. 14, 2025); and (4) *Scott v. Booz Allen Hamilton, Inc.*, 26-cv-00845 (M.D. Fla. filed Mar. 23, 2026).

or disclosure." 26 U.S.C. § 7431(d). The statute provides for damages, including "$1,000 for each act of unauthorized inspection or disclosure[.]" 26 U.S.C. § 7431(c)(1). In these actions, where the IRS or Treasury Department was named as a party, the DOJ zealously defended the government by challenging the timeliness of the plaintiffs' claims; disputing whether damages had been correctly calculated; and denying that the government could be held liable under § 7431 because the unlawful disclosures at issue were made by "a [Booz Allen] employee working on IRS contracts," and not an officer or employee of the United States. United States' Mot. To Dismiss, *Safe Harbor Int'l, LLC v. Internal Revenue Serv.*, No. 25-cv-00139, DE 31 (D. Md. filed July 23, 2025). In every case naming the government as a defendant, the DOJ engaged in a vigorous defense.[7]

That is, every case until the instant litigation.

This Complaint was filed on January 29, 2026—two years and three months after Ms. Habba's appearance at Mr. Littlejohn's plea hearing—by Plaintiffs President Trump ("***Lead Plaintiff***"), Donald J. Trump Jr., Eric Trump, and The Trump Organization, LLC (collectively, "***Plaintiffs***") against the IRS and the Treasury Department (collectively, "***Defendants***" or "***Government***"). Because Defendants are government agencies, they are afforded sixty days from the date that the United States Attorney was served to file an answer or responsive pleading. *See* FED. R. CIV. P. 12(a)(2). However, on April 17, 2026, three days before the sixty-day period lapsed, Plaintiffs filed a Consent Motion for a 90-day Extension ("***Consent Motion***") to relieve Defendants of their obligation to file a responsive pleading to the Complaint "while the Parties engage[d] in discussions

---

[7] In two related cases, the IRS and Treasury Department were not named as parties. *See, e.g.*, *Warren v. Booz Allen Hamilton, Inc.*, No. 24-cv-01252 (D. Md. filed Apr. 29, 2024); *MacNeil v. Booz Allen Hamilton, Inc.*, No. 25-cv-00963 (D. Md. filed Mar. 24, 2025).

designed to resolve this matter and avoid protracted litigation." (DE 40 at 2). The Consent Motion also represented that Daniel Epstein, co-counsel for Plaintiffs, conferred with counsel for Defendants, and Defendants consented to the requested extension. (DE 40 at 3). Counsel for Defendants was not identified. Other than the Complaint and Notice of Voluntary Dismissal, this was the only pleading filed by any party in this matter before dismissal.[8]

At this point, because the Court had serious concerns about whether it had subject matter jurisdiction in a case where the Lead Plaintiff ostensibly had direct, unassailable control over Defendants, it ordered the Parties to file memoranda of law on this issue by May 21, 2026. (DE 41). The Court then appointed *amici curiae* "to assist the Court in identifying the applicable law governing an analysis" of its subject matter jurisdiction. (DE 43). The *amici* were also directed to file a memorandum of law by May 21, 2026. (*Id.*) On May 14, 2026, the court-appointed *amici* filed their memorandum. (DE 45). Neither Party to this action, however, filed any pleading to address the Court's concerns.

Instead, on May 18, 2026, Plaintiffs filed a two-page Notice of Voluntary Dismissal with Prejudice ("**Notice of Dismissal**") (DE 52), where Plaintiffs stressed that the Notice of Dismissal automatically divested the Court of jurisdiction.[9] Subsequently, the DOJ

---

[8] The Court notes that various non-parties have filed motions to appear as *amici curiae*. For example, on February 5, 2026, one week after the Complaint was filed, a Motion for Leave to File Brief as *Amici Curiae* was filed by Former Government Officials and Public Interest Organizations. (DE 7). On February 12, 2026, another Motion for Leave to file a Brief as *Amici Curiae* was filed by Citizens for Responsibility and Ethics in Washington and Public Citizen. (DE 15). Because the latter motion indicated that, based on conferral, Plaintiffs were opposed to the motion, the Court entered an order giving Plaintiffs two weeks, until February 25, 2026, to file a memorandum in opposition. (DE 27). No opposition was filed, however, and the motions were granted by default. (DE 28).

[9] Plaintiffs argued that "a Rule 41(a)(1)(A) dismissal is self-executing, terminates the action upon filing, and divests the district court of jurisdiction" and stated that "the [N]otice

issued a press release about a "settlement" that had been reached in this matter, and published what purported to be the "settlement agreement" (the "***settlement agreement***") signed by lawyers for both Plaintiffs and Defendants.[10] In this document, the Parties referenced the instant litigation and claimed that, "[i]n the interest of resolving the dispute between the parties," they stipulated and agreed to certain terms, which included "a formal apology from the United States" to Plaintiffs, along with the creation of an "Anti-Weaponization Fund."[11] The Anti-Weaponization Fund, ostensibly set up "to provide a systematic process to hear and redress claims of [individuals] who suffered weaponization and lawfare," was to be financed by the Treasury Department's Judgment Fund in the amount of $1.776 billion dollars.[12]

The day after the dismissal, Acting Attorney General Todd Blanche testified before Congress.[13] In response to a question as to why the "settlement agreement" had not been

---

does not require judicial action." (DE 52 at 1). They emphasized that "no judicial analysis is appropriate." (*Id.* at 2).

[10] *Settlement Agreement, Trump v. Internal Revenue Serv.*, U.S. DEP'T OF JUSTICE (May 18, 2026), https://www.justice.gov/opa/media/1441201/dl?inline. At the same time that the DOJ publicized the "settlement agreement," the Treasury Department's General Counsel, Brian Morrissey, announced his resignation. Andrew Duehren, *Top Treasury Lawyer Resigns After Creation of 'Anti-Weaponization Fund'*, N.Y. TIMES (May 18, 2026), https://www.nytimes.com/2026/05/18/business/anti-weaponization-fund-brian-morrissey-treasury.html.

[11] *Id.*

[12] Press Release, U.S. Dep't of Justice, *Justice Department Announces Anti-Weaponization Fund* (May 18, 2026), https://www.justice.gov/opa/pr/justice-department-announces-anti-weaponization-fund. The Court notes that the DOJ previously established a "Weaponization Working Group" in February 2025. Memorandum from the Att'y Gen. to All Dep't Emps., *Restoring the Integrity and Credibility of the Department of Justice* (Feb. 5, 2025), https://www.justice.gov/ag/media/1388506/dl?inline.

[13] *A Review of the President's Fiscal Year 2027 Budget Request for the Department of Justice: Hearing Before the Subcommittee. on Commerce, Justice, Sci., & Related Agen-*

provided to this Court for review, he replied that "there is no judge" because the case had been dismissed and, therefore, there was "no mechanism" for reviewing the "settlement agreement."[14] On that same day, Acting Attorney General Blanche issued an "order" (the "**Release Order**") which referenced the "settlement agreement" and released the President, his relatives, companies, and affiliates from "any and all claims, counterclaims, [and] causes of actions" that "have been or could have been asserted" against Plaintiffs that arise out of "(1) any matters that were raised or could have been raised in the Case or the Pending Agency Claims; (2) Lawfare and/or Weaponization; (3) any matters currently pending or that could be pending (including tax returns filed before the Effective Date) before Defendants or other agencies or departments."[15] Unlike the "settlement agreement," which was signed by purported representatives of both Plaintiffs and Defendants, only Acting Attorney General Blanche's signature was on the Release Order.[16] Also on that day, it was reported that IRS officials had prepared a 25-page memorandum[17] that outlined major flaws with Plaintiffs' claims and listed the various

---

*cies of the S. Comm. on Appropriations*, 119th Cong. (2026) (statement of Todd Blanche, Acting Att'y Gen., U.S. Dep't of Justice), https://www.appropria-tions.senate.gov/hearings/a-review-of-the-presidents-fiscal-year-2027-budget-request-for-the-department-of-justice.

[14] *Id.*

[15] Order of the Att'y Gen., U.S. Dep't of Justice (May 19, 2026), https://www.justice.gov/opa/media/1441216/dl.

[16] *Id.*

[17] Andrew Duehren, *The IRS Thought It Could Fight Trump's Lawsuit, but It Reached a Deal Anyway*, N.Y. TIMES (May 19, 2026), https://www.ny-times.com/2026/05/19/admin/irs-trump-lawsuit-deal.html. The actual memorandum has yet to be published by the Government.

defenses that could be advanced on behalf of Defendants, defenses that had been raised in other litigation arising from the disclosures.[18]

On June 2, 2026, in testimony before the United States House of Representatives, Acting Attorney General Blanche advised that the Anti-Weaponization Fund would not be moving forward.[19] He did not, however, commit to a similar termination of the audit and immunity protections set forth in his Release Order. Six days later, President Trump nominated Mr. Blanche to permanently serve as Attorney General of the United States.

## II.    DISCUSSION

As it must, the Court begins with jurisdiction. *See Leedom Mgmt. Grp., Inc. v. Perlmutter*, 532 F. App'x 893, 895 (11th Cir. 2013) (explaining that courts must "always address threshold jurisdictional issues first, since [a court] cannot reach questions that [it] never had jurisdiction to entertain."). Typically, a voluntary dismissal filed under Rule 41(a) divests the court of its jurisdiction over the merits of a case. *See Anago Franchising, Inc. v. Shaz, LLC*, 677 F.3d 1272, 1278 (11th Cir. 2012); *see also Absolute Activist Value Master Fund v. Devine*, 998 F.3d 1258, 1266 (11th Cir. 2021) (citations and quotation marks omitted). But a voluntary dismissal does not deprive the court of authority to resolve issues collateral to the merits. *Absolute Activist Value Master Fund*, 998 F.3d at 1266. Among these collateral issues are those relating to Rule 11 sanctions. *Id.* (noting that "it

---

[18] The Court notes that in a subsequent response to a Freedom of Information Act request by Citizens for Responsibility and Ethics in Washington, the DOJ stated that there were no "responsive records within the Civil Division pertaining to [this litigation]." Letter from Brian Flannigan, Div. Couns. for Recs. & Info., Civ. Div., U.S. Dep't of Just., to Kayvan Farchadi, Citizens for Resp. & Ethics in Wash. (June 3, 2026).

[19] Hailey Fuchs & Jordain Carney, *Anti-Weaponization Fund Is Dead, Acting AG Says*, POLITICO (June 2, 2026), https://www.politico.com/news/2026/06/02/todd-blanche-anti-weaponization-fund-00947083. As the article notes, Acting Attorney General Blanche refused to commit to the termination of the Anti-Weaponization Fund in writing.

is clear that even when a voluntary dismissal disposes of an entire action, district courts retain jurisdiction to consider at least five different types of collateral issues: costs, fees, contempt sanctions, Rule 11 sanctions, and motions to confirm arbitral awards."); *see also Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395 (1990) ("As the violation of Rule 11 is complete when the paper is filed, . . . a voluntary dismissal does not expunge the Rule 11 dismissal.") (citations and quotation marks omitted).

"Although [the Eleventh Circuit] call[s] these issues 'collateral,' that doesn't make them any less important." *Hyde v. Irish*, 962 F.3d 1306, 1309 (11th Cir. 2020). "Many involve the power to enforce compliance with the rules and standards that keep the judiciary running smoothly." *Id.* Indeed, "[w]ithout them, abuses of the judicial system would go unchecked, burdening courts and individuals alike with needless expense and delay." *Id.* (quotation marks omitted). "And that's not just a matter of procedure." *Id.* Consequently, the Court will examine the matters raised in the non-parties' motion under the rubric of Rule 11 because the issues are collateral and their resolution is essential to assuring the integrity of the Court's jurisdiction and process. *See id.* (explaining that a court retains jurisdiction over collateral matters to "ensure that justice is done."); *Baker v. Alderman*, 158 F.3d 516, 523 (11th Cir. 1998) ("Rule 11 motions are collateral to an action and are not barred if filed after a dismissal order, or after entry of judgment.").

In order to examine whether Plaintiffs brought this case for an improper purpose, the Court must consider and "inevitably decide" the question posed to the Parties in its April 24, 2026, Order: is there a case or controversy presented in this litigation. *See Comparelli v. Republica Bolivariana De Venezuela*, 891 F.3d 1311, 1328 (11th Cir. 2018) ("We recognize that merits and jurisdiction will sometimes come intertwined . . .  If . . . the

district court's resolution of the jurisdictional questions . . . requires it to inevitably decide some, or all, of the merits issues, so be it.") (quoting *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 178 (2017)) (quotation marks omitted). Although jurisdiction ordinarily precedes the merits, a court may consider both where, as here, jurisdiction overlaps with the merits. *See Brownback v. King*, 592 U.S. 209, 217 (2021) (explaining that "the merits and jurisdiction will sometimes come intertwined, and a [district] court can decide all . . . of the merits issues in resolving a jurisdictional question, or vice versa.") (citations and quotation marks omitted); *Gutrejman v. United States*, 596 F. Supp. 3d 1, 8 (D.D.C. 2022) ("[T]he Court must resolve a jurisdictional defense . . . before resolving the two merits defenses . . . , but the Court's resolution of that jurisdictional defense will require the Court to address the merits as well."); *Jakubowicz v. Islamic Rep. of Iran*, No. 18-1450, 2022 WL 3354719, at *7 (D.D.C. Aug. 9, 2022) (addressing both standing and the merits and noting that "it is not uncommon for courts to consider jurisdiction and the merits together"); *Force v. Islamic Rep. of Iran*, 464 F. Supp. 3d 323, 361 (D.D.C. 2020) ("Although courts must, in general, resolve jurisdictional questions before reaching the merits, in the present context, the questions of jurisdiction and the merits merge. The jurisdictional test and the federal cause of action are, in relevant respects, the same[.]") (citation omitted).

## A. *Justiciability: Case or Controversy*

"Judicial Power . . . is the power of a court to decide and pronounce a judgment and carry it into effect between . . . parties who bring a case before it for decision." *Muskrat v. United States*, 219 U.S. 346, 356 (1911) (citation and quotation marks omitted). Article III, Section 2 of the United States Constitution confines judicial power to matters that

present a case or controversy. U.S. CONST. art. III, § 2, cl. 1. This precept exists as the defining principle for the federal judiciary. *See Lord v. Veazie*, 49 U.S. 251, 255 (1850)*; see also Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 239–41 (1937). Indeed, the Framers, relying on their knowledge of English law and practice, did not intend for Article III to empower federal judges to hear every possible dispute brought before them.[20] Thus, the terms "case" and "controversy" mark the threshold of federal judicial power.

The case or controversy requirement imposes two important limitations on the federal judiciary. First, the requirement limits "the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process." *Flast v. Cohen*, 392 U.S. 83, 95 (1968). Second, the requirement ensures that "the federal courts will not intrude into areas committed to the other branches of government." *Id*. at 95. "Federal judicial power is limited to those disputes which confine federal courts to a rule consistent with a system of separated powers and which are traditionally thought to be capable of resolution through the judicial process." *Id*. at 97. "Whenever the claim or contention of a party takes such a form that the judicial power is capable of acting upon it, then it has become a case [or] controversy." *Smith v. Adams*, 130 U.S. 167, 173–74 (1889).

---

[20] *See* CONST. ANNOTATED, art III, § 1.2, *Historical Background on Judicial Review*, https://constitution.congress.gov/browse/essay/artIII-S2-C1-2/ALDE_00001243/ (last visited on July 13, 2026) (discussing three occurrences in 1787 where the Framers declined to expand federal judiciary power).

### 1.  Adverseness is a Prerequisite to Article III Jurisdiction.

The "judicial power conferred by the Constitution" grants the federal judiciary "the right to determine actual controversies arising between **adverse litigants**, duly instituted in courts of proper jurisdiction." *Muskrat*, 219 U.S. at 361 (emphasis added). A justiciable controversy "must be definite and concrete, touching the legal relations of parties having adverse legal interests." *Aetna Life Ins. Co. of Hartford, Conn.*, 300 U.S. at 240–41. Adverseness is essential to a federal court's ability to adjudicate the merits of a case where federal courts are restricted to "questions presented in an adversary context[.]" *GTE Sylvania, Inc. v. Consumers Union of the United States, Inc.*, 445 U.S. 375, 382 (1980) (noting that adverseness "sharpens the presentation of issues"). Indeed, "[e]ven when Article III permits the exercise of federal jurisdiction, prudential considerations demand that the Court insist upon 'that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'" *United States v. Windsor*, 570 U.S. 744, 760 (2013) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).[21]

---

[21] In *Windsor*, the United States refused to pay the plaintiff a real estate tax refund due to § 3 of the Defense of Marriage Act's definition of marriage, despite acquiescing to the plaintiff's position that § 3 of the Act was unconstitutional. 570 U.S. at 753, 756. As the Court reasoned, "Windsor's ongoing claim for funds that the United States refuses to pay thus establishes a controversy sufficient for Article III jurisdiction." *Id.* at 758. Plaintiffs fail to acknowledge that there was a controversy in *Windsor* precisely because the plaintiff did not control the actions of the defendant, as Lead Plaintiff does here, and therefore could not secure the refund to which she was entitled. *See infra* pp. 17–38. Here, Plaintiffs do have the ability to control the "stakes" of the litigation and determine whether Defendants can or will give Plaintiffs the relief they seek independent of a judicial determination or statutory amendment. The decision in *Windsor* addressed the argument of when adverseness ceases and not whether adverseness exists as a threshold matter due to the relationship of the parties.

For more than a century, the Supreme Court has recognized the adverseness requirement. *See Veazie*, 49 U.S. at 255. In *Veazie,* a defendant, and his brother-in-law entered into a contract to institute a lawsuit that would procure a favorable court opinion as to land rights. *Id*. at 254. After examining the record, the *Veazie* court determined that there was no real conflict of interest between the parties because their interests regarding the issue of law were "one and the same[.]" *Id.* In fact, the *Veazie* court declared that "any attempt, by a mere colorable dispute, to obtain the opinion of the court upon a question of law which a party desires to know for his own interest or his own purposes, when there is no real and substantial controversy between those who appear as adverse parties to the suit, is an abuse which courts of justice have always reprehened [sic], and treated as a punishable contempt of court." *Id*. at 255. *Veazie* recognized that even where parties may work together to avoid the expense of litigation, there still must be a "real dispute between the parties concerning some matter of right." *Id.*

The Supreme Court repeated and reinforced the adverseness requirement in *Muskrat*. In *Muskrat*, several plaintiffs endeavored to halt the enforcement of legislation that affected their land rights. 219 U.S. 346, 349 (1911). The plaintiffs initiated the suit at the behest of Congress who authorized the plaintiffs to sue the United States on behalf of themselves and others with similar interests. *Id*. at 350. Aware of Congress's acquiescence to the suit, the *Muskrat* court nonetheless questioned its jurisdiction to entertain the proceeding. *Id*. at 351. The court there noted that "[t]he term ['case'] implies the existence of present or possible adverse parties, whose contentions are submitted to the court for adjudication." *Id*. at 357. After examining precedent establishing the limits of judicial power, the *Muskrat* court determined that the parties did not present a case or

controversy as contemplated under the Constitution. *Id*. The Supreme Court was not persuaded by the fact that the United States was named as a party defendant where the government did not have an interest adverse to the plaintiffs. *Id*. As a result, the Court held that, without sufficient adverseness between the parties, the action presented "no justiciable controversy" to be determined by the court. *Id*. at 363.

The decisions in *Veazie* and *Muskrat* establish beyond cavil that adverseness between litigants is a constitutional minimum that must be satisfied in every federal case seeking judicial determination. "[T]here is no Art. III case or controversy when the parties desire 'precisely the same result[.]'" *GTE Sylvania, Inc.*, 445 U.S. at 383 (quoting *Moore v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 47, 48 (1971)); *see also NLRB v. Constellium Rolled Prod. Ravenswood, LLC*, 44 F. 4th 395, 398 (4th Cir. 2022) (finding that the parties lacked adverseness where any judicial determination by the court "would only rubberstamp an agreement that the parties memorialized in writing and consummated before ever arriving on a federal court's doorstep"). Moreover, the adverseness requirement "subsists through all stages" of a federal judicial proceeding. *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (citations omitted). Therefore, a federal court must revisit the case or controversy inquiry as often as it deems necessary. *Id*.; *see also Hartfield v. King*, 184 U.S. 162, 165 (1902) (noting that "it is the duty of a court to make such inquiry, in order that it may not be imposed on by an apparent controversy to which there are really no adverse parties") (citations omitted).

Adverseness is not determined merely by affixing the labels "plaintiff" and "defendant" to the parties. *See Muskrat*, 219 U.S. at 361 (declining to find adverseness although the United States was a named defendant where the record revealed that the

United States' interest was not adverse to that of the plaintiffs). Courts must look beyond names and titles to determine whether a justiciable case or controversy is presented. *See e.g.*, *Cleveland v. Chamberlin*, 66 U.S. 419, 425 (1861) (dismissing an appeal where one party was in fact both appellant and appellee); *United States v. Interstate Com. Comm'n*, 337 U.S. 426, 430 (1949) (acknowledging that "courts must look behind names that symbolize the parties to determine whether a justiciable case or controversy is presented.").

With this principle in mind, a court must consider whether "one party is actually and formally in control of the other party," and if so, "adjudication may be refused." 13 Wright & Miller's Federal Practice & Procedure § 3530 (3d ed. 2026). Put another way, a court must determine whether a single party acts as the "*dominus litis*"—the "master" or owner of the suit—on both sides of the litigation. *See South Spring Hill Gold-Min. Co. v. Amador Medean Gold-Gold-Min. Co.*, 145 U.S. 300, 301–02 (1892) (determining that the litigation "ceased to be between adverse parties" where control of the corporations on both sides "had come into the hands of the same persons," causing the plaintiff to become the "*dominus litis*" on both sides); *see also Veritas Vincit v. Brown*, No. 24-cv-00079, 2024 WL 3543414, at *6 (E.D. Tex. July 25, 2024) ("The Court finds that Plaintiffs do in fact control Defendant Reticulum and that no case or controversy exists between Plaintiffs and [Defendant Reticulum], necessitating [Defendant] Reticulum's dismissal from the present case."). Courts "do not engage in the academic pastime of rendering judgments in favor of persons against themselves." *Interstate Com. Comm'n*, 337 U.S. at 430. Consonant with the general principle that "no person may sue himself[,]" adverseness is lacking where one party controls the other party. *Id*.; *see Dasma Inv., LLC v. Realty*

*Assoc. Fund III, L.P.*, 459 F. Supp. 2d 1294, 1304 (2006) ("It is undisputed that Ms. Padron controls both Dasma and PWC[] . . . Insofar as an action between Dasma and PWC is concerned, therefore, the necessary adversity under Article III of the Constitution is lacking."); *Carson v. Monsanto Co.*, 72 F.4th 1261, 1266 (11th Cir. 2023) (allowing an appeal to proceed where "both parties [had] a real interest in the legal positions" they advanced, and "nothing in the record establishe[d] that Monsanto control[led] [plaintiff] or his representation"); *id.* at 1269 (Jordan, J. concurring) ("In principle it is easy to see why an important constitutional issue should not be determined in a proceeding in which one nominal party has dominated the conduct of the other.") (citing Richard H. Fallon, Jr., John F. Manning, Daniel J. Meltzer, & David L. Shapiro, *Hart and Wechsler's The Federal Courts and the Federal System* 96 (7th ed. 2015)).

2. **The Parties Were Not Sufficiently Adverse to Satisfy Article III's Case or Controversy Prerequisite.**

The Complaint purports to present a controversy between Plaintiffs—President Donald J. Trump, Donald J. Trump Jr., Eric Trump, and the Trump Organization, LLC— and Defendants—the Internal Revenue Service and United States Treasury Department—claiming Defendants caused Plaintiffs reputational and financial harm for which they now seek "at least $10,000.000,000.00." (DE 1 ¶ 11; *Id.* at 26). At first glance, the Complaint seemingly satisfies Article III by establishing causes of action "arising under . . . the laws of the United States[.]" U.S. CONST. ART. III, § 2. However, closer examination reveals that a justiciable case or controversy is absent; Plaintiffs and Defendants are not adverse because one party controls this litigation. *See Muskrat*, 219 U.S. at 361 (noting that judicial power only extends to "actual controversies arising between adverse litigants[.]"). In reaching this conclusion, the Court determines that Plaintiffs improperly

employed this lawsuit to justify a particular award in this matter—access to taxpayer funds and exemption from audits and other investigations—which was accomplished by leveraging control over Defendants.

          a.   *There is No Case or Controversy Because One Party Controls This Litigation.*

President Trump is Chief of the Executive Branch, *see* U.S. CONST. Art. II, § 1 (the "**Vesting Clause**"), and the Vesting Clause is the bedrock of his authority over that branch of government. *Id*. Specifically, the Vesting Clause states that "The executive Power shall be vested in a President of the United States of America." *Id*.; *see also Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 496–97 (2010) ("[T]he President 'cannot delegate ultimate responsibility or the active obligation to supervise that goes with it,' because Article II 'makes a single President responsible for the actions of the Executive Branch.'") (citing *Clinton v. Jones,* 520 U.S. 681, 712–13, (1997)); *Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020) ("The entire executive Power belongs to the President alone.") (citation and quotation marks omitted). Indeed, just recently, the Supreme Court cited *Myers v. United States*, 272 U.S. 52, 133 (1926) as a "landmark decision" and "perhaps our best word on the subject" of whether the President could remove subordinates in government service at will. *Trump v. Slaughter*, 609 U.S. __, slip op. at 16 (2026). Finding that he could, the majority ruled that "[s]ubordinates who exercise the President's power are subject to removal by him. Then, and only then, can they remain accountable to the President, and the President to the people." *Id.* at 36. "[T]hese officers exercise the *President's* power, not their own, and thus must be *responsible* to him." *Id*. at 35 (emphasis in original).

Here, Defendants are the Treasury Department—an Executive agency—and the IRS, the largest bureau of the Treasury Department. Both Defendants are unquestionably part of the Executive Branch and ultimately answer to its Chief Executive, President Trump. President Trump's authority to appoint and remove federal officers as he sees fit is evidence of his ability to exercise control over Defendants. *See* U.S. CONST. ART. II, § 2. Article II explicitly states that "[t]he President shall . . . appoint . . . all Other Officers of the United States, whose Appointments are not herein otherwise provided for[.]" *Id.*; *see also Cunningham v. Neagle*, 135 U.S. 1, 63 (1890) (noting that the ministerial officers are marshals of the United States who are "appointed by the president," and are "removable from office at his pleasure[.]"). While the Constitution strategically allows "individual executive officials" to "wield significant authority," such "authority remains subject to the ongoing supervision and control of the elected President." *Seila Law LLC*, 591 U.S. at 200; *see also* Br. for Pet'r at 10, *Trump v. Slaughter*, 609 U.S. __ (2026) (No. 25-332) ("Article II requires that the President control all executive power—especially the authority wielded by agency heads, who are 'the most important' of the President's subordinates and who 'must be the President's alter ego[s]' in their agencies.") (citing *Myers*, 272 U.S. at 133); *id*. at 2 ("Removal is the President's indispensable tool of control."). President Trump's supervisory authority directly implicates two key individuals acting on behalf of Defendants: Scott Bessent,[22] the Secretary of the Treasury Department and Acting

---

[22] "On January 28, 2025, Secretary Bessent was sworn in as the 79th Secretary of the Treasury of the United States." *Scott Bessent*, U.S. Dept. of Treasury, https://home.treasury.gov/about/general-information/officials/scott-bessent (last visited July 9, 2026). Secretary Bessent also serves as the "Acting" Commissioner of the Internal Revenue Service. *See The Commissioner's Section*, Internal Revenue Serv., https://www.irs.gov/about-irs/the-commissioners-section (last updated Feb. 12, 2026).

Commissioner of the IRS, and Frank J. Bisignano,[23] the Chief Executive Officer of the IRS. Plaintiffs cannot argue before the Supreme Court that Executive Branch actors "unquestionably exercise[] executive power, and must therefore be controlled by the Chief Executive[,]" *Slaughter*, 609 U.S. at 27, and then here, argue that the Parties are sufficiently adverse to establish an actual case or controversy.

Secretary Bessent, in particular, is subject to President Trump's actual and direct control in *both* of his representative roles. First, as Secretary of the Treasury Department, Bessent is a member of President Trump's cabinet. In this role, Secretary Bessent is "the President's alter ego" in the matters of the Treasury Department "where the President is required by law to exercise authority." *Myers*, 272 U.S. at 133. Consequently, Bessent is under President Trump's direct control as an appointed member of his cabinet.[24]

Second, President Trump's actual control over Secretary Bessent is grounded in statute. The Internal Revenue Code establishes that in "the Department of the Treasury[,] a Commissioner of Internal Revenue . . . shall be appointed by the President[.]" 26 U.S.C. § 7803(a)(1)(A). The Internal Revenue Code also provides that, Bessent, in his role as Acting IRS Commissioner, "may be removed at the will of the President." 26 U.S.C. § 7803(a)(1)(D). President Trump employs his authority to remove the IRS commissioner, without cause, and has done so as recently as August 2025.[25] Through Secretary

---

[23] Frank Bisignano also serves as the "18th Senate-confirmed Commissioner of the U.S. Social Security Administration." *See Commissioner*, Soc. Sec. Admin., https://www.ssa.gov/agency/commissioner/ (last visited July 11, 2026).

[24] *See The Executive Branch*, The White House, https://www.whitehouse.gov/government/executive-branch/ (last visited July 6, 2026) ("[T]he members of the Cabinet are often the President's closest confidants.").

[25] Nicole Markus & Brian Faler, *Billy Long Out as IRS Commissioner*, Politico (last updated Aug. 8, 2025), https://www.politico.com/news/2025/08/08/billy-long-irs-

Bessent, President Trump also wields significant control over CEO Bisignano, who Secretary Bessent selected to be the "first Chief Executive Officer of the Internal Revenue Service."[26] CEO Bisignano reports directly to Secretary Bessent who oversees CEO Bisignano's management of the IRS's daily operations.[27] "Through the President's oversight, 'the chain of dependence [is] preserved,' so that 'the lowest officers, the middle grade, and the highest' all 'depend, as they ought, on the President, and the President on the community.'" *Seila Law LLC*, 591 U.S. at 224 (citing 1 Annals of Cong. 499 (J. Madison)). Therefore, not only is Secretary Bessent directed by President Trump **as his alter ego**, but the President's ability to remove him at-will, and control Bisignano through his oversight, unquestionably impedes Secretary Bessent and CEO Bisignano's ability to zealously represent the Treasury Department and IRS in a matter that is directly adverse to the President.

In addition to the Constitutional and statutory bases for President Trump's control over Defendants, President Trump's Executive Order confirms his intent to wield actual, comprehensive control over Defendants in this matter. Executive Order 14215: *Ensuring Accountability for All Agencies* ("***Executive Order***") sets out the scope and breadth of President Trump's control over federal agencies. The Executive Order was issued on February 18, 2025, shortly after President Trump took office for his second term, and

---

commissioner-trump-00500365 (noting that President Trump removed Billy Long as IRS commissioner just two months into Long's five-year tenure).

[26] *CEO Frank Bisignano*, Internal Revenue Serv., (last updated Mar. 4, 2026), https://www.irs.gov/about-irs/ceo-frank-bisignano.

[27] *See* Brian Scwartz, *Bessent Picks Social Security Chief Frank Bisignano as IRS CEO*, WALL ST. J. (Oct. 6, 2025, at 14:37 ET), https://www.wsj.com/us-news/law/irs-leaker-sought-job-with-aim-of-releasing-trump-tax-returns-doj-says-93944811.

expands the President's oversight of federal agencies and employees.[28] Notably, the Executive Order provides that "it shall be the policy of the executive branch to ensure Presidential supervision and control of the entire executive branch." *Id*. § 1.

Most relevant to the issue of control in this matter is Section 7 of the Executive Order which explicitly addresses President Trump's ability to direct Defendants' conduct in litigation. Section 7 begins by declaring, "The President and the Attorney General, **subject to the President's supervision and control**, shall provide authoritative interpretations of law for the executive branch." *Id*. (emphasis added). The Section continues by making clear that "The President and the Attorney General's opinions on questions of law are **controlling** on all employees in the conduct of their official duties."[29] *Id*. (emphasis added). The following language further animates the Court's concern as to adverseness in this matter:

> No employee of the executive branch acting in their official capacity may advance an interpretation of the law as the position of the United States that contravenes the President or the Attorney General's opinion on a matter of law, including but not limited to the issuance of regulations, guidance, and **positions advanced in litigation**, unless authorized to do so by the President or in writing by the Attorney General.

*Id*. (emphasis added).

Therefore, in this case, unlike others that private parties have instituted, Defendants and their representatives are unable to advance any legal position or

---

[28] *See* Exec. Order No. 14215, 90 FED. REG. 10447 (Feb. 24, 2025).

[29] Counsel for Plaintiffs points to the other Plaintiffs—Donald J. Trump, Jr., Eric Trump, and the Trump Organization, LLC—as having separate, disinterested claims from those of President Trump, establishing a viable case or controversy. However, these Plaintiffs share the same attorney, the same parent company, and the same parent and have not espoused any different or distinct view of this matter or this "Settlement." Accordingly, the Court will treat their role as parenthetical to that of Lead Plaintiff President Trump.

interpretation—however legitimate or well-reasoned—contrary to that held by Lead Plaintiff in this matter, President Trump. *See, e.g., Griffin v. Internal Revenue Serv.*, No. 22-cv-24023, DE 23; DE 58 (S.D. Fla. 2024) (challenging similar allegations through motions to dismiss the complaint and amended complaint). Not surprisingly then, no attorney appeared[30] on Defendants' behalf, challenged Plaintiffs' actions, or justified the United States' position in any way.

Plaintiffs seem to suggest that the course of litigation in *Griffin*, supports their position on adverseness, claiming that the plaintiff in *Griffin* asserted "substantially identical allegations against the same defendants, arising from the same course of conduct by the same individual." (DE 89 at 18). But unlike this case, the plaintiff in *Griffin* is a private, non-governmental actor. And, unlike this case, the *Griffin* defendants challenged the plaintiff's allegations. *See* United States' Mot. to Dismiss Complaint at 2, *Griffin*, No. 22-cv-24023 (S.D. Fla. Apr. 23, 2023), DE 23. In *Griffin*, the defendants (the same IRS and Treasury Department sued here) contested the plaintiff's privacy act claims by arguing preemption and, alternatively, the plaintiff's failure to plead actual damages. *Id*. The *Griffin* defendants also challenged the section 7431 claim, arguing the complaint was a shotgun pleading based solely on conclusory allegations. *Id*. After the motion to

---

[30] The DOJ, Civil Division "represents the United States, its departments and agencies, Members of Congress, Cabinet Officers, and other federal employees in any civil or criminal matter within its scope of responsibility." *See* Dep't of Just., *About the Civil Division*, https://www.justice.gov/civil/about (last visited June 16, 2026). Notably, although the statute allows President Trump to receive the Attorney General's "advice and opinion on questions of law when required," President Trump is not obligated to obey the Attorney General's opinion on issues of law. *See* 28 U.S.C. § 511; *see also* Saikrishna Bangalore Prakash, *Too Unitary,* 135 Yale L.J. Forum 533, 552 (2026) ("The President, and not the Attorney General, is the chief law-enforcement officer of the United States."). Indeed, "a lawyer's counsel does not bind the advice seeker." *Id.*

dismiss was granted in part and denied in part, the government filed an answer asserting a sovereign immunity defense and denying several allegations in the amended complaint. That action was settled after two years of litigation.[31]

Likewise, in *Safe Harbor Int'l, LLC v. Booz Allen Hamilton, Inc.*, a class action lawsuit brought by non-government plaintiffs, the government appeared and moved to dismiss the plaintiff's class action complaint. No. 25-cv-00139, 2026 WL 900051, at *1 (D. Md. Apr. 2, 2026). After the court denied its motion to dismiss, the government filed an answer, asserting sovereign immunity and statute of limitations defenses. To date, that litigation remains pending. Here, unlike *Griffin* and *Safe Harbor Int'l, LLC*, the same defendants, faced with the same claims caused by the "same course of conduct" attributable to the "same individual," did not endeavor to defend their agencies, safeguard taxpayer monies, or even file an appearance. Instead, before the Parties' deadline for addressing the Court's critical jurisdictional questions passed, the Parties executed the "settlement agreement" that effectively mooted the issues the Court identified. This case was "resolved" before any litigation occurred and before the Government was required to explicate its position.

---

[31] Additionally, *Griffin* was filed in 2022, well within the applicable statute of limitations period. And while the question of whether the government was the appropriate party survived a motion to dismiss challenge, the court there noted it was a matter more suited to summary judgment. Significantly, the settlement reached after two years of litigation with the IRS amounted only to a nonmonetary apology, not an award of billions of taxpayer dollars and conferral of immunities to plaintiff, his family, and affiliates.

Considering the brief chronology,[32] the silent docket, and Defendants' deviation

from basic litigation strategies pursued in similar cases, the Court must conclude that

---

[32] By comparison, the limited universe of other civil cases involving publicly available settlements of similar or greater monetary magnitude had significantly more active dockets, required much more time to resolve, and involved serious allegations of catastrophic environmental destruction, life-threatening physical harm, or egregious market fraud:

- *O'Brien's Brien's Response Mgmt., LLC v. BP Expl. & Prod. Inc.*, MDL No. 2179 (E.D. La.) (multidistrict litigation that consisted of approximately 3000 cases relating to the catastrophic explosion of the Deepwater Horizon rig; claims were resolved for approximately $20 billion after several years).

- *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392 (S.D.N.Y. 2003) (claims based on fraudulent accounting; case settled for approximately $6 billion after six years of litigation, with a docket spanning 3366 entries).

- *Fed. Trade Comm'n v. Amazon.com, Inc.*, No. 23-cv-01495 (W.D. Wash. 2023) (nonconsensual enrollment of consumers into subscriptions; parties stipulated to a $2.5 billion judgment, after litigating across 695 docket entries).

- *In re: Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liab. Litig.*, No. 15-MD-02672 (N.D. Ca. 2015). (Volkswagen AG, in a case involving Volkswagen's use of illegal software on its 2.0-liter diesel vehicles, agreed to pay up to $14.7 billion after vigorous motion practice in a case with 8281 docket entries).

- *United States ex rel. Thorpe v. GSK,* No. 11-cv-10398 (D. Mass. 2011) (false price reporting and off-label use practices; settlement resolved four pending qui tam lawsuits; approximately $3 billion settlement resolved four pending qui tam lawsuits).

- *In re: Enron Corp. Sec.*, No. 02-md-01446 (S.D. Tex. 2002) (Enron Corp. agreed to settle claims alleging investment fraud for a collective amount exceeding $7 billion—only after several years of vigorous litigation across multiple lawsuits, with the consolidated case spanning 473 entries).

- *Brown v. Am. Home Prod.,* No. 99-cv-20593 (E.D. Pa. 1999) (heart valve disease was caused by the combination of fenfluramine and phentermine; the manufacturer of the pharmaceuticals agreed to a $3.75 billion settlement after zealously defending their position with a docket spanning 5448 entries).

All of these billion-dollar civil settlements involved more time, effort, and advocacy than that expended in the instant case. Moreover, in these cases, the claims resolved were

Defendants chose not to "advance an interpretation of the law as the position of the United States that contravenes" President Trump's opinion regarding this lawsuit. *See* Executive Order § 7. It is clear that obeisance to the mandate of his Executive Order has been fulfilled by Defendants' actions (or more accurately, inaction) in this case. Therefore, not only does the Executive Order demonstrate President Trump's espoused control over Defendants' conduct generally in litigation, it also demonstrates President Trump's actual control in this litigation. *See* 13 Wright & Miller's Federal Practice & Procedure § 3530 (3d ed. 2026).

Adverseness is further defeated by President Trump's influence over the DOJ here. During an interview with the New York Times, President Trump publicly expressed his belief in his unequivocal control over the DOJ. *See Excerpts From Trump's Interview With The Times,* NEW YORK TIMES (Dec. 28, 2017), https://www.ny-times.com/2017/12/28/us/politics/trump-interview-excerpts.html ("I have absolute right to do what I want to do with the Justice Department."). However, the DOJ is tasked with zealously representing the United States' interests, *see* 28 U.S.C. § 516,[33] and is trusted

---

legally cognizable: discrimination, property damage, or tort as defined by applicable state and federal statutes. Here, however, the terms "Anti-Weaponization" and "Lawfare" are inchoate and the "settlement agreement" provides no legal definition as to what constitutes either term, outside their meaning in political discourse.

[33] "The Judiciary Act of 1789 created the Office of the Attorney General which evolved over the years into the head of the Department of Justice and chief law enforcement officer of the Federal Government." *See* Office of the Attorney General, U.S. Dep't of Just., https://www.justice.gov/ag (last visited June 17, 2026). "Since the Judiciary Act of 1789, the United States Attorney General has had the authority 'to give his advice and opinion upon questions of law when required by the President of the United States, or when requested by the heads of any of the departments, touching any matters that may concern their departments.'" *See Citizens for Resp. & Ethics in Washington v. United States Dep't of Just.,* 922 F.3d 480, 483 (D.C. Cir. 2019) (citing Judiciary Act of 1789, § 35, 1 Stat. 73, 93 (codified as amended at 28 U.S.C. §§ 511–513)).

to remain insulated from political influence. Fidelity to the rule of law can be achieved only when the DOJ is free to assess the facts and governing law of each case it reviews without the stain of political interference.[34] There is "an expectation that even the Attorney General must be able to draw the line between political allegiance and fidelity to the people, as well as the fair administration of the law." Tonna Onyendu, *Department of Justice's Role in Electoral Politics: Maintaining Neutrality in the Enforcement of Voting Rights,* 31 Geo. J. Legal Ethics 799, 803 (2018).[35]

> b. *The Conduct of Executive Branch Actors Demonstrates Lack of Adverseness and Improper Motive.*

Here, Defendants' actions (or inaction), as directed by the DOJ, and the subsequent "resolution" of this lawsuit leads the Court to conclude the Parties' interests

---

[34] Legislators on both sides of the political aisle have emphasized the need for an independent DOJ. *See, e.g.*, *Confirmation Hearing on the Nomination of Michael B. Mukasey to be Attorney General of the United States Before the S. Comm. on the Judiciary*, 110th Cong. 478 (2007) (Patrick J. Leahy, (D.)) ("There is good reason why the rule of law requires that we have an Attorney General and not merely a Secretary of the Department of Justice. This is a different kind of Cabinet position. It is distinct from all others. It requires greater independence"); *Nomination of Eric H. Holder, Jr., Nominee to be Attorney General of the United States Before the S. Comm. on the Judiciary*, 111th Cong. 403 (2009) (Arlen Specter, (R.)) ("Next to the President of the United States, there is no Federal officer more important than the Attorney General. The Attorney General is different from any other Cabinet officer because Cabinet officers ordinarily carry out the policies of the President. But the Attorney General has an independent duty to the people and to uphold the rule of law.").

[35] It has been reported that a Principal Deputy Associate Attorney General advised United States Attorneys around the country that the President is the Department's "chief client." Ben Penn, *In-Your-Face DOJ Aide Rides Prosecutors for 'Chief Client' Trump*, BLOOMBERG L. (Feb. 19, 2026), https://news.bloomberglaw.com/us-law-week/in-your-face-doj-aide-rides-prosecutors-for-chief-client-trump; *see supra* p. 26. Former Attorney General Pam Bondi also characterized DOJ attorneys as the President's "lawyers." *See* Memorandum from the Att'y Gen. to All Dep't of Just. Emps., General Policy Regarding Zealous Advocacy on Behalf of the United States (Feb. 5, 2025), https://www.justice.gov/ag/media/1388521/dl.

were "one and the same." *Veazie*, 49 U.S. at 256. In justifying the "unusual"[36] settlement to resolve Plaintiffs' claims, the DOJ and Acting Attorney General Blanche in a press release, and Acting Attorney General Blanche's Congressional testimony respectively, cited *Keepseagle v. Vilsack*, 99-cv-03119, (D.D.C. 1999), as the "precedent" for the unprecedented establishment of the $1.776 billion dollar fund. However, Plaintiffs' briefing is conspicuously silent as to this justification, making no mention of the *Keepseagle* case. Understandably so.[37]

In *Keepseagle*, the parties—including the Department of Agriculture represented by the DOJ—engaged in a decade-long litigation regarding alleged discrimination perpetrated against thousands of Native American farmers and ranchers who had been illegally denied farm loans and access to benefit programs. *Keepseagle v. Vilsack*, 118 F. Supp. 3d 98, 104 (D.D.C. 2015). As the presiding judge observed, "[i]t was a major class-action seeking to remedy what many felt was the latest chapter in the federal government's sordid history of mistreating Native Americans." *Id.* at 104. There, "[f]or

---

[36] *See A Review of the President's Fiscal Year 2027 Budget Request for the Department of Justice,* 119th Cong. (2026) (statement of Todd Blanche, Acting Attorney General) ("So what we've done with this fund. . . And by the way, it is true that this is unusual").

[37] During the first administration of President Trump, Associate Attorney General Rachel Brand delivered remarks to the Washington, D.C. Lawyer Chapter of the Federalist Society. Rachel L. Brand, Assoc. Att'y Gen., *Remarks to the Washington, D.C. Lawyers Chapter of the Federalist Society* (Feb. 15, 2018), https://www.justice.gov/archives/opa/speech/associate-attorney-general-brand-delivers-remarks-washington-dc-lawyers-chapter. In her remarks, Ms. Brand acknowledged that the "Department of Justice is not your typical litigant or litigator." *Id.* She explained that "protecting the public fisc is something the Attorney General takes seriously," and highlighted *Keepseagle* as "one of the worst examples" of settlements involving the DOJ. Ms. Brand critiqued the fact that, under the mechanism of the *Keepseagle* fund, "hundreds of millions of dollars of the taxpayer's money will be spent in ways never appropriated by Congress, with virtually no oversight." *Id.* In President Trump's second administration, the DOJ now contrives to rehabilitate *Keepseagle* as the rationale for this "unusual" settlement.

nearly ten years, the parties engaged in extensive and contentious discovery and motions practice," *id.* at 105; propounded notice to putative class members regarding a proposed class settlement; defined the mechanisms of class claims for recovery; and participated in an hours-long fairness proceeding, where every person who attended was heard. The *Keepseagle* case history stands in stark contrast to the 109-day sojourn of this matter where Defendants never appeared, never challenged Plaintiffs' claims, and never filed a single pleading.

Ultimately, the DOJ has endeavored to justify its position to create the appearance of a case or controversy "resolved" under the aegis of the Court. But the Parties, most of whom are government actors, did not engage in any public discussion or judicial review regarding their "unusual" arrangement and whether they were legally adverse; indeed, they actively avoided such an undertaking.[38] And the extraordinary award fashioned by the Parties for claims that were never litigated, and have yet to be defined, on behalf of unidentified third parties[39] whose future remedies bear no relationship to the claims in this case, indicates that real adverse interests were never before the Court. *Cf. Monsanto Co.*, 72 F.4th at 1266 (finding a justiciable case or controversy where the parties zealously

[38] The Court is extremely troubled by the testimony given by Acting Attorney General Blanche on May 19, 2026. In response to why the "settlement agreement" had not been submitted to this Court for review, he stated that "there is no judge" because the case had been dismissed and, therefore, there was "no mechanism" for reviewing the agreement. *See supra* note 13. While temporally accurate, this answer is, at best, misleading and, at worst, disingenuous. The Court was available to review any pleading by any Party at any time during this lawsuit. And if Acting Attorney General Blanche had thought the dismissal was improvidently granted or thought Plaintiffs misspoke when they said, "no judicial analysis is appropriate," (DE 52 at 2), he only had to file an appearance and ask for relief.

[39] Compounding these concerns, an official at the DOJ publicly stated that he intended to apply for compensation from the Fund. *See* Daniel Lippman, *DOJ Official Sought Weaponization Fund*, Politico (June 10, 2026), https://www.polit-ico.com/news/2026/06/10/doj-official-sought-weaponization-fund-patrick-davis-00955.

asserted their rights and there was "no suggestion" that the defendant "selected or control[ed]" the plaintiff's counsel). Indeed, the DOJ seems to have purposefully adopted the strategy of creating a "slush fund disguised as a settlement, and then doling the money out to whatever constituency the Executive wants bankrolled." *Keepseagle v. Perdue*, 856 F.3d 1039, 1058 (D.D.C. 2017) (Rogers, J., dissenting).[40]

The Court's conclusion regarding the Parties' shared interest is also underscored by the circumstances surrounding the execution of the "settlement agreement." First, the "settlement agreement" is signed on behalf of Plaintiffs by Daniel Epstein ("**Mr. Epstein**"), a former White House Senior Associate Counsel and Special Assistant to President Trump from 2017 until 2020. Notably, Mr. Epstein was never counsel of record in this case; the Complaint's signature block identified him as counsel[41] for Plaintiffs but represented that his *pro hac vice* application was "forthcoming." (DE 1 at 27). Since no such application was filed with the Court, and since, in other matters pending in Florida and elsewhere, Mr. Epstein sought *pro hac* admission within weeks of filing the

---

[40] While ignoring the facts and history of the *Keepseagle* case, the DOJ also seems to studiously ignore the lessons of *Keepseagle*. Here, the DOJ chose to bypass notice, adversarial advocacy, legal analysis, and court review altogether to go straight to creating its own billion-dollar Cy Pres fund for non-parties with no pending claims against the United States. In this way, the DOJ has both disregarded the precedential meaning of *Keepseagle* while engaging in the constitutional assault predicted by its most ardent critics.

[41] Mr. Brito signed the Complaint—he is admitted to the Florida Bar and is admitted to the United States District Court for the Southern District of Florida. Mr. Brito did not sign the "settlement agreement," but his name appears on it. Mr. Epstein's name appears on the Complaint, but he did not (and could not) sign it. Mr. Epstein did sign the "settlement agreement."

complaint,[42] the Court can only surmise that Mr. Epstein was aware that he would never need to appear and litigate the merits of Plaintiffs' claims.

Second, the "settlement agreement" is signed on behalf of Defendants by Stanley Woodward, Jr., the current Associate Attorney General at the DOJ, and Acting Attorney General Blanche. Before he went to the DOJ, Associate Attorney General Woodward represented several individuals charged in connection with the events of January 6, 2021, at the United States Capitol.[43] He also represented Walt Nauta, who was President Trump's personal aide and a co-defendant in the criminal matter involving the return of classified documents at Mar-a-Lago.[44] Before his appointment to the DOJ, Acting Attorney General Blanche served as President Trump's personal criminal defense attorney in several high-profile matters. *See, e.g.*, *United States v. Trump*, No. 23-cr-80101 (S.D. Fla. 2023) ("**Mar-a-Lago Documents Case**"); *United States v. Trump*, No. 23-cr-00257 (D.D.C. 2023) (the criminal case charging President Trump with conspiring

---

[42] *See Trump v. Brit. Broad. Corp.*, No. 25-cv-25894, (S.D. Fla. filed Dec. 15, 2025); *see also Trump v. N.Y. Times Co.*, No. 25-cv-02487 (M.D. Fla. filed Sept. 15, 2025). Mr. Epstein also appeared as counsel for President Trump after appropriately filing *pro hac* papers in *Trump v. CBS Broad. Inc.*, No. 24-cv-00236 (N.D. Tex. filed October 31, 2024). In that case, Mr. Epstein sought *pro hac* admission despite being a member of the State Bar of Texas.

[43] Associate Attorney General Woodward appeared and represented Connie Meggs and Kelly Meggs (husband and wife), Ryan Samsel, and Federico Klein. *See United States v. Meggs*, No. 21-cr-00028 (D.D.C. 2021); *United States v. Meggs*, No. 22-cr-00015 (D.D.C. 2021); *United States v. Samsel*, 21-cr-00537 (D.D.C. 2021); *United States v. Klein,* No. 24-cv-02610 (D.D.C. 2021).

[44] *See United States v. Trump*, No. 23-cr-80101 (S.D. Fla. 2023). In that same matter, Associate Attorney General Woodward also represented Yuscil Tavares, an information technology worker at Mar-a-Lago who was charged alongside President Trump and Walt Nauta for his role in allegedly deleting surveillance camera footage. That representation was the subject of a conflict of interest hearing pursuant to *United States v. Garcia*, 517 F.2d 272 (5th Cir. 1975).

to overturn the 2020 election and for attempting to obstruct with the election's results before, during, and after January 6, 2021); *People v. Donald J. Trump*, No. 71543-23 (N.Y. Sup. Ct. N.Y. Cnty. Dec. 3, 2024) (the "hush money" case that raised allegations of President Trump falsifying business records).

While the Court appreciates that attorneys successfully transition between private practice and government service, such transitions do not absolve counsel of their ethical obligations. For example, Rule 11.1(c) of the Southern District of Florida Local Rules incorporates the Florida Bar's rules of professional conduct as ethical standards. *See* S.D. Fla. L.R. 11.1(c) ("The standards of professional conduct shall include the current Rules Regulating the Florida Bar."). As relevant here, Rule 4-1.11 of the Rules Regulating the Florida Bar provides a conflict-of-interest rule which specifically governs former and current government officers and employees. The commentary to this rule explains, in relevant part, the following:

> This rule represents a balancing of interests. On the one hand, where the successive clients are a government agency and another client, public or private, **the risk exists that power or discretion vested in that agency might be used for the special benefit of the other client. A lawyer should not be in a position where benefit to the other client might affect performance of the lawyer's professional functions on behalf of the government**.

R. Regul. the Fla. Bar 4-1.11 (emphasis added).[45] The spectre of that risk seems to be present here.

---

[45] These principles, however, are not confined to Florida practitioners or Florida Bar rules. The attorneys involved in the negotiation and execution of the "settlement agreement" are governed by similar ethical standards in the states in which they are admitted to practice law. The Court may take judicial notice of those admissions. *See Jackson v. United States*, Nos. 12-cv-388, 20-cr-198, 2014 WL 5474132, at *12 n.6 (M.D. Fla. Oct. 29, 2024) (taking judicial notice of attorney's Florida bar membership status because attorney's membership and status "can be readily and accurately determined from Florida Bar

The gravamen of the "settlement agreement" is to fund claims premised on events including those arising from, *inter alia*, the Mar-a-Lago Documents Case and the events of January 6, 2021.[46] Indeed, these two cases have been referenced as quintessential Anti-Weaponization and Lawfare claims.[47] Instead of either recusing[48] because of their previous representations or vigorously defending this lawsuit as required to do so by DOJ

---

records on www.floridabar.org, and the accuracy of those records cannot reasonably be questioned"). Attorney Epstein is admitted in Texas, the District of Columbia, and Maryland. Attorney Woodward is likewise admitted in the District of Columbia, and as noted above, Attorney Blanche is admitted in New York.

[46] "President Trump's views about the prosecution of those who attacked the U.S. Capitol on January 6 . . . are well known[.]" *United States v. Nordean*, No. 21-cr-00175, DE 1098 (D.D.C. July 10, 2026) (dismissing indictments with prejudice following appellate court's vacatur of judgments against four defendants convicted at trial of "serious offenses" arising from January 6, 2021).

[47] *See supra* note 11; *see also* Sabrina Lam, *Trump defends 'Anti-Weaponization Fund' amid GOP blowup*, Politico (May 22, 2026), https://www.polit-ico.com/news/2026/05/22/trump-defends-anti-weaponization-fund-00933727 (reporting on President Trump's May 22, 2026, statement that "I gave up a lot of money in allowing the just announced Anti-Weaponization Fund to go forward. I could have settled my case, including the illegal release of my Tax Returns and the equally illegal BREAK IN of Mar-a-Lago, for an absolute fortune. **Instead, I am helping others, who were so badly abused by an evil, corrupt, and weaponized Biden Administration, receive, at long last, JUSTICE!**") (emphasis added). Acting Attorney General Blanche expressly acknowledged that the Anti-Weaponization Fund "is not limited to in any way scope or form to January 6th" but declined to ensure that the funds would not be disbursed "to anyone convicted on the January 6th attack on Congress." *Supra* note 13 at 37:26 and 01:48-37.

[48] *See* Katelyn Polantz, *Exclusive: Acting AG Todd Blanche was told last year to recuse from Justice Department matters involving Trump*, CNN (May 14, 2026), https://www.cnn.com/2026/05/14/politics/todd-blanche-recusal-trump-investigations-brennan. As a Justice Department spokeswoman stated: "[Blanche] is recused from many cases before DOJ. In any cases that are still ongoing where he previously represented someone, he is recused." *Id.* In this case, however, notwithstanding his prior representation of President Trump, Blanche did not recuse.

policies and procedures,[49] these lawyers agreed to a "settlement" involving a staggering amount of money potentially benefitting former clients.

Moreover, the Release Order, signed only by Acting Attorney General Blanche, extends a blanket grant of immunity to all Plaintiffs and their families and "affiliates," and precludes all "current or possible" investigations or actions before any other agencies or departments.[50] The Release Order also purports to bar the IRS from conducting any future tax audits of President Trump, his sons, and their entities.[51] This provision directly contravenes 26 U.S.C. § 7217, titled "Prohibition on executive branch influence over taxpayer audits and other investigations," which states:

> It shall be unlawful for any applicable person to request, directly or indirectly, any officer or employee of the Internal Revenue Service to conduct or terminate an audit or other investigation of any particular taxpayer with respect to the tax liability of such taxpayer.

26 U.S.C. § 7217(a).

The explicit text of this statute prohibits President Trump and his lawyers—one of whom was former White House Counsel—from asking for or promoting termination of an audit directed toward him.[52] And acquiescing to any such demand is wholly incompatible

---

[49] *See* U.S. Dep't of Just., *Just. Manual* § 4-3.432 (2018) (requiring that request for compromise "demonstrate a thorough, thoughtful exploration of any issues relating to jurisdiction, liability, and damages, with the ultimate goal of ensuring that a proposed settlement is in the best interests of the United States and that the United States has brought peace with respect to any claims that the plaintiff could bring based on the subject matter of the case").

[50] *See supra* note 15.

[51] *Id*.

[52] This proviso of the "settlement" also raises the question of whether the agreement violates Article II, Section 3 of the United States Constitution, which directs that the President "shall take [c]are that the Laws be faithfully executed[.]" U.S. CONST. art. II, § 3.

with the duties of DOJ attorneys (as well as CEO Bisignano for the IRS) to enforce the law and protect the public interest. Moreover, the conferral of possibly millions of dollars in tax relief and corollary benefits potentially violates Article II, Section I of the United States Constitution, a limitation surely known by former White House Counsel and the current Acting Attorney General. *See* U.S. CONST. art. II, § 1, cl. 7: "The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be encreased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them."[53] No sitting President has ever sued federal agencies completely subject to his control for monetary benefits, or any benefits that inure to him, his family, and associates. The failure of any attorney in this case to address, on this docket, the relationship of this Article II proscription with the benefits conferred by the "settlement" is a glaring omission that speaks to the control of the Lead Plaintiff.[54]

Another signal that adverseness was absent was Acting Attorney General Blanche's unilateral repudiation and severance of the purported "Anti-Weaponization Fund" associated with this lawsuit.[55] Two weeks after the dismissal, in testimony before the House of Representatives, Acting Attorney General Blanche conceded that the DOJ

---

[53] "Neither the Union nor any of its members will be at liberty to give, nor will he (the President) be at liberty to receive any other emolument than that which may have been determined by the first act." THE FEDERALIST NO. 73 (A. Hamilton).

[54] As recently discussed in a decision affirming attorney sanctions, the Eleventh Circuit observed that "one of a lawyer's chief duties is to give his clients a clear-eyed view of whether the law says what the client wants it to say." *Est. of Lane Caviness v. Atlas Air, Inc.*, No. 24-11033 (11th Cir. July 10, 2026).

[55] *See* Defendant's Notice of Filing, *Floyd v. Dep't. of Just.*, No. 1:26-cv-01399, DE 93 (E.D. Va. filed on May 22, 2026).

was "not moving forward with the fund, period."[56] Acting Attorney General Blanche's decision, which has not been memorialized or adopted by Plaintiffs[57] or their lawyers, demonstrates his confidence that he could speak for, and bind, both sides of this matter. This certitude supports the conclusion that the Parties worked in tandem and were never actually adverse. Indeed, "a party may not unilaterally repudiate a settlement agreement once it is reached." *Reed by and through Reed v. United States*, 891 F.2d 878, 881 n.3 (11th Cir. 1990). "It is 'hornbook law' requiring no citations of authority, except common sense, that a contract once entered into may not thereafter be unilaterally modified; subsequent modifications require consent and 'a meeting of the minds' of all of the initial parties to the contract whose rights or responsibilities are sought to be affected by the modification." *Tropicana Pools, Inc. v. Boysen*, 296 So. 2d 104, 108 (Fla. Dist. Ct. App. 1974). Acting Attorney General Blanche's apparent capacity to speak for both Plaintiffs and Defendants, sign a "settlement" document on behalf of all Parties to this action, and then repudiate part of that agreement, demonstrates that there was only one party whose interests were being represented throughout this case.

In this case, the President[58] filed a lawsuit alleging reputational and financial harm from the unlawful disclosure of his tax returns. (DE 1). He sued the IRS and the Treasury Department—entities that are part of the Executive Branch headed by him and, more

---

[56] *Supra* note 19.

[57] In an interview with CNN, President Trump defended the "Anti-Weaponization Fund" to reporters, noting that he didn't know whether the fund was "fully dead or just on hold" and that he would "have to ask the lawyers." *See* Sarah Ferrls, *et al.*, *Trump tells CNN he doesn't know if $1.8 billion fund is dead, calling it 'a beautiful thing'*, CNN (June 3, 2026), https://www.cnn.com/2026/06/03/politics/anti-weaponization-fund-trump.

[58] Again, while Plaintiffs also include Donald J. Trump, Jr., Eric Trump, and The Trump Organization, LLC, these individuals and entity are parenthetical to this analysis.

recently, that have been directed to adhere to any interpretation of law advanced by him. And while it is true that President Trump had a legal right to bring a suit for the unlawful disclosure, any remedy would be circumscribed by the legal guardrails applicable to all litigants: the statute of limitations, naming the appropriate defendant, and pleading special recoverable damages. Notably, had President Trump (and his then-lawyers Alina Habba and Todd Blanche) brought this lawsuit in a timely fashion while he was a private citizen, this litigation understandably might have been resolved in a 109-day time span. But that is not what happened. Instead, President Trump did not pursue his claims until he once again occupied the White House and had appointed his former lawyer, and the former lawyer of persons who are putative beneficiaries of the "Anti-Weaponization Fund" to prominent positions in the DOJ. These officials then negotiated on behalf of the United States, with his current lawyers, including his former White House Counsel to reach a "settlement." It is risible to suggest that there was ever adverseness between the Parties.

In dismissing the non-parties' claims of collusion, Plaintiffs reveal the true position of the Parties and say the quiet part out loud: "Regardless of whether Plaintiffs had ever filed this action, the Government and Plaintiffs still had the power to resolve all disputes between the parties." (DE 89 at 15). The power to resolve was never a question before this Court. Whether Executive Branch actors can privately agree to give themselves and their former clients blanket immunities and billions of dollars in tax monies for legally undefined grievances was never an issue advanced to this Court. The question is whether the Parties could do so by claiming to be adverse and engaging the legitimacy of a court proceeding. The answer is a resounding "no": the Lead Plaintiff and the Government are one, a fully realized unitary interest. Because "Plaintiffs have no answer for the fact that

the [L]ead Plaintiff, President Trump, directs and controls the Defendants[,]" this "renders this lawsuit non-adversarial, collusive, and jurisdictionally improper." *See* DE 94 at 4.

And because this fact was so obvious and so insurmountable, the Court finds that this matter was brought for an improper purpose—to gain the imprimatur of judicial legitimacy for a "settlement" that had no viable basis in law or fact. As was observed in another matter brought in this District, "this case is part of Mr. Trump's pattern of misusing the courts to serve political purposes." *Trump v. Clinton*, 653 F. Supp. 3d 1198, 1219 (S.D. Fla. 2023).

Having concluded that this action was presented for an improper purpose, the Court now turns to the question of sanctions. This inquiry proceeds under two independent, but overlapping frameworks: Federal Rule of Civil Procedure 11 and the Court's inherent authority.

### B. *Federal Rule of Civil Procedure 11*[59]

Federal Rule of Civil Procedure 11 ("**Rule 11**") governs the filings of pleadings, motions, and other papers with the Court. "The purpose of Rule 11 is to deter baseless filings in [the] district court and thus streamline the administration and procedure of federal

---

[59] As acknowledged by the non-party movants, Rule 60(d)(3) allows the Court to "set aside a judgment for fraud on the Court." FED. R. CIV. P. 60(D)(3); *see also Bevan v. Lee Cnty. SO*, 224 F. App'x 880, 882 (11th Cir. 2007) ("A federal court can vacate its own judgment upon proof that a fraud has been perpetrated on the court.") (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44 (1991)). The Court notes that it possesses the authority to protect the integrity of these proceedings under Rule 11 and its inherent authority, and so it need not invoke Rule 60(d)(3). However, this decision should not be understood as a final determination regarding any fraud perpetrated on the court and does not foreclose the possibility of future relief under Rule 60(d)(3). *See SEC v. ESM Grp., Inc.*, 835 F.2d 270, 273 (11th Cir. 1988) ("Fraud that prevents the functioning of the judicial process does not have to be brought within any specific period of time."). Accordingly, the Court expresses no view as to whether the requirements of Rule 60(d)(3) have been satisfied.

courts." *Peer v. Lewis*, 606 F.3d 1306, 1311 (11th Cir. 2010) (citations omitted). As relevant here, when an attorney files a pleading in federal court, he certifies that, among other things, the pleading is not being presented for an improper purpose. FED. R. CIV. P. 11(B); *Spolter v. SunTrust Bank*, 403 F. App'x 387, 391 (11th Cir. 2010). Because this question strikes at the heart of the integrity of the judicial process, the Court may raise the improper purpose inquiry *sua sponte* and at any time. FED. R. CIV. P. 11(c)(3); *see also id.* advisory committee's note to 1983 amendment ("The time when sanctions are to be imposed rests in the discretion of the trial judge.").

An improper purpose under Rule 11 includes filing suit to force a settlement. *See e.g.*, *Scott v. Vantage Corp.*, 64 F.4th 462, 472–73 (3d Cir. 2023) (discerning no abuse of discretion in district court's conclusion that plaintiffs violated Rule 11(b) where they filed a lawsuit with no "eye toward settlement" and to force a settlement); *Roe v Rivian Auto. LLC*, No. 20-998, 2020 WL 8812913, at *3 (C.D. Cal. Dec. 11, 2020) (determining that case was presented for an improper purpose where plaintiff filed lawsuit to garner publicity and force a settlement); *Johnson v. 27th Ave. Caraf, Inc.*, 9 F.4th 1300, 1309 (11th Cir. 2021) (affirming sanctions against client whose "motivation [to file lawsuits] was to obtain payment of legal fees, as opposed to compliance with the ADA."). Even seemingly viable claims can support the finding of improper purpose when presented in such a way that subverts the rules or the Court's authority. *See In re Flynn*, 139 F.R.D. 698, 699 (S.D. Fla. 1991).

"Rule 11 authorizes a court to sanction a party who submits a pleading for an improper purpose." *Smith v. Psych. Sols., Inc.*, 750 F.3d 1253, 1260 (11th Cir. 2014). Such sanctions are discretionary and may be imposed on any party as the court deems

appropriate. FED. R. CIV. P. 11(c)(1). "[T]he imposition of a Rule 11 sanction is not a judgment on the merits of an action. Rather, it requires the determination of a collateral issue: whether the attorney has abused the judicial process, and, if so, what sanction would be appropriate." *Cooter & Gell*, 496 U.S. at 396.

"The standard for testing conduct under Rule 11 is 'reasonableness under the circumstances,' an objective standard." *Laborers Local 938 Joint Health & Welfare Tr. Fund v. B.R. Starnes Co. of Fla.*, 827 F.2d 1454, 1458 (11th Cir. 1987). "[A]s is almost always the case, the district court is better situated than [the reviewing appellate court] to marshal the pertinent facts and apply the fact-dependent legal standard mandated by Rule 11." *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 638 (11th Cir. 2010) (citing *Cooter & Gell*, 496 U.S. at 402) (quotation marks omitted). "Given the district court's familiarity with the case and the parties, the district court is in a better position 'to make these determinations in the first instance[.]'" *Id.*

The Eleventh Circuit has recognized three instances in which Rule 11 sanctions are appropriate: where a pleading (1) "has no reasonable factual basis"; (2) "is based on a legal theory that has no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law"; or (3) is "in bad faith for an improper purpose." *Massengale v. Ray*, 267 F.3d 1298, 1301 (11th Cir. 2001) (quoting *Worldwide Primates, Inc. v. McGreal*, 87 F.3d 1252, 1254 (11th Cir. 1996)). This Order discusses whether Rule 11 sanctions are warranted under the improper purpose prong.[60]

---

[60] The Court confines its analysis to Rule 11's improper purpose prong. That said, this election should not be construed as suggesting that the remaining Rule 11 grounds are inapplicable.

The Court divides its analysis in three parts. First, the Court considers whether Plaintiffs' Rule 41(a)(1)(A)(i) voluntary dismissal precludes consideration of Rule 11 sanctions. Second, the Court determines whether Plaintiffs' conduct discussed *supra* satisfies Rule 11's improper purpose standard. Finally, the Court addresses what sanctions, if any, are appropriate.

### 1. Plaintiffs' Rule 41(a)(1)(A)(i) Voluntary Dismissal Does Not Preclude Consideration of Rule 11 Sanctions.

As stated previously, and as the non-party movants correctly note, a voluntary dismissal does not deprive a district court of jurisdiction to determine whether Rule 11 has been violated and, if so, what sanctions are appropriate. *See, e.g.*, *Fox v. Acadia State Bank*, 937 F.2d 1566, 1569 n.2 (11th Cir. 1991) ("[W]e hold that the stipulated dismissal did not deprive the district court of jurisdiction to impose Rule 11 sanctions."); *Sussman v. Salem, Saxon & Nielsen, P.A.*, 818 F. Supp. 1510, 1516 (M.D. Fla. 1993) (explaining "that voluntary dismissal of a claim under Rule 41(a)(1), if otherwise sanctionable under Rule 11, does not preclude the assessment of sanctions."). As the Supreme Court has explained,

> The filing of complaints, papers, or other motions without taking the necessary care in their preparation is a separate abuse of the judicial system, subject to separate sanction. As noted above, a voluntary dismissal does not eliminate the Rule 11 violation. Baseless filing puts the machinery of justice in motion, burdening courts and individuals alike with needless expense and delay. Even if the careless litigant quickly dismisses the action, the harm triggering Rule 11's concerns has already occurred. Therefore, a litigant who violates Rule 11 merits sanctions even after a dismissal. Moreover, the imposition of such sanctions on abusive litigants is useful to deter such misconduct. If a litigant could purge his violation of Rule 11 merely by taking a dismissal, he would lose all incentive to stop, think and investigate more carefully before serving and filing papers.

*Cooter & Gell*, 496 U.S. at 398 (citations omitted).

That reasoning applies with equal force here. Adopting Plaintiffs' position would grant parties immunity from Rule 11 sanctions, incentivizing them to misuse the judicial process and then moot the violation by voluntarily dismissing the case before the court can act. *See Absolute Activist Value Master Fund Ltd.*, 998 F.3d at 1266 ("If we divested the district court of jurisdiction over [sanctions] motions, an enterprising plaintiff could abuse the judicial system but nevertheless get off scot free by voluntarily dismissing its case under Rule 41(a)(1)(A)(i)."). Rule 11 does not permit such a result, and the Court will not countenance such behavior. *See id.* Therefore, contrary to Plaintiffs' assertions, the Rule 41(a)(1)(A)(i) voluntary dismissal does not foreclose the Court's Rule 11 inquiry. *See Cooter & Gell*, 496 U.S. at 395 (noting that "the violation of Rule 11 is complete when the paper is filed") (citation and quotation marks omitted).

### 2. Plaintiffs' Conduct Satisfies Rule 11's Improper Purpose Standard.

This case concerns whether Plaintiffs' conduct, as described *supra*, satisfies Rule 11's improper purpose standard. The Court concludes that it does. "[Plaintiffs] pursued this lawsuit in bad faith for the improper purpose of dishonestly advancing a political narrative." *Trump v. Clinton*, No. 22-14102-CV, 2023 WL 1207842, at *9 (S.D. Fla. Sept. 15, 2023). These efforts cannot be allowed in this Court. *See Procup v. Strickland*, 792 F.2d 1069, 1073 (11th Cir. 1986) ("Federal courts have both the inherent power and the constitutional obligation to protect their jurisdiction from conduct which impairs their ability to carry out Article III functions."); *Santana v. Frank Sufka Fam. Tr. Fund*, No. 26-cv-1440, 2026 WL 1492775, at *3 (M.D. Fla. May 28, 2026) ("If judges allow the court system to be weaponized by any party for improper purposes, the public is not well-served. Judges have a responsibility to ensure the courts remain open to all to pursue claims in good faith. They have an equally important responsibility to ensure courts are not abused for

improper purposes."). Certainly, a court should not be a forum for a party that cynically views a lawsuit as a vehicle to achieve a predetermined outcome: "I'm suing myself."[61]

"Improper purpose [under Rule 11] is often inferred from circumstantial evidence." *Thompson*, 610 F.3d at 665 (Tjoflat, J., concurring in part and dissenting in part); *Cohen v. Burlington, Inc.*, No. 18-cv-81420, 2020 WL 1033349, at *8 (S.D. Fla. Mar. 3, 2020) (same); *Meide v. Pulse Evol. Corp.*, No. 18-cv-1037, 2021 WL 4459653, at *10 (M.D. Fla. Sept. 29, 2021) (relying on plaintiff's persistence in pursuing factually and legally frivolous claims as circumstantial evidence of an improper purpose under Rule 11). Here, the record before the Court supports such an inference. As aptly summarized by the non-party movants, Plaintiffs acted in bad faith and for an improper purpose by "collusively filing a lawsuit with claims subject to multiple dispositive defenses solely to provide cover for a collusive settlement." (DE 94 at 12). The Court agrees. *See Trocano v. Vivaldi*, No. 25-11813, 2026 WL 446510, at *6–7 (11th Cir. Feb. 17, 2026) (explaining that the "district court may in its discretion impose Rule 11 sanctions against a party or lawyer who pursues a claim that is obviously barred by a waivable affirmative defense like the statute of limitations."). Accordingly, the Court must now determine what sanctions, if any, are appropriate. *See id.* (noting that "Rule 11 sanctions are discretionary" and therefore "just because a district court can impose sanctions does not mean that the court is required to do so.") (citation omitted).

---

[61] Even in the context of the Mar-a-Lago lawsuit, which became part of the "settlement," President Trump recognized the unique dynamics of his position and commented: "I'm suing myself." Joseph Gedeon, *Trump Says He Has Final Say on Paying Himself $230m for Past Investigations*, THE GUARDIAN (Oct. 22, 2025, 10:30 AM), https://www.theguardian.com/us-news/2025/oct/22/donald-trump-damages-federal-investigations.

### 3. Sanctions are Appropriate.

District courts have broad discretion to tailor appropriate and reasonable sanctions under Rule 11. *See Riccard v. Prudential Ins. Co Am.*, 307 F.3d 1277, 1295 (11th Cir. 2002) (citing *Donaldson v. Clark*, 819 F.2d 1551, 1557 (11th Cir. 1987)). A court may impose both monetary and non-monetary sanctions. FED. R. CIV. P. 11(C)(4). When assessing *sua sponte* Rule 11 sanctions, "[t]he initiating court must employ[:] (1) a show cause order to provide notice and an opportunity to be heard; and (2) a higher standard (akin to contempt) than in the case of party-initiated sanctions." *Kaplan v. DaimlerChrysler, A.G.*, 331 F.3d 1251, 1255 (11th Cir. 2003) (quotation marks omitted).[62]

The Eleventh Circuit considers several factors in determining an appropriate sanction under Rule 11, including: "whether the person has engaged in similar conduct in other litigation," "what effect it had on the litigation process in time or expense," and "whether the person responsible is trained in the law." *See Thomas v. Early Cnty, Ga.*, 518 F. App'x 645, 646 (11th Cir. 2013) (citing FED. R. CIV. P. 11 advisory committee's note to 1993 amendment).

Plaintiffs maintain that monetary sanctions are unavailable because their voluntary dismissal preceded any order to show cause. (DE 89 at 13–14). This argument relies on a faulty premise: that the Court's authority under Rule 11 is limited to monetary sanctions.

---

[62] In assessing the adequacy of a show cause order under Rule 11, the Eleventh Circuit applies a "flexible standard." *DaimlerChrysler, A.G.*, 331 F.3d at 1257. Therefore, "in many cases substantial compliance may suffice." *Id.* Here, Plaintiffs received notice of the conduct at issue and a full opportunity to respond. *See Johnson*, 9 F.4th at 1311 ("Due process requires that the attorney (or party) be given fair notice that his conduct may warrant sanctions and the reasons why.") (quoting *In re Mroz*, 65 F.3d 1567, 1575 (11th Cir. 1995)). And Plaintiffs briefed the applicability of Rule 11 sanctions, indicating that they understood its relevance.

The Court recognizes that Rule 11(c)(5)(B) limits a court's ability to impose monetary sanctions on its own initiative where the show cause order follows a voluntary dismissal or settlement. FED. R. CIV. P. 11(C)(5)(B); *see also Capital Corp. Merch. Banking, Inc. v. Norwich*, No. 6:07-cv-1626, 2009 WL 10671309, at *2 (M.D. Fla. June 2, 2009) (recommending that sanctions not be awarded to defendant where they were sought following plaintiff's voluntary dismissal), *report and recommendation adopted*, No. 07-cv-1626, DE 97 (M.D. Fla. June 23, 2009). The non-party movants do not contest this settled proposition. (DE 94 at 13) (explaining that Rule 11(c)(5)(B)'s limitation is "narrow" and does not foreclose "*non-monetary* sanctions") (emphasis in original).

However, this case presents unusual circumstances that distinguish it from the ordinary Rule 11 dispute. Plaintiffs do not identify at what point during the abbreviated procedural history of this case the Court realistically could have raised the issue of Rule 11 monetary sanctions. Had the Court done so before ordering briefing on the Court's subject matter jurisdiction, or after briefing was ordered but before the Parties responded, Plaintiffs undoubtedly would have protested that the discussion was both unmerited and premature. Moreover, the Advisory Committee Notes to Rule 11 explain that the reason monetary sanctions should be raised before a settlement is that a monetary resolution could be impaired by the threat of sanctions. FED. R. CIV. P. 11 advisory committee's note to 1993 amendment ("Parties settling a case should not be subsequently faced with an unexpected order from the court leading to monetary sanctions that might have affected their willingness to settle or voluntarily dismiss a case."). That concern is not implicated here.

Nonetheless, the Court need not decide whether the circumstances of this case permit monetary sanctions notwithstanding the language of Rule 11(c)(5)(B). That limitation applies only to monetary sanctions and does not prevent the Court from determining whether Rule 11 has been violated or whether appropriate *non-monetary* sanctions are appropriate. *See generally Goldenberg v. Indel, Inc.*, No. 09-5202, 2011 WL 1134454, at *1 (D.N.J. Mar. 25, 2011) ("But [Rule 11(c)(5)(B)'s] restriction is explicitly limited to monetary sanctions. The [c]ourt is empowered to issue a number of other sanctions against malfeasant parties, including censure, educational requirements, or referral to disciplinary authorities.").

Thus, after considering the totality of the circumstances, including the record, the relevant law, the written submissions, and the factors identified by the Eleventh Circuit, the Court concludes that Rule 11 sanctions are appropriate here. *See Trump v. Clinton*, 640 F. Supp. 3d at 1332, 1334 (awarding sanctions under Rule 11's improper purpose and concluding that "courts are not intended for performative litigation" as this "is harmful to the rule of law, portrays judges as partisans, and diverts resources that should be directed to real harms and legitimate legal claims."). In fashioning an appropriate sanction, the Court is guided by Rule 11's deterrent purpose. *See Baker*, 158 F.3d at 528 (explaining that "deterrence remains the touchstone of the Rule 11 inquiry."). The Court therefore imposes non-monetary sanctions under Rule 11 as follows:

1. Plaintiffs' Attorney Alejandro Brito is **REFERRED** to The Florida Bar for its consideration, review, and determination as to whether any disciplinary action is appropriate in light of the findings and rulings made in this Order. The Clerk of Court is **DIRECTED** to mail a copy of this

Order to The Florida Bar, of which Attorney Alejandro Brito is a member (No. 98442).

2. All future applications by Daniel Z. Epstein for admission *pro hac vice* in the Southern District of Florida will be **DENIED** for one year or until further order of this Court.

3. The Parties are prohibited from referring to the purported "settlement agreement," or using, offering, admitting, or citing any of its provisions in any judicial, administrative, regulatory, arbitration, or any other official proceeding as evidence of a "settlement" reached in this matter, Case No. 26-cv-20609-KMW (S.D. Fla. 2026).[63] "Plaintiffs" means the named Plaintiffs in this lawsuit: President Donald J. Trump, Donald J. Trump, Jr., Eric Trump, the Trump Organization, LLC and includes any of their agents, representatives, officers, directors, employees, partners, corporate agents, subsidiaries, affiliates, or any other person acting in concert with the party or under the party's control, whether directly or indirectly. "Defendants" means the Internal Revenue Service and the United States Department of the Treasury.

### C. *Inherent Authority*

Having concluded that sanctions are warranted under Rule 11, the Court will now address whether sanctions are likewise appropriate under the Court's inherent authority.

---

[63] Again, as noted by Plaintiffs in their brief, whether a private agreement between the Parties—as if "there is no judge"—is valid and enforceable or is a depredation of the Judgment Fund and an illegal conferral of immunity is not before this Court. (DE 89 at 15) ("Regardless of whether Plaintiffs had ever filed this action, the Government and the Plaintiff still had the power to resolve all disputes between the parties.").

Although Rule 11 limits imposing monetary sanctions following a voluntary dismissal, the Court's inherent authority remains available to address conduct that abuses the judicial process. *Trump v. Clinton*, 161 F.4th 671, 688 (11th Cir. 2025) ("Federal courts have the inherent authority to fashion an appropriate sanction for conduct which abuses the judicial process."); *Peer*, 571 F. App'x at 844 ("And the inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct . . . for these rules are not substitutes for the inherent power.") (citations and quotation marks omitted).

Independent of Rule 11, federal courts possess inherent authority to protect the integrity of judicial proceedings. *See Kleiner v. First Nat'l Bank of Atl.*, 751 F.2d 1193, 1209 (11th Cir. 1985) ("Courts possess the inherent power to protect the orderly administration of justice and to preserve the dignity of the tribunal.") (citing *Roadway Ex., Inc. v. Piper*, 447 U.S. 752, 764–65 (1980)). "The inherent power of a court to manage its affairs necessarily includes the authority to impose reasonable and appropriate sanctions upon errant lawyers practicing before it." *Id.* (citations omitted). "These powers are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers*, 501 U.S. at 43 (citations and quotation marks omitted). "A court's inherent power is both broader and narrower than other means of imposing sanctions . . . . [w]hereas each of the other mechanisms reach only certain individuals or conduct, the inherent power extends to a full range of litigation abuses. At the very least, the inherent power must continue to exist to fill in the interstices." *JTR Enter., LLC v. An Unknown Entity*, 93 F. Supp. 3d 1331, 1367 (S.D. Fla. 2015); *see also Peer*, 571 F. App'x at 844 ("Whereas rule-based sanctions can reach only 'certain individuals or conduct, the

inherent power extends to a full range of litigation abuses' and serves to fill [in] the gaps left by rule-based sanctions.") (quoting *Chambers*, 501 U.S. at 46).

As the Supreme Court discussed in *Chambers*, "[N]othing in the other sanctioning mechanisms or prior cases interpreting them that warrants a conclusion that a federal court may not, as a matter of law, resort to its inherent power to impose attorney's fees as a sanction for bad-faith conduct." 501 U.S. at 50. Furthermore, "[N]either is a federal court forbidden to sanction bad-faith conduct by means of the inherent power simply because that conduct could also be sanctioned under the statute or the Rules." *Id.* Thus, while "the court ordinarily should rely on the Rules rather than the inherent power . . . if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power." *Id.* The Court does so here. *See* FED. R. CIV. P. 11 advisory committee's note to 1993 amendment ("Rule 11 is not the exclusive source for control of improper presentations of claims . . . [and therefore] does not inhibit the court . . . in exercising its inherent powers[.]").

"The key to unlocking a court's inherent power is a finding of bad faith." *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998) (citations omitted). This is a subjective standard. *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017) ("As a starting point, the inherent-powers standard is a subjective bad-faith standard."). "Once unlocked, the power carries with it the authority to assess attorney's fees as a sanction for bad faith conduct." *Sciarretta v. Lincoln Nat'l. Life Ins. Co.*, 778 F.3d 1205, 1212 (11th Cir. 2015) (citing *Chambers*, 501 U.S. at 45–46). Bad faith is present if a court determines "that fraud has been practiced upon it, or that the very temple of justice has been defiled," or where a party is responsible for "delaying or disrupting the

litigation[.]" *Chambers*, 501 U.S. at 46 (citations and quotation marks omitted); *Barash v. Kates*, 585 F. Supp. 2d 1347, 1362 (S.D. Fla. 2006). "Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44. (citations omitted).

"When the court uses its inherent powers to punish a party with attorneys' fees, there must be a direct causal link between the condemned conduct and the resulting costs." *ByoPlanet Int'l, LLC v. Johansson*, 792 F. Supp. 3d 1341, 1352 (S.D. Fla. 2025) (citing *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108 (2017)). "Sanctions under the Court's inherent powers are compensatory, not punitive." *Id.*

The conduct of the Parties triggers the Court's inherent authority. As to Plaintiffs, they filed a multibillion-dollar lawsuit asserting claims that they knew, or should have known, were time-barred and for an amount of damages unsupported by facts or law.[64] Plaintiffs could make no connection between the billions of dollars they sought, and the recovery authorized under the governing statute. *See* 26 U.S.C. § 7431(c)(1) (providing for damages in the amount of "$1,000 for each act of unauthorized inspection or disclosure."). Generally, the "central purpose" of a lawsuit must be to "vindicate rights through the judicial process." *In re Kunstler*, 914 F.2d 505, 520 (4th Cir. 1990). This lawsuit was not brought to vindicate rights; it was brought to manipulate the judicial process to pursue benefits unavailable in litigation because the Parties were not adverse.

Defendants' conduct is equally untenable. It is telling that the DOJ, which is tasked with enforcement of United States law, has remained conspicuously absent and silent

---

[64] Even the Fund amount—$1.776 billion—speaks of a "branding" effort rather than a deliberate and thoughtful calculation of damages.

when serious questions about this matter have been raised. *See generally Ponzi v. Fessenden*, 258 U.S. 254, 262 (1922) (explaining that the Attorney General is the head of the DOJ and that he, acting through United States Attorneys, "is the hand of the President in taking care that the laws of the United States in protection of the interests of the United States in legal proceedings . . . be faithfully executed.") (citations omitted). And when representatives did choose to expound on the Department's conduct, they offered misleading explanations of the facts and the law.[65] In abdicating its responsibility to zealously defend the interests of the United States, the Government entered into a "settlement" that deviated from its litigation posture in similar actions, disregarded DOJ policies, and accomplished objectives beyond those authorized, as well as those specifically prohibited, by law. Under these circumstances, the Court may reasonably infer that the Government failed to defend this lawsuit or to respond to the Court's jurisdictional inquiry because its position would not withstand judicial scrutiny and because resolution of the threshold issues identified by the Court would not have favored its preferred outcome to this case.[66]

---

[65] *See supra* pp 7–8.

[66] *See generally Callahan v. Schultz*, 783 F.2d 1543, 1545 (11th Cir. 1986) ("The adverse inference rule provides that when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him.") (citations and quotation marks omitted); *In re Bailey*, 451 B.R. 640, 645 (Bankr. N.D. Ga. 2011) ("This Court draws an adverse inference from [d]efendants' concealment and assumes that truthful answers to those questions and production of documents would have been unfavorable to [d]efendants" and ultimately concluding that "the concealment of that information was intentional . . . and possibly motivated by a desire to perpetrate fraud on the [c]ourt."); *see also In re Mart*, 75 B.R. 808, 810 (Bankr. S.D. Fla. 1987) ("Furthermore, the failure of a party to provide evidence peculiarly available to that party supports the inference that the truth revealed by that evidence would be damaging to the party.") (citations omitted).

The Parties used the existence of federal litigation as a means of conferring legitimacy upon a course of action that they were unwilling to subject to judicial review. The context of the "settlement," the relationships of the people involved in negotiating and approving it, the ethical implications of their conduct, and the Parties' swift efforts to dismiss this case after the Court raised fundamental jurisdictional questions all support this conclusion. Accordingly, the Court expressly finds that Plaintiffs acted in bad faith. *See Sofaly v. Portfolio Recovery Assocs., LLC*, 155 F.4th 289, 295 (3d Cir. 2025) (monetary sanctions were proper under the court's inherent power where the lawyers acted in bad faith and committed fraud on the court by using "their clients to bring contrived lawsuits"). That finding is enough to invoke the Court's inherent authority. *See JTR Enter., LLC v. Columbian Emeralds*, 697 F. App'x 976, 986 (11th Cir. 2017) ("The key to invoking a court's inherent power to sanction is a finding of bad faith.") (citation omitted).

The Court finds monetary sanctions appropriate under its inherent authority and prerogative to police the matters and litigants who avail themselves of its jurisdiction. *See Purchasing Power, LLC*, 851 F.3d at 1223 ("Courts have the inherent power to police those appearing before them.") (citing *Chambers*, 501 U.S. at 46).[67] These monetary sanctions would include the attorneys' fees incurred by Court-appointed *amici*[68] in

---

[67] Although the Court's inherent authority extends to sanctioning all parties and counsel who engaged in bad-faith conduct, *see Spolter*, 403. F. App'x at 390 (noting that district "courts have the inherent power to impose sanctions on parties and lawyers"), the Court assesses monetary sanctions only against Plaintiffs and Plaintiffs' counsel.

[68] Court-appointed *amici* include John Gleeson and David A. O'Neil of Debevoise & Plimpton LLP; Donald B. Verrilli, Jr. of Munger Tolles & Olson LLP; and Faith E. Gay, Philippe Z. Selendy, and Corey Stoughton of Selendy Gay PLLC, who were all appointed by the Court on April 29, 2026. (DE 43).

appearing before the Court and briefing the jurisdictional questions identified by the Court. *See Barnes v. Dalton*, 158 F.3d 1212, 1215 (11th Cir. 1998) ("Where, as here, the district court fashions a sanction which is a direct response to the harm that the bad faith conduct of the attorney causes, it is clearly acting within its discretion.").

> As one leading treatise has explained:

> Ordinarily, an amicus curiae who participates in a proceeding by leave of court or by court appointment is not entitled to compensation when he or she serves the interests of litigants, witnesses or any other private party . . . However, **where the court appoints an amicus curiae who renders services which prove beneficial to a resolution of the questions presented, the court may properly award compensation and direct it to be paid by the party responsible for the situation which prompted the court to make the appointment**.

4 Am. Jur. 2d Amicus Curiae § 12 (emphasis added); *see also Morales v. Turman*, 820 F.2d 728, 731 (5th Cir. 1987) (attorneys' fees may be awarded to appointed amici if the amici's services were highly beneficial and defendants were properly considered the parties who made the services necessary). Nonetheless, the Court-appointed *amici* have declined any reimbursement for their important service to the Court. [69]

There remain the initial *amici*—whose appearance was not contested by any Party—and the thirty-five former Federal Judges, whose briefing precipitated this Order. Accordingly, these *amici*, if they wish, may file, within fourteen (14) days of this Order, a memorandum regarding any appropriate reimbursement. Plaintiffs may file any response seven (7) days thereafter. Finally, the Clerk of Court is **DIRECTED** to mail a copy of this

---

[69] The Court acknowledges and thanks Court-appointed *amici* and their firms for their willingness to review the unprecedented jurisdictional questions presented by this case. Their thorough and well-reasoned scholarship, and uncompromising commitment to the rule of law—along with those of the organizations and lawyers referenced *supra*—are hallmarks of a vigorous, independent legal profession critical to sustaining a vigorous, independent judiciary.

Order to the State Bar of New York, of which Acting Attorney General Blanche is a member (No. 4192456), **AND** to the District of Columbia Bar, of which Associate Attorney General Woodward is a member (No. 997320), where disciplinary proceedings are currently ongoing.[70]

### III.   CONCLUSION

John Adams warned, "Facts are stubborn things; and whatever may be our wishes, our inclinations, or the dictates of our passions, they cannot alter the state of facts and evidence." Thus, whatever may be the Parties' wishes, inclinations, or the dictates of their passion, they cannot alter the state of the facts or evade the rule of law. Contrary to Plaintiffs' concern, the Court did not have to "sally forth" to look for a wrong to right. *See* DE 89 at 17 (citing *Margolin v. Nat'l Ass'n of Immig. Judges*, 608 U.S. __ (2026)). The Court need only look to the uncontroverted facts here:

1. Donald Trump is President.

2. President Trump controls the actions of the Secretary of the Treasury Department Scott Bessent, IRS CEO Frank Bisignano, and all Executive Branch actors.

---

[70] Ethics complaints have been filed in New York and the District of Colombia against Acting Attorney General Blanche and Associate Attorney General Woodward. *See* Letter to Attorney Grievance Committee Re: Ethics Complaint Against Todd Blanche, https://dea5edf3-e27d-4adc-a42a-b9c082bc3167.usrfiles.com/ugd/dea5ed_b024aad49d1049c1ab03f01e8f1aa7fc.pdf; *see also* Request for Investigation of Stanley E. Woodward, Jr. D.C. Bar No. 997320, https://www.documentcloud.org/documents/28264896-cfa-dc-bar-complaint-stanley-woodward/.

3.  President Trump, through Executive Order § 7, also controls the litigation strategy and interpretation of the laws guiding the Department of Justice. *See supra* note 28.

4.  For the 109 days that this case was pending, no attorney representing the United States filed a notice of appearance or any document indicating the government's position, interest, or awareness of this matter.

5.   Defendants' actions are consonant with the dictates of Executive Order § 7.

These facts lead to the inexorable conclusion that the "settlement" terms, the individuals who signed the "settlement" as well as the putative beneficiaries of the "settlement," demonstrate a shared, unitary interest. And the unilateral revision and renunciation of the "Fund" component of the "settlement" demonstrate the fact that all Parties were aligned, and ultimately, undifferentiated. This action was never about a party seeking judicial resolution of a legal issue or a factual dispute. The nature of the suit itself and the conduct of the Parties and counsel from its filing make plain that this was an attempt to use the Court to provide some legitimacy to an agreement to confer immunity to people and entities affiliated with the President and to earmark billions of dollars from American taxpayers to redress grievances not defined in the law. The President may be the functional "dominus litus" of the Executive Branch, but as a party to a civil suit, he, as well as all the parties and lawyers before a court, are bound by the rules. Ensuring that our courts are used only for the express purpose created by the Constitution is the obligation of every judge and an obligation that this Court must discharge in light of the matter before it.

In sum, the facts before this Court demonstrate there was never adverseness between the Parties; there was never a case or controversy; and there was never a question as to who would prevail.

**DONE AND ORDERED** in Chambers in Miami, Florida, on this 13th day of July, 2026.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE