**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

|  |  |
|---|---|
| PRESIDENT DONALD J. TRUMP, DONALD J. TRUMP JR., ERIC TRUMP, AND THE TRUMP ORGANIZATION, LLC,<br><br>     *Plaintiffs*,<br><br>v.<br><br>INTERNAL REVENUE SERVICE AND U.S. DEPARTMENT OF THE TREASURY,<br><br>     *Defendants*. | No. 1:26-cv-20609-KMW |

<u>**PLAINTIFFS' AND THEIR ATTORNEYS' EXPEDITED MOTION TO STAY THE SANCTIONS ORDER AND RELATED PROCEEDINGS PENDING APPEAL**</u>

Pursuant to S.D. Fla. L.R. 7.1(d) and Fed. R. App. P. 8(a)(1), Plaintiffs President Donald J. Trump, Donald J. Trump Jr., Eric Trump, and The Trump Organization, LLC ("Plaintiffs"), with their attorneys Alejandro Brito and Daniel Epstein ("Attorneys," and, together with Plaintiffs, "Movants"), respectfully move this Court on an expedited basis for a stay of the Court's July 13, 2026 Order, D.E.106 ("Sanctions Order"), and related proceedings pending appeal.  The Sanctions Order invokes serious concerns regarding fundamental tenets of justice and cannot stand.

Should the Court fail to rule on this Motion by August 5, 2026, Movants intend to seek relief from the Eleventh Circuit pursuant to Fed. R. App. P. 8(a)(2), in order to protect their rights and avoid the continuing and irreversible harm resulting from the Sanctions Order.

## INTRODUCTION

This case arose from the Internal Revenue Service's ("IRS") admitted failure to protect Plaintiffs' tax information from a convicted criminal.  That convicted felon, Charles Littlejohn, deliberately stole and disclosed Plaintiffs' information, pled guilty, and went to prison.  In addition to criminal penalties, Congress created a civil remedy for precisely that injury.  Plaintiffs invoked it, the parties negotiated a compromise, and the action was voluntarily dismissed with prejudice. That should have ended the case.  Instead, the Court transformed a completed statutory dispute into an improper sanctions proceeding.  It incorrectly branded the litigation collusive, mistakenly accused Plaintiffs and counsel of bad faith, threatened professional licenses and reputations, imposed monetary sanctions, and entered a sweeping injunction forbidding future reference to the Settlement Agreement.  D.E.106 at 46-47, 52-53.  All of that was error.  The Sanctions Order threatens free speech, professional livelihoods, and the integrity of judicial proceedings.

The ruling rests on a grievous legal error: that, because President Trump supervises the Executive Branch, he and the United States necessarily possess the same legal interest and cannot be adverse to each other.  That is wrong.  President Trump asserted a personal claim arising from the theft of his own tax information.  The IRS and the U.S. Department of the Treasury ("Treasury") represented the sovereign's interests in public funds and federal law.  Donald Trump Jr., Eric Trump, and The Trump Organization asserted their own independent claims.  Presidential supervision did not erase those rights or merge those interests.

The Sanctions Order nevertheless erroneously treated its novel theory of adversity as the starting point and then refracted the facts through that mistaken lens.  Settlement became proof of collusion, even though there was none, potential (weak) defenses became proof that the claims

were fictitious, which they were not, and ordinary professional relationships became proof of coordination, which did not exist. But the Sanctions Order identified no pre-filing *sub rosa* agreement, no false allegation, and no specific direction by President Trump controlling Defendants' litigation decisions. The predicate legal error thus supplied the conclusion, causing the Sanctions Order to incorrectly recast entirely innocuous facts as misconduct.

The danger posed by the Sanctions Order is profound. The Court called the Article III question "unprecedented," appointed six *amici*, and devoted nearly thirty pages to resolving it—yet it then declared the contrary position "so obvious and so insurmountable" that advancing it warranted career-altering sanctions. *Id.* at 9-38, 53 n.69. That mistake converts disagreement into professional punishment, and strikes at the integrity of the adjudicative process itself. A system that sanctions lawyers for advancing positions on constitutional questions cannot sustain fearless advocacy or principled legal development. *See Donaldson v. Clark*, 819 F.2d 1551, 1561 (11th Cir. 1987).

The improper manner in which the sanctions were imposed heightens those concerns. The Court never ordered Mr. Brito or Mr. Epstein to show cause, never identified much of the conduct it wrongly condemned, and never disclosed that professional sanctions, monetary sanctions, and a sweeping, unconstitutional speech injunction were under consideration. It relied on press reports and extrarecord material to infer motive and imposed punishment without individualized findings of knowing misconduct, of which there was none. The Sanctions Order then compounded those errors with an unconstitutional content-based prior restraint dictating what private parties and federal agencies may say in future official proceedings.

The Eleventh Circuit is overwhelmingly likely to vacate the Sanctions Order. A stay is necessary now to preserve meaningful appellate review before the Sanctions Order inflicts further constitutional, professional, and reputational harm that no later ruling can undo.

## **BACKGROUND**

### A. **Long-Running Illegal and Politically Motivated Conduct Precipitated This Action**

Plaintiffs sued the IRS and Treasury ("Defendants") pursuant to 26 U.S.C. § 7431, seeking damages for the unauthorized disclosure of their confidential tax return information. D.E.1. From 2019 to 2020, former IRS employee-contractor Charles Littlejohn unlawfully obtained Plaintiffs' tax returns and disclosed them to the media. *Id.* ¶¶ 6-7. He applied for his IRS position with "the

goal" of accessing President Trump's tax information. *Id.* ¶¶ 65, 67. Littlejohn clearly targeted the Plaintiffs. *Id.* ¶¶ 35, 69, 113, 122.

The IRS exercised extensive control over Littlejohn's work. IRS Contracting Officer Representatives oversaw the day-to-day operations of contractors, and the IRS managed Littlejohn's daily tasks and projects. *Id.* ¶¶ 24-25. Paul Wight, Supervisory Management and Program Analyst at Treasury, directed and supervised Littlejohn's activities. *Id.* ¶¶ 29-30. The agency monitored his technical performance, ensured that he completed training, and confirmed his compliance with safeguards protecting taxpayer information. *Id.* ¶¶ 25-26. The IRS controlled Littlejohn's staff-like access to IRS data. *Id.* It had authority to reprimand and fire him. *Id.*

Between at least May 2019 and September 2020, Littlejohn systematically stole Plaintiffs' most sensitive financial information. *Id.* ¶¶ 7, 59. He uploaded Plaintiffs' confidential tax returns to a private website using his IRS computer, saved them on portable devices, and hand-delivered them to reporters hostile to the President. *Id.* ¶¶ 36-37, 54. Littlejohn fed the stolen materials to The New York Times and ProPublica, which collectively published dozens of articles that resulted in a barrage of negative coverage for Plaintiffs, especially President Trump. *Id.* ¶¶ 53-58, 73-75. Tens of millions of readers viewed these articles, inflicting severe reputational and financial harm on Plaintiffs, including triggering a meritless civil suit by the New York Attorney General. *Id.* ¶¶ 104, 113.

Plaintiffs had no reason to suspect an unauthorized IRS disclosure after the September 27, 2020, New York Times story because the article did not identify the IRS as the source, and the then IRS Commissioner incorrectly concluded the disclosure did not originate from the IRS. *Id.* ¶ 77. On January 29, 2024, President Trump learned about the specific disclosures from an IRS-issued letter sent pursuant to § 7431(e). *Id.* ¶ 76. Eric Trump and Donald Trump Jr. learned of the specific disclosures of their tax returns upon receiving IRS notices on December 16, 2024. *Id.* ¶¶ 78, 80. The Trump Organization received IRS notices between December 2024 and 2026. *Id.* ¶¶ 5, 82.

The IRS's failures were staggering. Every year from 2010 through 2020, the Treasury Inspector General for Tax Administration warned the IRS about critical security deficiencies in its protection of taxpayer data, which the IRS ignored. *Id.* ¶ 32. As a result, it took Littlejohn only a few hours to steal Plaintiffs' tax returns, and the IRS failed to detect the breach for three years. *Id.* ¶¶ 38-39. The IRS did not even block the creation of private websites on IRS computers—the

mechanism Littlejohn used to exfiltrate the data.  *Id.* ¶ 37.  The scope of the breach was enormous: The Trump Organization alone received IRS notices concerning 418 affiliated entities, as well as numerous individuals.  *Id.* ¶ 84.

Littlejohn ultimately pled guilty and was sentenced to the statutory maximum of sixty months in prison.  *Id.* ¶ 35; D.E.106 at 4.  At sentencing, Judge Ana Reyes found that "Littlejohn's targeting of a sitting President of the United States [wa]s part of a three-year criminal scheme" and she found he "intend[ed] to harm at least some taxpayers."  D.E.1 ¶¶ 71-72.  Even the IRS itself admitted "it failed to prevent Mr. Littlejohn's criminal conduct and unlawful disclosure[.]"  *Id.* ¶ 12.

### B.      Procedural History Leading to the *Sua Sponte* Sanctions

Before his nomination and reelection as well as after, President Trump and the other Plaintiffs investigated potential claims arising from Littlejohn's illegal disclosures.  Plaintiffs timely filed the Complaint on January 29, 2026.  D.E.1.  On April 17, 2026, the Parties filed a consent motion to extend the deadline for Defendants to respond.  D.E.40.  On April 24, 2026, the Court ordered the Parties to brief "whether a case and controversy exists."  D.E.41 at 4.  On April 29, 2026, the Court appointed attorneys from three law firms as *amici* to assist the Court in determining whether it had subject matter jurisdiction.  D.E.43.  It is unclear what prompted the appointment of these particular *amici*.

On May 18, 2026, Plaintiffs voluntarily dismissed this case with prejudice.  D.E.52. Because that filing extinguished the claims, the Court cancelled the jurisdictional briefing deadline and closed the case.  D.E.62.  No new facts concerning the Parties, the claims, or the dismissal emerged between the closure of the case and the subsequent collateral proceedings.  Then, on May 27, 2026, thirty-five non-party movants—*with no conceivable standing or first-hand knowledge*— filed a Motion for Relief from Judgment or Order under Rule 60(b), requesting that the Court set aside the dismissal, falsely alleging that a "fraud on the Court" occurred.  D.E.63.

On May 29, 2026, the Court ordered Plaintiffs to brief their position on certain issues, "including (1) the charges of collusion and whether the Parties are truly adverse; (2) the assertion that the dismissal in this case was premised on deception by the Parties; and (3) the question of whether the case should be reopened because the Court was the 'victim of a fraud.'"  D.E.65 at 3. The Court did not order Defendants to respond.  Nor did it order Mr. Brito or Mr. Epstein to show cause, identify any conduct by either Attorney as potentially sanctionable, or provide notice that

4

professional sanctions, monetary sanctions, and a restriction on future speech were under consideration.  Plaintiffs filed a timely response.  D.E.89.

### C.      The Court's Sanctions Order

The Sanctions Order contains extensive factual and legal "findings" concerning adverseness, timeliness, and the conduct and motives of Plaintiffs, their Attorneys, and Executive Branch officials.  The Sanctions Order acknowledged that the Parties' Settlement Agreement was "not before this Court."  D.E.106 at 47 n.63.  Having said that, the Sanctions Order still placed the Settlement Agreement at the center of its analysis, drawing wrongful conclusions regarding the Parties' intent, and then using those conclusions to improperly impose sanctions and bar reference to the Settlement Agreement.

The Sanctions Order's incorrect findings of collusion, improper purpose, and bad faith all flowed from its threshold legal error on Article III adversity.  The Court wrongly believed this action lacked Article III adverseness because President Trump "controlled" Defendants, which he did not, and Executive Branch officials were subject to his supervision and removal authority.  *Id.* at 17-21.  The Sanctions Order thus erroneously treated presidential supervision as establishing both the absence of adversity and the presence of bad faith.  *Id.* at 5, 24-26, 37-38.

In reaching that conclusion, the Sanctions Order wrongly treated the claims of the other plaintiffs—Donald Trump Jr., Eric Trump, and The Trump Organization—as "parenthetical" to those of President Trump.  *Id.* at 22 n.29.  The Sanctions Order did not separately analyze those Plaintiffs' injuries, statutory claims, or notice of the disclosures.  The Court also concluded that Plaintiffs' claims were untimely, incorrectly measuring the limitations period from the appearance of President Trump's counsel at Littlejohn's plea hearing, without regard to when each Plaintiff received IRS notice of the disclosures at issue.  *Id.* at 5, 37.  The Court relied on judicially noticed news reports, public commentary, and other materials outside the record to find information and make erroneous conclusions about the Parties' and the Attorneys' motives.

The Sanctions Order purports to ban the Parties from "referring to the purported 'settlement agreement,' or using, offering, admitting, or citing any of its provisions in any judicial, administrative, regulatory, arbitration, or any other official proceeding as evidence of a 'settlement' reached in this matter."  *Id.* at 47.  The prohibition is prospective and indefinite, unconstitutionally restricting the Parties' speech.  The Court barred Mr. Epstein, who signed the Settlement Agreement, from *pro hac vice* admission in this District for one year or until further

5

order of the Court.  *Id.*  The Court referred Mr. Brito to The Florida Bar for signing the Complaint.  *Id.* at 46-47.  The Court invited *amici* to submit a fee petition, and they collectively seek $43,610.83.  *Id.* at 53; D.E.111; D.E.112.  Movants filed a timely Joint Notice of Appeal on July 31, 2026.

## DISCUSSION

A stay pending appeal is appropriate when the movants show (1) they are likely to succeed on the merits; (2) they will suffer irreparable harm without a stay; (3) a stay will not substantially injure other interested parties; and (4) the public interest supports the stay.  *Nken v. Holder*, 556 U.S. 418, 425-26 (2009).  Those factors are analyzed on a sliding scale: When the second, third, and fourth factors favor relief, a movant need only present a "substantial case on the merits." *Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986).  That standard is satisfied where an appeal presents "serious legal question[s]," *LabMD, Inc. v. FTC*, 678 F. App'x 816, 819 (11th Cir. 2016), or "a complex and novel question that has not yet been clearly addressed by the Eleventh Circuit," *In re EMI Resorts, Inc.*, No. 09-20526-CIV, 2010 WL 11506117, at *1 (S.D. Fla. Sept. 2, 2010).

## I.     Movants Are Likely to Succeed on the Merits

The Sanctions Order contains multiple errors that independently require reversal and reinforce one another.  *First*, its core substantive theory is wrong: presidential supervision does not eliminate Article III adversity.  *See United States v. Nixon*, 418 U.S. 683, 693 (1974).  Moreover, disagreement over an "unprecedented" constitutional question cannot support findings of collusion, improper purpose, and bad faith—much less career-altering sanctions against counsel for advancing the contrary view.  *Second*, the Court attempted to supply proof of misconduct through procedures that violated Rule 11, the Federal Rules of Evidence, and due process: inadequate notice, an extrarecord factual inquiry, and no individualized findings tied to any Movant's conduct or state of mind.  *Third*, the resulting injunction compounds those errors by imposing a sweeping, unconstitutional prior restraint on speech and petitioning in proceedings far beyond this case.  Individually and collectively, these errors make reversal overwhelmingly likely and thus compel a stay.

### A.     The Sanctions Order Is Substantively Flawed

The Sanctions Order wrongly transformed a genuine statutory dispute into a finding of misconduct.  Plaintiffs invoked a remedy Congress expressly created for the unlawful disclosure

of their tax information, the parties resolved the case, and the action was dismissed with prejudice. The Sanctions Order nevertheless adopted the unprecedented view that presidential supervision made Article III adversity impossible, then wrongly treated that legal conclusion as proof that the lawsuit was collusive, the settlement predetermined, and Movants' purpose improper, all of which is not the case. The Sanctions Order thus punished Movants for losing a legal argument the Court itself needed dozens of pages to resolve. That was grievously wrong, and reversal is likely.

### 1. *This Case Presented a Genuine Article III Controversy That the Parties Resolved by Settlement*

This case presented a concrete and justiciable statutory dispute between parties with opposing legal and financial interests. Charles Littlejohn deliberately obtained and disclosed Plaintiffs' confidential tax information through his work for the IRS and pled guilty to a federal felony. The IRS admitted that "it failed to prevent Mr. Littlejohn's criminal conduct and unlawful disclosure[.]" D.E.1 ¶¶ 12, 71-72; D.E.106 at 4. Congress created a private cause of action for that precise injury, *see* 26 U.S.C. § 7431, and Plaintiffs were hardly alone in pursuing that remedy. *See, e.g.*, *Griffin v. IRS, et al.*, 730 F. Supp. 3d 1312, 1318 (S.D. Fla. 2024).

Each Plaintiff invoked that statutory remedy based on disclosure of his or its own tax information. President Trump sued in his personal capacity for injury to information belonging to him personally. D.E.1 ¶ 76. Donald Trump Jr., Eric Trump, and The Trump Organization asserted their own claims arising from separate disclosures. D.E.1 ¶¶ 78-85. The recovery sought would belong to the individual Plaintiffs, would not run with the Presidency, and would not become an asset of the Executive Branch. Article III jurisdiction was therefore straightforward: Plaintiffs alleged "injury in fact," fairly traceable to the IRS's failure to protect their tax information, and "likelihood that the requested relief will redress the alleged injury"—the damages Congress expressly authorized. *Alabama-Tombigbee Rivers Coal. v. Norton*, 338 F.3d 1244, 1252 (11th Cir. 2003) (internal quotation marks omitted).

Moreover, the claims rested on a powerful statutory and factual foundation. Littlejohn deliberately exploited his IRS access to steal and disclose Plaintiffs' confidential tax information, and the IRS admitted that it failed to prevent his criminal conduct. The Complaint alleged extensive IRS control over Littlejohn's work, access, supervision, and compliance obligations. D.E.1 ¶¶ 7, 22-30. Two courts addressing claims arising from the same disclosures have already held that materially similar allegations plausibly established that Littlejohn was an "employee of the United States" under § 7431. *Griffin*, 730 F. Supp. 3d at 1318; *Safe Harbor Int'l LLC, et al. v.*

7

*Booz Allen Hamilton, Inc., et al.*, No. 25-CV-00139, 2026 WL 900051, at \*11 (D. Md. Apr. 2, 2026). Plaintiffs thus brought statutory claims, similar to those brought by plaintiffs in other cases, arising from egregious misconduct and an admitted failure by the agency charged with protecting their information. The Parties then reached a settlement. They were not required to (and did not) seek judicial approval, a consent judgment, retained jurisdiction, or any other judicial imprimatur. *See* 26 U.S.C. § 7431 (containing no requirement of court approval for settlement agreements).

In short, Plaintiffs suffered an admitted governmental failure, invoked the exact remedy Congress supplied, asserted substantial claims already sustained in materially similar litigation, and resolved those claims through settlement. The Court's contrary account is legally indefensible and will not survive appellate review.

### 2. *The Sanctions Order's Contrary Conclusion Rests on an Unprecedented and Erroneous Theory of Adversity*

The Sanctions Order's mistaken theory of sanctions rests entirely on a proposition that Article III does not recognize: That President Trump's supervision of the Executive Branch made him legally incapable of maintaining an adverse claim against Defendants. The Court erroneously declared President Trump and the Government "one, a fully realized unitary interest"; and on that basis, it deemed the action "non-adversarial, collusive, and jurisdictionally improper." D.E.106 at 37-38. The sanctions thus rest on a categorical rule that a President who sues an Executive agency is necessarily suing himself.

***Merits.*** That premise is incorrect. Blackletter law distinguishes between an officeholder and the sovereign he serves. In an official-capacity action, the government is the real party in interest; in a personal-capacity action, "the real party in interest is the individual, not the sovereign." *Lewis v. Clarke*, 581 U.S. 155, 162-63 (2017); *see also Hafer v. Melo*, 502 U.S. 21, 25 (1991). The Presidency likewise remains distinct from "the individual who happens to be the President." *Clinton v. Jones*, 520 U.S. 681, 701 (1997). That is why the Supreme Court has recognized adversity in disputes between the United States and the President in his personal capacity. *See Nixon*, 418 U.S. at 693. So too here. President Trump, together with other private Plaintiffs, sued in his personal capacity to vindicate a personal statutory right, while the IRS and Treasury represented the sovereign's distinct interests. His official authority did not merge those capacities, did not make those interests identical, and did not convert his private rights into rights of the United States. While Executive Order 14215 confirms presidential supervision of the Executive Branch, it cannot merge official interests and personal interests—or otherwise destroy

adversity that exists.  *See* Exec. Order No. 14215, 90 Fed. Reg. 10,447 (Feb. 24, 2025).

The Sanctions Order's contrary theory would produce far-reaching and illogical results.  A President struck by a U.S. Postal Service vehicle could not recover from the United States because the President ultimately supervises the Postal Service.  A President misdiagnosed at the Walter Reed Army Medical Center could not pursue a personal claim against the responsible federal actors because they serve within the Executive Branch.  However, Article III does not strip the President or any other government officials of ordinary private rights merely because the defendant is an agency over which they exercise ultimate supervisor authority.  *Accord Alexander v. Trump*, 413 So. 3d 795, 800 (Fla. Dist. Ct. App. 2025) (rejecting the notion that Article II can be used "as a sword to prevent [the President] from voluntarily initiating . . . civil litigation in his individual capacity").

Further, the Sanctions Order's theory is indefensible as to Donald Trump Jr., Eric Trump, and The Trump Organization.  None exercised authority over the IRS or Treasury.  Yet the Court wrongly treated their claims as "parenthetical" because of shared counsel, family or corporate ties, and a common litigation position with the President.  D.E.106 at 22 n.29.  That reasoning would disable all Presidents' family, friends, former colleagues, and affiliated businesses from asserting private rights against the Executive Branch whenever their interests align with the Executive Branch.  That is untenable.  Article III does not extinguish private statutory rights through association with the President.  *See, e.g.*, *Biden v. IRS*, No. 1:23-cv-02711-TJK (D.D.C. filed Sept. 18, 2023) (suit by Hunter Biden against the IRS, during President Biden's term, for the alleged unauthorized disclosure of his tax-return information).

The Sanctions Order's and *amici*'s cited authorities do not support it.  *Lord v. Veazie*, 49 U.S. (8 How.) 251, 254-55 (1850), and *Muskrat v. United States*, 219 U.S. 346, 361-63 (1911), involved suits lacking genuinely adverse legal interests.  *United States v. Johnson*, 319 U.S. 302, 303-05 (1943), involved something very different from presidential supervision: one party arranged the litigation, paid its costs, procured the nominal plaintiff's lawyer, and maintained the case under its "full control."  Those cases are inapposite, and turn on the absence of a real dispute as well as evidence that one actor actively and affirmatively orchestrated both sides.

The cases that actually govern this dispute confirm adversity.  *Nixon* requires courts to "look behind names that symbolize the parties to determine whether a justiciable case or controversy is presented."  418 U.S. at 693.  For that reason, *Nixon* found adversity between the

9

President in his personal capacity and an instrumentality of the Executive Branch.  The Eleventh Circuit's decision in *Carson v. Monsanto Co.* likewise asks whether both parties possess "a real interest in the legal positions they advance" and whether the record shows that one side actually and directly controls the other or its representation.  72 F.4th 1261, 1266 (11th Cir. 2023) (en banc).  *United States v. Interstate Commerce Commission* likewise instructed courts to look beyond formal governmental overlap and examine the concrete dispute over "who is legally entitled to sums of money."  337 U.S. 426, 430-31 (1949).  Here, President Trump, together with other private litigants as Plaintiffs, asserted a personal claim for compensation, while the IRS and Treasury represented the sovereign's separate interests.  Those competing legal interests satisfy Article III adversity.

Nor is *NLRB v. Constellium Rolled Products Ravenswood, LLC* analogous.  43 F.4th 395, 398-400 (4th Cir. 2022).  There, the parties sought judicial approval of a result they had already fixed.  Here, Plaintiffs filed substantial statutory claims arising from completed injuries, and the parties later settled them.  The Sanctions Order identified no pre-filing settlement or agreement to manufacture judicial proceedings.  None existed.  Its cases therefore distinguish sham litigation from genuine disputes; they do not establish that presidential supervision alone destroys Article III adversity, because it does not.

***Bad faith.***  In addition to the Sanctions Order's errors on the merits, treating a disagreement over an "unprecedented" Article III question as sanctionable misconduct was grievously wrong.  The Court appointed six *amici*, devoted nearly thirty pages to the issue, and then wrongly declared the contrary position "so obvious and so insurmountable" that advancing it established collusion, improper purpose, and bad faith.  D.E.106 at 9-38, 53 n.69.  A court may reject what it deems a novel constitutional argument.  It may not punish lawyers for making it.

The use of sanctions here threatens the legal profession, the development of law, and the legal system at large.  Lawyers must remain free to advance reasonable positions on novel and politically charged questions without risking their reputations, licenses, and livelihoods.  Rule 11 must protect "doctrinal development, novel legal arguments, [and] cases of first impression."  *Donaldson v. Clark*, 819 F.2d 1551, 1561 (11th Cir. 1987); *see also Buckler v. MacGregor*, 634 F. App'x 694, 697 (11th Cir. 2015).  A stay is thus necessary to prevent irreparable harm not only

to counsel's reputations and livelihoods, but to the integrity of the adversarial system itself.

### 3.    *The Sanctions Order's Purported Indicia of Collusion Do Not Support Its Findings, But Rather Repackage Its Erroneous Theory of Adversity*

Every circumstance the Sanctions Order incorrectly invoked as evidence of collusion is consistent with a genuine controversy resolved by settlement.

The Sanctions Order first wrongly treated the settlement's timing as evidence that no genuine controversy existed.  D.E.106 at 24-26 & n.32.  But the case did not settle overnight; the parties litigated and negotiated for more than three months, openly disclosed those discussions, and reached a compromise rather than a complete capitulation by either side.  D.E.40 at 2.

The strength of the underlying claims makes the accusation still less plausible.  Littlejohn pled guilty to unlawfully disclosing tax information, and the IRS admitted that it failed to prevent his criminal conduct.  D.E.1 ¶ 12.  The Complaint included detailed allegations regarding Littlejohn's employment status, supervision, and potential joint-employment relationship with the IRS and Booz Allen to address a potentially disputed element of liability—allegations impossible to reconcile with the notion that the case was filed solely to facilitate a predetermined settlement. *Id.* ¶¶ 20-31.  Two courts addressing the same disclosures likewise have held that materially similar allegations by unrelated plaintiffs plausibly established that Littlejohn was an "employee of the United States" for purposes of § 7431.  *Griffin*, 730 F. Supp. 3d at 1318; *Safe Harbor Int'l*, 2026 WL 900051, at *11.  Claims with that factual and legal foundation cannot rationally become evidence of contempt-like misconduct merely because the Government chose settlement over prolonged litigation.   The Sanctions Order's comparisons to class actions, multidistrict proceedings, environmental disasters, and mass-tort settlements call into question this legitimate dispute.  The duration and docket volume of unrelated cases do not establish collusion here.

The Sanctions Order's statute of limitations analysis also fails.  D.E.106 at 5, 24 n.31, 37, 43, 50.  The Complaint alleged separate discovery dates for each Plaintiff, beginning with President Trump's January 29, 2024, IRS notice and extending into 2026 for The Trump Organization.  D.E.1 ¶¶ 76-86.  Plaintiffs filed on January 29, 2026.  The Sanctions Order nevertheless wrongly treated counsel's appearance at Littlejohn's October 2023 plea hearing as notice to every Plaintiff of every disclosure, without addressing the later IRS notices.  At most, that theory supplied a disputed limitations defense. *See Aloe Vera of Am., Inc. v. United States*, 699 F.3d 1153, 1160 (9th Cir. 2012) (The date of discovery applies to "knowledge of each particular disclosure" rather than "by a single generalized event."); *Bancroft Glob. Dev. v. United*

11

*States*, 330 F. Supp. 3d 82, 95-97 (D.D.C. 2018) (refusing to dismiss a complaint on statute of limitations grounds).  This did not establish knowing misconduct or collusion.

The remaining circumstances are further removed from collusion.  Counsel's prior professional relationships established no coordination, common control, or pre-filing agreement. *Contra* D.E.106 at 30-34.  Mr. Epstein's failure to obtain *pro hac vice* admission likewise established nothing about his expectations at filing. *Contra id.* at 30-31.  The Court acknowledged that it could only "surmise" his motive. *Id.* at 31. The case simply ended before admission became necessary.  "Surmise" cannot support a professional sanction.  With respect to Mr. Brito, the Court acknowledged that he "did not sign the 'settlement agreement,' but his name appears on it," which is not evidence to support any erroneous finding of collusion, nor can it rightfully serve to support the Court's sanctions against Mr. Brito. *Id.* at 30, n. 41.

**B.      Additionally, the Sanctions Order Is Likely to Be Reversed Because It Is Procedurally Defective**

**1.      *The Court Imposed Sanctions Without the Notice Required by Due Process and Rule 11***

Due process requires "fair notice that [the] conduct may warrant sanctions and the reasons why," together with a meaningful opportunity to defend against the charge. *In re Mroz*, 65 F.3d 1567, 1575-76 (11th Cir. 1995).  Rule 11 is equally explicit; before imposing sanctions on its own initiative, a court must order the specific "attorney, law firm, or party" to show cause why "conduct specifically described in the order" did not violate Rule 11(b).  Fed. R. Civ. P. 11(c)(3).

The Sanctions Order violated those settled rules.  The May 29 Order directed Plaintiffs to respond to accusations of collusion, adversity, deception, and fraud on the Court.  D.E.65 at 2-3. It never ordered Mr. Brito or Mr. Epstein to show cause.  It never identified any act by either Attorney as sanctionable.  It never advised their professional standing, bar status, or ability to practice in this District was at stake.  The Court nevertheless imposed career-impacting sanctions.

Plaintiffs likewise received no notice of much of the grounds the Court ultimately decided. The May 29 Order did not identify the statute of limitations, the damages demand, counsel's prior professional relationships, asserted conflicts or recusal obligations, the legality or scope of the Settlement Agreement, the President's Compensation Clause, or the future use of the Settlement Agreement as potential grounds for sanctions.  It did not disclose that the Court was considering monetary sanctions under its inherent authority, and it gave no warning that the Court might enter a sweeping injunction.  That was reversible error. *See Kaplan v. DaimlerChrysler, A.G.*, 331 F.3d

1251, 1256-57 (11th Cir. 2003) (reversal required when the conduct ultimately condemned was not identified in the show-cause notice); *Mitchell v. Nobles*, 873 F.3d 869, 875 (11th Cir. 2017) (trial court abused its discretion in imposing sanctions "without affording . . . notice or an opportunity to respond"); *United States v. Shaygan*, 652 F.3d 1297, 1317-18 (11th Cir. 2011).

### 2. *A Record Was Established Through Improper Judicial Notice and Extrarecord Investigation*

Further, the Sanctions Order independently requires reversal because its findings rest on materials the Court could not lawfully use. The Court relied on judicially noticed press reports and extrarecord research to decide disputed questions of motive, intent, internal deliberations, and litigation strategy. That violated Federal Rules of Evidence 201(b) and (e), and the due-process limits governing inherent-power sanctions. *See Kornhauser v. Comm'r of Soc. Sec.*, 685 F.3d 1254, 1258 (11th Cir. 2012) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991)).

Rule 201 forbids reliance on news reports for the truth of disputed assertions. A court may notice that an article was published; it may not accept the article's account as fact. Fed. R. Evid. 201(b); *Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997); *see United States v. Baker*, 432 F.3d 1189, 1211 (11th Cir. 2005). Yet the Court took "judicial notice of articles reporting on relevant events" and relied extensively on reporting by The New York Times, The Wall Street Journal, Politico, CNN, The Guardian, Bloomberg Law, and other outlets. D.E.106 at 3 n.3, 7-9, 20-21, 26-27, 29, 33, 36, 43. The Court also did not provide a meaningful opportunity to be heard required by Rule 201(e). *See Bryant v. Ford*, 967 F.3d 1272, 1275 (11th Cir. 2020). Both errors independently require vacatur and warrant a stay.

Those errors cannot be repaired once sanctions have already been imposed. The Court entered a final ruling based on materials it could not lawfully treat as evidence and without the hearing Rule 201(e) required. Reversal is likely and a stay is warranted in the interim.

### 3. *The Sanctions Order Made No Individualized Findings*

The Sanctions Order independently requires reversal because it imposed sanctions without individualized findings tied to any particular movant's conduct, knowledge, or intent. That violates blackletter law and will compel reversal.

*Sua sponte* Rule 11 sanctions require a "higher standard" that is "akin to contempt." *Kaplan*, 331 F.3d at 1255. Inherent-power sanctions require subjective bad faith established through evidence of the sanctioned person's own conduct and state of mind. *Chambers*, 501 U.S. at 50-51; *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1224-25 (11th Cir.

13

2017). Collective attribution and conjecture do not satisfy either standard.

The Sanctions Order made no individualized findings as to Mr. Brito or Mr. Epstein. It identified no false statement by either lawyer, no knowledge of a pre-filing settlement, no agreement to suppress defenses, and no direction to Government counsel. Yet, it referred Mr. Brito to The Florida Bar and barred Mr. Epstein from seeking *pro hac vice* admission for one year. D.E.106 at 46-47.

The findings against Plaintiffs are no more individualized. The Court did not determine what any Plaintiff knew when suit was filed, who supposedly entered a pre-filing arrangement, when it was reached, what it required, or which Plaintiff authorized it. No such arrangement existed. Nor did it find that any Plaintiff knew an allegation was false or intended to deceive the Court. That is because neither issue was present. The Court simply moved from its erroneous control theory to the false accusation that every Plaintiff and lawyer acted in concert.

The record on which the Court ruled contains no actor-specific finding capable of supporting contempt-like misconduct or subjective bad faith. The Court chose the procedure, selected the materials, and entered a sanctions ruling. That ruling cannot be sustained through vague inference and guilt by association. The Sanctions Order should therefore be vacated, and these collateral proceedings stayed pending appeal.

## C.  The Speech Injunction Is Overbroad, Is an Unconstitutional Prior Restraint, and Exceeds Any Sanctions Authority

In addition, Rule 11 and inherent authority cannot support an order forbidding the President, private Plaintiffs, federal agencies, and sweeping categories of associated persons from "referring to" the Settlement Agreement or invoking it in any future judicial, administrative, regulatory, arbitral, or other official proceeding. D.E.106 at 47. That unprecedented injunction regulates future speech and advocacy, is unconstitutional, and is patently unlawful.

The Sanctions Order's command is a content-based prior restraint. It singles out one subject—the Settlement Agreement—and suppresses one message, *i.e.*, that the Settlement Agreement exists and may carry legal effect. Prior restraints carry a "heavy presumption" of constitutional invalidity, *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963), and constitute "the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). They require findings that the threatened harm is "both great and certain and cannot be mitigated by less intrusive measures." *CBS, Inc. v. Davis*, 510 U.S. 1315, 1317 (1994) (Blackmun, J., in chambers). The Sanctions Order identified no

threatened unlawful speech, no resulting harm, and no reason narrower relief would be inadequate. Indeed, it did not address the First Amendment at all.

The injunction also unconstitutionally disables the Parties from asserting legal rights in future proceedings. A party may need to invoke the Settlement Agreement as a release, defense, compromise, satisfaction, or other legally operative fact. The First Amendment protects access to adjudicative bodies and the presentation of reasonably based claims and defenses. *See BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 524-25, 532-33 (2002). The injunction therefore wrongly suppresses both the evidence and the argument on which a future claim or defense may depend.

Moreover, this Court possessed no freestanding jurisdiction over the Settlement Agreement merely because the Parties settled a case once pending before it. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 378-82 (1994). The Sanctions Order acknowledged that the Settlement Agreement's validity and enforceability were "not before this Court." D.E.106 at 47 n.63. A court that disclaims authority to decide an agreement's legal effect cannot accomplish the same result by forbidding reference to the agreement.

Rule 11 independently forecloses this remedy. Any sanction must be "limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4). The alleged violation concerned the filing of the Complaint. The unlawful injunction wrongly regulates future speech about a later agreement. It neither addresses a representation in the Complaint nor deters repetition of the alleged filing misconduct. Rule 11 does not authorize a roving restraint on future advocacy. *See Donaldson*, 819 F.2d at 1561; *Buckler*, 634 F. App'x at 697. The Rule "is not intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories." *Donaldson*, 819 F.2d at 1561 (citation omitted).

The Sanctions Order's breadth confirms its invalidity. The injunction reaches the Parties' "agents, representatives, officers, directors, employees, partners, corporate agents, subsidiaries, affiliates," and anyone acting under their control. D.E.106 at 47. Those persons committed no identified misconduct and received no notice or opportunity to be heard. Even a valid injunction may bind nonparties only within the confined categories recognized by Rule 65(d)(2). *See* Fed. R. Civ. P. 65(d)(2); *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 13-14 (1945). That is not the case here.

The injunction therefore fails on every independent ground. It is a content-based prior restraint unsupported by constitutional findings; it impairs the right to petition; it dictates what

15

other tribunals may hear; it exceeds Rule 11's tailoring requirement; it regulates Executive Branch advocacy; and it binds persons never accused of misconduct.  Even if every antecedent sanctions finding survived, which it would not, this injunction could not.  Again, the Eleventh Circuit is likely to vacate the Sanctions Order, and it must be stayed immediately.

## II.        The Movants Will Suffer Irreparable Harm Absent a Stay

The Sanctions Order is already inflicting immediate constitutional, professional, and reputational injuries that appellate reversal cannot repair after the fact.  "Even when a later money judgment might undo an alleged injury, the alleged injury is irreparable if damages would be difficult or impossible to calculate."  *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010) (citation and internal quotation marks omitted).  That standard is readily satisfied here: the injunction suppresses protected speech now, while the professional sanctions inflict injuries that will mature before appellate review can occur.

### A.        The Prior Restraint Is an Unconstitutional Restriction on Speech and Litigation Conduct

"[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Scott*, 612 F.3d at 1295.  That rule is decisive here.  The injunction forbids Movants from "referring to" the Settlement Agreement or invoking it in any judicial, administrative, regulatory, arbitral, or other official proceeding.  D.E.106 at 47.  Every day the unlawful injunction remains in force, it suppresses protected speech and petitioning activity that no later appellate ruling can restore.  A later vacatur cannot recover the arguments Movants were barred from making, the evidence they were prohibited from offering, or the proceedings conducted under that unconstitutional restraint.

The injunction is therefore causing irreparable harm now.  The First Amendment does not require Movants to endure months of compelled, unconstitutional silence while awaiting appellate review.  *Elrod*, 427 U.S. at 373.  A stay is necessary to halt that ongoing constitutional injury and preserve the Eleventh Circuit's ability to provide meaningful relief.

### B.        The Bar Referral and *Pro Hac Vice* Ban Impose Irreparable Reputational and Professional Harm

Sanctions that damage professional standing or restrict the practice of law cannot be remedied through money damages because their consequences are inherently intangible, difficult or impossible to calculate, and insulated from monetary recovery by sovereign immunity.  *Scott*, 612 F.3d at 1295; *Kleiner v. First Nat'l. Bank of Atlanta*, 751 F.2d 1193, 1200 n.14 (11th Cir.

1985) (recognizing "disciplinary action and consequent disqualification may expose counsel to further sanctions by the bar and portends adverse effects upon counsel's careers and public image").

The Sanctions Order bans Mr. Epstein from *pro hac vice* admission in the Southern District of Florida for one year. This ban takes immediate effect and directly restricts Mr. Epstein's ability to practice law in this District. It has already resulted in significant, unfounded public attacks on his reputation and professional standing that cannot be fully remedied through a later appellate victory. If the appeal takes twelve months or more—as appeals often do—the ban will have run its full course before the Eleventh Circuit can review it. An appellate reversal would be diminished because the harm would already be complete. *In re Gonzalez*, No. 12-MC-60047, 2012 WL 12895515, at *1 (S.D. Fla. Jan. 23, 2012) (staying suspension pending appeal); *Schlumberger Techs., Inc. v. Wiley*, 113 F.3d 1553, 1562 (11th Cir. 1997) ("[T]he power [to disbar] is one that ought always to be exercised with great caution; and ought never be exercised except in clear cases of misconduct, which affect the standing and character of the party as an attorney.").

The Sanctions Order also refers Mr. Brito to The Florida Bar for disciplinary proceedings. Once a bar referral is made and disciplinary proceedings initiated, the damage to an attorney's professional reputation is immediate and irreversible—regardless of the ultimate outcome. *Kleiner*, 751 F.2d at 1200 n.14 (the potential for disciplinary proceedings before the bar "portends adverse effects upon counsel's careers and public image"). The mere pendency of a bar complaint imposes stigma, triggers disclosure obligations, may create malpractice insurance consequences, and may affect the attorney's ability to retain existing clients or attract new ones. Even when the Sanctions Order is ultimately reversed on appeal, the ramifications of a disciplinary referral, once set in motion, cannot easily be undone. A stay must issue.

## III.    A Stay Will Not Impose Substantial Cognizable Injury to Interested Parties

A stay will preserve the *status quo* without imposing any cognizable injury. *See LabMD, Inc.*, 678 F. App'x at 819. The underlying claims were dismissed with prejudice, the Parties' dispute has ended, and Defendants have asserted no interest in enforcing the sanctions during appeal. Staying the injunction, the professional sanctions, and the derivative fee proceedings will require no party to act, surrender no substantive right, and disturb no ongoing merits litigation. This factor weighs decisively in Movants' favor.

17

**IV.     The Public Interest Supports a Stay of the Sanctions Order and Related Proceedings**

The public interest strongly favors preserving appellate review of an order that unconstitutionally restricts speech, burdens access to tribunals, sanctions lawyers without adequate process, and announces an unlawful and unprecedented limitation on the personal rights of a President.   Allowing those consequences to take effect before review would harm interests extending far beyond these Movants.

*First*, the public has a compelling interest in ensuring that sanctions—especially sanctions imposed *sua sponte*—remain confined by Rule 11, the Federal Rules of Evidence, and due process. Sanctions imposed without notice, admissible evidence, or individualized findings chill advocacy well beyond the persons named in the order.  They raise a *bona fide* concern among lawyers and litigants that novel or politically charged claims may expose them to professional discipline based on a record the court assembles itself.  *See Buckler*, 634 F. App'x at 697 ("[T]he purpose of Rule 11 is to deter frivolous lawsuits and not to deter novel legal arguments or cases of first impression." (citation omitted)).  A stay prevents that chilling effect from taking root while the Eleventh Circuit reviews the Sanctions Order's legality.

*Second*, the public interest in a stay is stronger still because the injunction directly restrains speech and petitioning in future proceedings.  The First Amendment right to petition includes access to courts and agencies.  *Int'l Brotherhood of Teamsters Local 947 v. NLRB*, 66 F.4th 1294, 1306 (11th Cir. 2023) (explaining "[t]he First Amendment right to petition the government for a redress of grievances includes a right of access to the courts" and is "one of the most precious of the liberties safeguarded by the Bill of Rights").  The Sanctions Order wrongly forbids the Parties from presenting a legal agreement, related evidence, and associated arguments to future decisionmakers.  Preserving that restriction during appeal would normalize judicial control over what litigants may say and what other tribunals may hear.  The public interest runs decisively against that result.

*Third*, the public has a fundamental interest in the faithful application of due process.  The procedural protections of the Fifth Amendment exist not only for the benefit of the particular parties before the court, but as structural safeguards that maintain the legitimacy and integrity of the judicial system.  *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980) (due process "preserves both the appearance and reality of fairness, generating the feeling, so important to a popular government, that justice has been done" (citation and internal quotation marks omitted)).  Severe

18

sanctions imposed through undisclosed theories, extrarecord factfinding, and speculation undermine both. Staying those sanctions during review protects confidence in the judiciary's neutrality, and in the procedures governing the exercise of its most coercive powers.

*Fourth*, and finally, this appeal presents questions of exceptional institutional importance: whether presidential supervision destroys adversity in a President's personal-capacity suit (it does not); whether a court may impose contempt-like sanctions through extrarecord investigation (it may not); and whether sanctions authority permits a prior restraint governing future proceedings (it does not). It is "in the public interest to establish the appropriate legal principles" governing such questions before the challenged order produces irreversible consequences. *Noriega v. Pastrana*, No. 07-22816-CIV, 2008 WL 331394, at *3 (S.D. Fla. Jan. 31, 2008) (staying proceeding where appeal involved "credible arguments" on "unique issues" to be considered by the Eleventh Circuit).

The public interest thus decidedly favors a stay for the same reason the merits favor reversal: the Sanctions Order's harmful consequences extend beyond this case, while maintaining the *status quo* imposes no countervailing harm.

## V.      The Fee Proceedings Should Be Held in Abeyance Pending Appeal

For the reasons explained above, Movants are likely to prevail on appeal, and the fee proceeding should be held in abeyance until that appeal is resolved.

*First*, the wrongful invitation to seek fees, which the Court entered pursuant to its inherent authority, is entirely derivative of the underlying sanctions ruling. D.E.106 at 52-53. If the Sanctions Order is reversed on appeal—as Movants submit it will be—the fee proceedings will be moot. Requiring the parties to litigate fee amounts while the Eleventh Circuit reviews the very basis for the fee award is wasteful and unnecessary. This is particularly true because the Court's inherent authority ruling rests on a finding of bad faith that, like other factual findings, rests on inadmissible evidence that falls short of the clear-and-convincing evidentiary standard required for such sanctions. *See Chambers*, 501 U.S. at 46-47 (inherent authority sanctions assessing attorney's fees require finding that conduct was "in bad faith, vexatious[], wanton[], or [done] for oppressive reasons").

*Second*, the Eleventh Circuit has recognized that staying derivative proceedings pending appeal of the underlying order is appropriate. *See Martinair Holland, N.V. v. Benihana, Inc.*, 815 F. App'x 358, 359 (11th Cir. 2020) (staying briefing on fee appeal pending decision on the merits).

Where, as here, the fee proceedings are entirely dependent on the validity of the underlying Sanctions Order, holding those proceedings in abeyance is the course most consistent with judicial economy, fairness to the litigants, and orderly appellate practice.

*Third*, *amici* are not entitled to fees because they are not parties, and therefore cannot be prevailing parties entitled to recover attorneys' fees. *See Universal Oil Prods. Co. v. Root Ref. Co.*, 328 U.S. 575, 580-81 (1946). The Eleventh Circuit has squarely held that "[a]n organization or group that files an amicus brief on the winning side is not entitled to attorney's fees and expenses as a prevailing party, because it is not a party," and the court "will not allow that result to be changed by the simple expedient of having counsel for a party do some or all of the amicus work." *Glassroth v. Moore*, 347 F.3d 916, 919 (11th Cir. 2003); *see also Nuclear Regulatory Comm'n v. Texas*, 605 U.S. 665, 677-78 (2025). Those authorities foreclose the Court from inviting the *amici* to seek "appropriate reimbursement" or awarding any attorneys' fees "incurred by Court-appointed amici." D.E.106 at 52-53.

*Fourth*, recasting the award as a sanction does not help. If the Court could rely on its inherent authority to issue sanctions, that would be the exception that swallows the rule. *See* Fed. R. Civ. P. 11(c)(5)(B); D.E.106 at 45, 52-53. This is especially true where there is no causal link between Plaintiffs' filings and *amici* voluntarily incurring fees on a motion they did not win, as is the case here. D.E.106 at 50. Accordingly, the Court erred in permitting the *amici* to seek fees, and the fee proceedings should be stayed on these grounds.

## CONCLUSION

For the foregoing reasons, Movants respectfully request that the Court stay the July 13, 2026, Sanctions Order (D.E.106) in full pending appeal, hold the fee proceeding in abeyance pending appeal, and grant such other relief as is just and proper.

20

## REQUEST FOR EXPEDITED CONSIDERATION

Movants bring this Motion on an expedited basis, pursuant to Local Rule 7.1(d)(2), because the Sanctions Order's operative provisions are in effect now and inflict continuing, irreparable harm each day they remain in force.  Movants respectfully request an expedited ruling on the instant Motion on or before August 5, 2026.  A ruling by that date is necessary to permit Movants, if the stay is denied, to seek timely relief in the United States Court of Appeals for the Eleventh Circuit under Federal Rule of Appellate Procedure 8(a)(2) before the challenged provisions inflict further irreparable harm that a later reversal cannot undo.  Movants respectfully request that the Court set an expedited briefing schedule (if necessary), and rule at the earliest practicable date.

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(a)(3)

The undersigned counsel certifies that on July 31, 2026, counsel for Movants conferred with counsel for Defendants, who do not oppose the relief sought in this Motion.  With full reservation of rights and waiver of none, the undersigned counsel certifies that it has made reasonable and good-faith efforts to confer with counsel for the initial *amici* (D.E.7, D.E.15), counsel for the court-appointed *amici* (D.E.43), and counsel for the former federal judges (D.E.63), notwithstanding they are all non-parties to this action.  Specifically, on July 30, 2026, undersigned counsel emailed counsel for each *amicus* group at 11:19 p.m. ET, requesting their position on the relief sought in this Motion.  Counsel for initial *amici* Former Government Officials, Common Cause, and Project on Government Oversight (D.E.7) oppose the Motion.  Counsel for initial *amici* Citizens for Responsibility and Ethics in Washington and Public Citizens (D.E.15) take no position on the Motion.  Counsel for the former federal judges (D.E.63) oppose the Motion.  As of the filing of this Motion, counsel has not received a response from the court-appointed *amici* (D.E.43), who have declined any fees.  Given the exigent nature of the relief requested, Movants file this Motion now to avoid any delay.  Counsel will continue efforts to confer and will promptly advise the Court of any position communicated after filing.

Dated: July 31, 2026

Respectfully submitted,

**DLA PIPER LLP (US)**

*/s/ Christopher G. Oprison*
Christopher G. Oprison (FBN 0122080)
200 South Biscayne Blvd., Suite 2500
Miami, FL 33131
Telephone: (305) 423-8522
Facsimile: (305) 437-8131
chris.oprison@dlapiper.com

*Counsel for Plaintiffs President Donald J.*
*Trump, Donald J. Trump Jr., Eric Trump,*
*The Trump Organization, LLC, Alejandro*
*Brito, and Daniel Epstein*

22

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on July 31, 2026, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notice of Electronic Filing generated by CM/ECF.  I further certify that the foregoing document is being served on Defendants by U.S. Mail at the following addresses:

U.S. Department of the Treasury
Attention: Secretary of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220

U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

U.S. Attorney's Office Southern District of Florida
99 N.E. 4th Street
Miami, FL 33132

Internal Revenue Service
Attention: Commissioner of Internal Revenue
1111 Constitution Avenue, NW
Washington, D.C. 20224

/s/ Christopher G. Oprison
Christopher G. Oprison