**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 1:26-cv-20609-WILLIAMS/LETT**

PRESIDENT DONALD J. TRUMP, et al.,
Plaintiffs,

v.

INTERNAL REVENUE SERVICE, et al.,
Defendants.

# CORRECTED MEMORANDUM OF COURT-APPOINTED *AMICI CURIAE* REGARDING MOTION FOR STAY

# TABLE OF CONTENTS

**Pages**

INTERESTS OF *AMICI CURIAE* ........ 1
INTRODUCTION ........ 1
STANDARD ........ 2
ANALYSIS ........ 3
I. Appealability of the Court's Sanctions Order ........ 3
II. Movants' Challenges to the Court's Findings That the Proceeding Lacked Adversity and Was Pursued for an Improper Purpose ........ 5
A. Legal Considerations Bearing on the Court's Findings ........ 5
1. The Nature of the Court's Adversity Assessment ........ 6
2. The Connection Between the Court's Adversity Findings and Sanctions ........ 10
B. Factual Considerations Bearing on the Court's Findings ........ 11
III. Movants' Challenges to the Court's Sanction Concerning Future Official Proceedings ........ 13
A. First Amendment Principles ........ 14
1. Speech Clause Principles ........ 14
2. Petition Clause Principles ........ 16
B. Considerations Relevant to Applying Those Principles ........ 17
IV. Movants' Due Process Arguments ........ 21
A. Whether the Court's Sanctions Order Provided Due Process to Movants ........ 21
1. Notice of Rule 11 Sanctions ........ 22
2. Notice of Inherent Power Sanctions ........ 26
3. Propriety of Judicial Notice ........ 30
4. Individualization of Findings ........ 31
V. The Remaining Stay Factors ........ 32
A. Irreparable Harm ........ 32
B. Effect on Interested Parties and the Public Interest ........ 37
VI. The Fee Proceedings ........ 38
CONCLUSION ........ 40

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*7020 Ent., LLC v. Miami-Dade County*,
519 F. Supp. 3d 1094 (S.D. Fla. 2021) ....31

*Acheron Cap., Ltd. v. Mukamal*,
22 F.4th 979 (11th Cir. 2022) ....4

*Adkins v. Christie*,
227 F. App'x 804 (11th Cir. 2007) ....3, 33, 35

*ADT LLC v. NorthStar Alarm Servs., LLC*,
853 F.3d 1348 (11th Cir. 2017) ....20, 21

*Ala. Aircraft Indus., Inc. v. Boeing Co.*,
2018 WL 6220075 (N.D. Ala. 2018) ....37

*Alabama v. U.S. Army Corps of Eng'rs*,
424 F.3d 1117 (11th Cir. 2005) ....35

*Alexander v. Trump*,
413 So. 3d 795 (Fla. Dist. Ct. App. 2025) ....7

*Am. Unites for Kids v. Rousseau*,
985 F.3d 1075 (9th Cir. 2021) ....32

*Assoc. Builders & Contractors Fla. First Coast Chapter v. GSA*,
174 F.4th 26 (11th Cir. 2026) ....37

*Bank of Jackson Cnty. v. Cherry*,
980 F.2d 1362 (11th Cir. 1993) ....16

*Barnes v. Dalton*,
158 F.3d 1212 (11th Cir. 1998) ....18

*Barrett v. Walker Cnty. Sch. Dist.*,
872 F.3d 1209 (11th Cir. 2017) ....14

*BE & K Constr. Co. v. NLRB*,
536 U.S. 516 (2002) ....17, 19

*Bill Johnson's Rests., Inc. v. NLRB*,
461 U.S. 731 (1983) ....16, 17

*Carter v. Allen*,
762 F. App'x 827 (11th Cir. 2019) ....................16

*Chambers v. NASCO, Inc.*,
501 U.S. 32 (1991)....................30, 37, 39

*Clawson v. Thornell*,
2025 WL 2938798 (D. Ariz. Sep. 26, 2025)....................26

*Clinton v. Jones*,
520 U.S. 681 (1997)....................7, 39

*Cohen v. Burlington, Inc.*,
2020 WL 1033349 (S.D. Fla. Mar. 3, 2020)....................10

*Comput. Scis. Corp. v. Tata Consultancy Servs. Ltd.*,
159 F.4th 429 (5th Cir. 2025) ....................20

*Cook v. Am. S.S. Co.*,
134 F.3d 771 (6th Cir. 1998) ....................30

*Cooter & Gell v. Hartmarx Corp.*,
496 U.S. 384 (1990)....................10

*Cordova v. Univ. Hosp. & Clinics, Inc.*,
92 F.4th 266 (5th Cir. 2024) ....................15

*CTI-Container Leasing Corp. v. Uiterwyk Corp.*,
685 F.2d 1284 (11th Cir. 1982) ....................39

*Danubis Grp., LLC v. Landmark Am. Ins. Co.*,
685 F. App'x 792 (11th Cir. 2017) ....................22

*Dem. Exec. Comm. of Fla. v. Lee*,
915 F.3d 1312 (11th Cir. 2019) ....................32

*Devaney v. Cont'l Am. Ins. Co.*,
989 F.2d 1154 (11th Cir. 1993) ....................24

*Dial HD, Inc. v. ClearOne Comm'cns*,
536 F. App'x 927 (11th Cir. 2013) ....................23

*Donaldson v. Clark*,
819 F.2d 1551 (11th Cir. 1987) .................... *passim*

*In re Engle Cases*,
283 F. Supp. 3d 1174 (M.D. Fla. 2017)....................21, 22

*Fellheimer, Eichen & Braverman v. Charter Techs.*,
57 F.3d 1215 (3d Cir. 1995)....29

*Fitzgerald v. McNae*,
2025 WL 1865665 (S.D. Fla. June 17, 2025)....2

*Fleming v. United States*,
127 F.4th 837 (11th Cir. 2025)....31

*Florida v. United States*,
2023 WL 3813774 (11th Cir. June 5, 2023)....37

*Fort v. AFSCME*,
375 F. App'x 109 (2d Cir. 2010)....34

*FTC v. Standard Oil Co. of Cal.*,
449 U.S. 232 (1980)....34, 39

*Garcia v. Spruce Servs.*,
662 F. Supp. 3d 1245 (S.D. Fla. 2023)....39, 40

*Garcia-Mir v. Meese*,
781 F.2d 1450 (11th Cir. 1986)....37

*Gentile v. State Bar of Nevada*,
501 U.S. 1030 (1991)....15, 16

*Gerber v. Bd. of Regents of the Univ. Sys. of Ga.*,
--- F.Supp.3d ----, 2026 WL 1068679 (M.D. Ga. Apr. 20, 2026)....35

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974)....16

*Glatter v. Mroz* (*In re Mroz*),
65 F.3d 1567 (11th Cir. 1995)....27, 29

*In re Gleason*,
492 F. App'x 86 (11th Cir. 2012)....15

*GRACE, Inc. v. City of Miami*,
685 F. Supp. 3d 1365 (S.D. Fla. 2023)....32

*Greer v. Moon*,
2025 WL 3062749 (D. Utah Oct. 31, 2025)....17

*Griffin v. Verizon Commc'ns Inc.*,
746 F. App'x 873 (11th Cir. 2018)....31

*Gulisano v. Burlington, Inc.*,
34 F.4th 935 (11th Cir. 2022) ....................11

*Hafer v. Melo*,
502 U.S. 21 (1991)....................7

*Jaffe v. Sundowner Props., Inc.*,
808 F.2d 1425 (11th Cir. 1987) ....................3

*In re Jan. 2021 Short Squeeze Trading Litig.*,
584 F. Supp. 3d 1161 (S.D. Fla. 2022) ....................31

*Johnson v. 27th Avenue Caraf, Inc.*,
9 F.4th 1300 (11th Cir. 2021) ....................17, 24, 25

*Kaplan v. DaimlerChrysler, A.G.*,
331 F.3d 1251 (11th Cir. 2003) ....................26, 29

*King v. Cessna Aircraft Co.*,
562 F.3d 1374 (11th Cir. 2009) ....................4

*King v. Fleming*,
899 F.3d 1140 (10th Cir. 2018) ....................15

*Kingsley Books, Inc. v. Brown*,
354 U.S. 436 (1957)....................14

*Kleiner v. First Nat'l Bank of Atlanta*,
751 F.2d 1193 (11th Cir. 1985) ....................15, 16, 35

*Koji IP, LLC v. Renesas Elecs. Am., Inc.*,
2026 WL 793025 (N.D. Cal. Mar. 20, 2026)....................35

*Koutoulas v. SEC*,
2024 WL 5483102 (S.D. Fla. Nov. 5, 2024)....................33

*Lake v. Gates*,
130 F.4th 1054 (9th Cir. 2025) ....................17

*Lasar v. Ford Motor Co.*,
399 F.3d 1101 (9th Cir. 2005) ....................24

*LaTele Tele., C.A. v. Telemundo Commc'ns Grp., LLC*,
2016 WL 6471201 (11th Cir. May 26, 2016)....................38

*Lewis v. Clarke*,
581 U.S. 155 (2017)....................7

*Lord v. Veazie*,
49 U.S. 251 (1850)....................5, 10

*Lothschuetz v. Carpenter*,
898 F.2d 1200 (6th Cir. 1990)....................18

*Lozman v. City of Rivera Beach*,
2011 WL 13107422 (S.D. Fla. May 4, 2011)....................39

*Madsen v. Women's Health Ctr., Inc.*,
512 U.S. 753 (1994)....................14, 17

*Mamma Mia's Trattoria, Inc. v. Original Brooklyn Water Bagel Co., Inc.*,
768 F.3d 1320 (11th Cir. 2014)....................20

*Managed Care Advisory Grp., LLC v. United Healthcare of N.C.*,
2022 WL 792267 (11th Cir. Mar. 16, 2022)....................4

*In re Markus*,
78 F.4th 554 (2d Cir. 2023)....................24

*Mayer v. Wall Street Equity Grp.*,
672 F.3d 1222 (11th Cir. 2012)....................3

*McCarthy v. Fuller*,
810 F.3d 456 (7th Cir. 2015)....................18

*McDonald v. Smith*,
472 U.S. 479 (1985)....................16

*Miller v. Cardinale* (*In re DeVille*),
361 F.3d 539 (9th Cir. 2004)....................29

*Miller v. Felix* (*In re Miller*),
414 F. App'x 214 (11th Cir. 2011)....................25

*Mitchell v. Nobles*,
873 F.3d 869 (11th Cir. 2017)....................22, 26

*Morillo-Cedron v. Dist. Dir. for the U.S. Citizenship & Immigr. Servs.*,
452 F.3d 1254 (11th Cir. 2006)....................3, 26

*Muskrat v. United States*,
219 U.S. 346 (1911)....................8

*Myers v. United States*,
272 U.S. 52 (1926)....................11

*Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*,
896 F.2d 1283 (11th Cir. 1990) ....................................................................................33

*New Pac. Overseas Grp. (USA) Inc. v. Excal Int'l Dev. Corp.*,
2000 WL 377513 (S.D.N.Y. Apr. 12, 2000).......................................................................24

*Nken v. Holder*,
556 U.S. 418, 434 (2009)................................................................................... *passim*

*Noakes v. Case W. Reserve Univ.*,
2021 WL 4441608 (N.D. Ohio Sep. 28, 2021)...................................................................35

*Ocon v. Equinamics Corp.* (*In re Ocon*),
2009 WL 405370 (11th Cir. Feb. 19, 2009) ......................................................................30

*In re Office of Ala. Att'y Gen.*,
2023 WL 129438 (11th Cir. Jan. 9, 2023) .........................................................................31

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*,
413 U.S. 376 (1973)..........................................................................................................14

*Precision Specialty Metals, Inc. v. United States*,
315 F.3d 1346 (Fed. Cir. 2003)..........................................................................................29

*Procup v. Strickland*,
792 F.2d 1069 (11th Cir. 1986) ...................................................................................17, 18

*In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*,
278 F.3d 175 (3d Cir. 2002)...............................................................................................24

*Purchasing Power, LLC v. Bluestem Brands, Inc.*,
851 F.3d 1218 (11th Cir. 2017) ..........................................................................10, 28, 32

*Riccard v. Prudential Ins. Co.*,
307 F.3d 1277 (11th Cir. 2002) ....................................................................... *passim*

*Robinson v. Cal. State Bar*,
2015 WL 3486724 (N.D. Cal. May 28, 2015) ...................................................................34

*Ross v. Chisholm*,
2006 WL 8432325 (S.D. Fla. Mar. 23, 2006)........................................................................3

*Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*,
349 F. Supp. 3d 298 (S.D.N.Y. 2018)...............................................................................30

*Rozier v. Ford Motor Co.*,
573 F.2d 1332 (5th Cir. 1978) ..........................................................................................30

*In re Sanford L. Firm*,
106 F.4th 706 (8th Cir. 2024) ....................24

*Sciarretta v. Lincoln Nat'l Life Ins. Co.*,
778 F.3d 1205 (11th Cir. 2015) ....................11

*Seattle Times Co. v. Rhinehart*,
467 U.S. 20 (1984) ....................15

*SEC v. Ahmed*,
2020 WL 5951484 (D. Conn. Oct. 8, 2020) ....................4

*SEC v. MinTrade Techs., LLC*,
2019 WL 13240979 (S.D. Fla. Dec. 4, 2019) ....................2

*Sentis Grp. v. Shell Oil Co.*,
559 F.3d 888 (8th Cir. 2009) ....................30

*Serpe v. FTC*,
2025 WL 4098300 (S.D. Fla. Oct. 30, 2025) ....................34

*Siegel v. LePore*,
234 F.3d 1163 (11th Cir. 2000) ....................33

*Silverberg v. DuPont de Nemours Inc.*,
2024 WL 1442164 (E.D. Pa. Apr. 2, 2024) ....................34

*Sindi v. El-Moslimany*,
896 F.3d 1 (1st Cir. 2018) ....................18

*Smith v. LePage*,
834 F.3d 1285 (11th Cir. 2016) ....................4

*Stansell v. Revolutionary Armed Forces of Colom.*,
120 F.4th 754 (11th Cir. 2024) ....................4

*Summit Med. Assocs., P.C. v. Pryor*,
180 F.3d 1326 (11th Cir. 1999) ....................4

*Swanson v. United States*,
2025 WL 1027399 (11th Cir. 2025) ....................17

*Tarasewicz v. Royal Caribbean Cruises Ltd.*,
2016 WL 3944178 (S.D. Fla. Mar. 17, 2016) ....................30

*Ted Lapidus, S.A. v. Vann*,
112 F.3d 91 (2d Cir. 1997) ....................29

*Thomas v. Tenneco Packaging Co.*,
293 F.3d 1306 (11th Cir. 2002) ....................15

*Thompson v. RelationServe Media, Inc.*,
610 F.3d 628 (11th Cir. 2010) ....................10

*Tory v. Cochran*,
544 U.S. 734 (2005) ....................15

*Touchston v. McDermott*,
234 F.3d 1130 (11th Cir. 2000) ....................2

*Traylor v. City of Atlanta*,
805 F.2d 1420 (11th Cir. 1986) ....................17

*Trump v. Clinton*,
161 F.4th 671 (11th Cir. 2025) ....................27

*Trump v. Clinton*,
653 F. Supp. 3d 1198 (S.D. Fla. 2023) ....................11

*Trump v. Slaughter*,
146 S. Ct. 2283 (2026) ....................6

*TVA v. EPA*,
278 F.3d 1184 (11th Cir. 2002) ....................7

*United States v. Alvarez*,
567 U.S. 709 (2012) ....................16

*United States v. Frazier*,
26 F.3d 110 (11th Cir. 1994) ....................30

*United States v. Khoury*,
901 F.2d 948 (11th Cir. 1990) ....................28

*United States v. McCorkle*,
321 F.3d 1292 (11th Cir. 2003) ....................3

*United States v. Nixon*,
418 U.S. 683 (1974) ....................7

*United States v. Philip Morris USA Inc.*,
566 F.3d 1095 (D.C. Cir. 2009) ....................21

*United States v. Robinson*,
83 F.4th 868 (11th Cir. 2023) ....................20

*United States v. Shaygan*,
652 F.3d 1297 (11th Cir. 2011) ....................21, 26, 28

*In re Walker*,
532 F.3d 1304 (11th Cir. 2008) ....................34

*White v. Hopkins*,
2024 WL 3924606 (E.D. Mo. Aug. 23, 2024) ....................28

*Wright v. CompGeeks.com*,
429 F. App'x 693 (10th Cir. 2011) ....................29

*In re Zantac (Ranitidine) Prods. Liab. Litig.*,
2023 WL 5429301 (S.D. Fla. Aug. 23, 2023) ....................4

*Zuk v. E. Pa. Psych. Inst. of the Med. Coll. of Pa.*,
103 F.3d 294 (3d Cir. 1996) ....................29

**Statutes and Rules**

26 U.S.C. § 7431 ....................8, 13

26 U.S.C. § 7803 ....................11

28 U.S.C. § 1291 ....................3

28 U.S.C. § 1292 ....................4

Fed. R. Bankr. P. 9011 ....................29

Fed. R. Civ. P. 11 .................... *passim*

Fed. R. Civ. P. 37 ....................24

Fed. R. Civ. P. 60 ....................30

Fed. R. Civ. P. 62.1 ....................28

Fed. R. Civ. P. 65 ....................20, 21

Fed. R. Evid. 201 ....................30, 31

Fed. R. Evid. 801 ....................31

**Other Authorities**

Devlin Barrett & Tyler Pager, *Trump Said to Demand Justice Dept. Pay Him $230 Million for Past Cases*, N.Y. Times (Oct. 21, 2025), https://www.nytimes.com/2025/10/21/us/politics/trump-justice-departmentcompensation.html [https://archive.ph/8YS9I] ....................................................12

Exec. Order No. 14215, 90 Fed. Reg. 10447 (Feb. 24, 2025) .................................................6, 11

The Fla. Bar, *The Lawyer Discipline Process* (last visited Aug. 14, 2026), https:// www.floridabar.org/public/acap/acap002/ [https://perma.cc/22MU-42LZ]...........................34

Forbes Breaking News, *'I'm Supposed To Work Out A Settlement With Myself': Trump Addresses Lawsuit Against IRS* (YouTube, Feb. 1, 2026), https://youtu.be/wxyTtLB1USY ..........................................................................................12

Press Briefing by Press Secretary Jen Psaki (Apr. 5, 2022), https://bidenwhitehouse.archives.gov/briefing-room/press-briefings/2022/04/05/press-briefing-by-press-secretary-jen-psaki-april-5-2022/......................9

S.D. Fla. Rules Governing Attorneys r. 4(b)(2)..............................................................................36

*Read the full transcript: President Donald Trump interviewed by 'NBC Nightly News' anchor Tom Llamas*, NBC News (Feb. 4, 2026), https://www.nbcnews.com/politics/trumpadministration/trump-interview-nbc-news-extend-transcript-tom-llamas-super-bowl-2026-rcna257410, [https://perma.cc/T4SR-KVZH] ..........................................................................................12

## INTERESTS OF *AMICI CURIAE*

In its Order dated April 24, 2026, the Court indicated that it "has concerns about whether it has subject matter jurisdiction in this case" and appointed undersigned counsel "to assist the Court in identifying the applicable law governing an analysis of this issue." Dkt. No. 43. *Amici* accordingly submitted a memorandum in support of neither party in an effort to aid the Court in determining whether jurisdiction lies in this case. Dkt. No. 45.

Following this Court's order imposing sanctions on Plaintiffs and their counsel, Dkt. No. 106 ("Sanctions Order"), Plaintiffs and their counsel (together, "Movants") appealed and moved this Court for a stay of further proceedings pending appeal, Dkt. No. 114 ("Motion" or "Mot."). In its Order dated August 1, 2026, the Court ordered *amici* to "submit a response identifying relevant legal authority and addressing the multiple issues raised in Plaintiffs' and their attorneys' Motion to assist the Court in resolving this matter." Dkt. No. 115. *Amici* thus submit this memorandum in support of neither party to aid the Court in its assessment of the issues necessary to adjudicate the Motion.

## INTRODUCTION

After the parties voluntarily dismissed this case, a group of 35 former federal judges filed a motion to reopen, asserting that the parties had perpetrated a fraud on the Court by filing the case without genuine adversity for the purpose of conferring benefits to the President and his family. That motion also alleged that the parties "settled" the case to shield their conduct from judicial scrutiny and evade the Court's then-ongoing inquiry into whether this suit presented a case or controversy under Article III of the Constitution.[1] In light of these "grievous allegations," on May 29, 2026, the Court issued an order, which stated that it was "empowered to investigate serious misconduct within the purview of Rule 11" and required Plaintiffs to respond to the allegations in the former judges' motion. Dkt. No. 65 ("May 29 Order"). On July 13, 2026, after Plaintiffs filed their response, the Court issued a Sanctions Order in which it found that Plaintiffs filed this case for an improper purpose and had acted in bad faith. The Court imposed several sanctions under Rule 11, invited certain non-appointed *amici* to file a motion for attorney's fees, and allowed Plaintiffs to respond to any such motions. Sanctions Order at 53. Before that process had concluded,

[1] The Court appointed the undersigned *amici* to "identify the applicable law governing an analysis" of the Court's subject matter jurisdiction. Dkt. No. 43.

Plaintiffs appealed the Sanctions Order to the U.S. Court of Appeals for the Eleventh Circuit, Dkt. No. 113, and then moved this Court for a stay of further proceedings pending that appeal, *see generally* Mot.[2]

At the Court's direction, *amici* set out considerations for the Court in assessing six issues relevant to the Motion: Movants' likelihood of establishing appellate jurisdiction; Movants' likelihood of success on their challenge to the Court's findings on adversity and bad faith; Movants' likelihood of success on their challenge to the Court's sanction concerning future official proceedings; Movants' likelihood of success on their due process arguments; irreparable harm and the effect of a stay on third parties and the public interest; and Movants' separate request to hold further proceedings in abeyance.

*Amici* believe that Movants have not demonstrated a substantial likelihood of prevailing on the merits of their due process arguments: The Court provided sufficient notice and basis for the Rule 11 sanctions it imposed, and it has not yet imposed any inherent power sanctions, instead allowing Movants to respond to the motions for attorney's fees. Nevertheless, to address Movants' concerns of insufficient process, the Court retains the option to provide additional process. The Court could, for example, construe its Sanctions Order as an order to show cause and allow Movants to introduce evidence in documentary form or at a hearing. If the Court has doubts about its jurisdiction while the Sanctions Order is on appeal, it may solicit more evidence on the appropriateness of sanctions and issue an indicative ruling on how it would rule in the event of a remand.

## STANDARD

A "stay pending appeal is an extraordinary remedy for which the moving party bears a heavy burden." *Fitzgerald v. McNae*, 2025 WL 1865665, at *1 (S.D. Fla. June 17, 2025). To be entitled to a stay pending appeal, the moving party must show "(1) a substantial likelihood that [the movant] will prevail on the merits of the appeal; (2) a substantial risk of irreparable injury . . . unless the [stay] is granted; (3) no substantial harm to other interested persons; and (4) no harm to the public interest." *SEC v. MinTrade Techs., LLC*, 2019 WL 13240979, at *1 (S.D. Fla. Dec. 4, 2019) (Williams, J.) (quoting *Touchston v. McDermott*, 234 F.3d 1130, 1132 (11th Cir. 2000)).

[2] At the time of this filing, Movants' appellate request for the same relief is pending before the Eleventh Circuit. *See generally* Time Sensitive Motion for Stay, *Trump v. Thirty-Five Former Fed. Judges*, No. 26-12692 (11th Cir. Aug. 12, 2026), Dkt. No. 8.

## ANALYSIS

### I. Appealability of the Court's Sanctions Order

"Whether [Movants] are likely to prevail on the merits in their appeal turns on whether the Eleventh Circuit . . . has jurisdiction over the appeal." *Ross v. Chisholm*, 2006 WL 8432325, at *5 (S.D. Fla. Mar. 23, 2006). The existence and scope of the Eleventh Circuit's appellate jurisdiction over this matter is unclear.

*Amici* note first that the Court's referrals for disciplinary review are not reviewable by the Eleventh Circuit. *See Adkins v. Christie*, 227 F. App'x 804, 806 (11th Cir. 2007) ("A referral cannot be characterized as a sanction or a disciplinary measure. Through a referral, a district court simply indicates that in its view, conduct of the attorneys merits further examination by the disciplinary committee, which may or may not result in a sanction. As such, a referral is not a reviewable measure." (citing *United States v. McCorkle*, 321 F.3d 1292, 1298–99 (11th Cir. 2003))). Those portions of the Court's Sanctions Order are thus irrelevant to its assessment of Movants' likelihood of success on the merits on appeal.

The question of the Eleventh Circuit's jurisdiction over the remainder of the appeal is more complex. Courts of appeals typically review only "final decisions" of the district courts. 28 U.S.C. § 1291. A post-judgment proceeding, such as the Court's sanctions proceeding, is treated "as a free-standing litigation" and becomes final only when it "disposes of all the issues raised in the motion [or order] that initially sparked the postjudgment proceedings." *Mayer v. Wall Street Equity Grp.*, 672 F.3d 1222, 1224 (11th Cir. 2012). The Court has entered Rule 11 sanctions, but the Court has not imposed sanctions against Movants under its inherent powers,[3] instead inviting certain *amici* to file motions for attorney's fees and allowing Movants to respond. Sanctions Order at 53. Since "the award of attorney's fees is not collateral . . . but a part of [a] sanction, the amount of the award must be determined" before a sanctions order becomes final. *Jaffe v. Sundowner Props., Inc.*, 808 F.2d 1425, 1427 (11th Cir. 1987) (per curiam); *see Morillo-Cedron v. Dist. Dir. for the U.S. Citizenship & Immigr. Servs.*, 452 F.3d 1254, 1256 (11th Cir. 2006) ("Where the amount of the fee award has not been determined, a district court order granting attorney's fees is not final."

[3] The possible attorney's fees against Movants are the only inherent power sanctions at issue. Attorney General Blanche and Associate Attorney General Woodward have not appeared in this action and are not parties to the Motion.

(cleaned up)). The Eleventh Circuit may thus conclude that because the Court's Sanctions Order "itself contemplated" future orders, it was "a mere step towards" a final post-judgment order, not a final decision. *Acheron Cap., Ltd. v. Mukamal*, 22 F.4th 979, 988 (11th Cir. 2022) (cleaned up). If the Court concludes that appellate jurisdiction is unlikely, it may discount Movants' likelihood of success on appeal accordingly.[4]

It is possible that the Eleventh Circuit will characterize the Court's Rule 11 sanction restricting the Parties' use of their "purported 'settlement agreement' . . . as evidence of a 'settlement' reached in this matter," Sanctions Order at 47, as an injunction, making it appealable under 28 U.S.C. § 1292(a)(1). It is not clear that the Court's sanction in the form of a "non-monetary directive," *see* Fed. R. Civ. P. 11(c)(4), should be considered an "injunction" within the meaning of § 1292(a)(1), *see Managed Care Advisory Grp., LLC v. United Healthcare of N.C.*, 2022 WL 792267, at *3 (11th Cir. Mar. 16, 2022) (§ 1292(a)(1) is construed "functional[ly]" and "narrowly" to restrict appeals to "interlocutory orders of serious, perhaps irreparable, consequence." (quotation omitted)). But if the Eleventh Circuit does treat the sanction as appealable under U.S.C. § 1292(a)(1), it may exercise pendent appellate jurisdiction over "otherwise non-appealable" issues. *Smith v. LePage*, 834 F.3d 1285, 1292 (11th Cir. 2016). However, whether to exercise such jurisdiction is "within [the Eleventh Circuit's] discretion," *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1335 (11th Cir. 1999), and "the Supreme Court has signaled that pendent appellate jurisdiction should be present only under rare circumstances," *King v. Cessna Aircraft Co.*, 562 F.3d 1374, 1379 (11th Cir. 2009) (collecting authority); *see also SEC v. Ahmed*, 2020 WL 5951484, at *2 (D. Conn. Oct. 8, 2020) ("Considering that pendent appellate jurisdiction is a doctrine courts of appeals apply sparingly and in exceptional circumstances, it would be unreasonable to require district courts to stay proceedings when any party simply sought review of an otherwise non-reviewable order under a pendent jurisdiction theory.").

For present purposes, it is sufficient to note that the Eleventh Circuit's jurisdiction is far from assured.

---

[4] The Court retains jurisdiction over any non-final orders notwithstanding Movants' notice of appeal. *See Stansell v. Revolutionary Armed Forces of Colom.*, 120 F.4th 754, 763 (11th Cir. 2024) ("[F]iling a notice of appeal from a nonappealable order [does] not divest the district court of jurisdiction" (quotation omitted)); *In re Zantac (Ranitidine) Prods. Liab. Litig.*, 2023 WL 5429301, at *4 (S.D. Fla. Aug. 23, 2023).

## II. Movants' Challenges to the Court's Findings That the Proceeding Lacked Adversity and Was Pursued for an Improper Purpose

Movants argue that they are likely to succeed on appeal of the Sanctions Order because the Court committed legal and factual errors in reaching its conclusions on adversity and in ordering sanctions based on those conclusions. To assist the Court in considering these objections, *amici* set out in the analysis below the principles and key considerations relevant to each of them.

### A. Legal Considerations Bearing on the Court's Findings

The Court's conclusion in the Sanctions Order that the Parties lacked adversity rested on two related findings: first, that President Trump controlled both sides of the suit, rendering independence between the Parties illusory, Sanctions Order at 18–21; and second, that the Parties' conduct in this case—particularly that of the Defendant government entities—demonstrated that "the Parties' interests were 'one and the same,'" *id.* at 27–28 (quoting *Lord v. Veazie*, 49 U.S. 251, 256 (1850)). The result, according to the Court, was that this proceeding served, at most, as a vehicle for Plaintiffs to "confer[] legitimacy" on an award of "taxpayer funds and exemption from audits and other investigations." *Id.* at 52, 18. The Court accordingly imposed sanctions on the basis that the Parties pursued this proceeding for an improper purpose and in bad faith. *Id.* at 43, 46–47, 52–54.

Movants now challenge those findings on the grounds that the Court inappropriately adopted a categorical rule for adversity in suits against the Executive Branch, *see* Mot. 8 (arguing that "[t]he sanctions . . . rest on a categorical rule that a President who sues an Executive agency is necessarily suing himself"), and in turn improperly rested sanctions on that rule. *See id.* at 6 (arguing that "disagreement over an 'unprecedented' constitutional question cannot support findings of collusion, improper purpose, and bad faith—much less career-altering sanctions against counsel for advancing the contrary view").[5] As discussed further below, these challenges do not appear to establish an abuse of discretion. District courts possess considerable authority to impose sanctions under Rule 11 and their inherent powers; here, Movants have not identified an error that warrants disturbing the Court's issuance of sanctions under Rule 11 or its findings related to

---

[5] *See also* Mot. 7 (arguing that "[t]he Sanctions Order . . . adopted the unprecedented view that presidential supervision made Article III adversity impossible, then wrongly treated that legal conclusion as proof that the lawsuit was collusive, the settlement predetermined, and Movants' purpose improper").

inherent power sanctions, including because their primary claim of error rests on a misreading of the Court's analysis.

### 1. The Nature of the Court's Adversity Assessment

The authorities are clear that adversity calls for a functional, fact-specific inquiry. *See* Dkt. No. 45, at 3–8. Contrary to Movants' characterization in their stay motion, the Court's 56-page Sanctions Order reflects precisely that approach—indeed, the Sanctions Order did not, as Movants contend, simply treat the President's supervisory authority as dispositive of the adversity inquiry. *Contra* Mot. 1, 5. Instead, the Order separately examined both (1) the legal and practical mechanisms through which President Trump could control the Defendants, and (2) whether the Parties' conduct in and surrounding the litigation demonstrated genuinely divergent interests. *See* Sanctions Order at 18–38.

To be sure, the Court discussed certain factors that, viewed in isolation, could potentially suggest a more far-reaching outcome in suits against the Executive. The Court noted, for example, the President's constitutional and statutory authority to appoint and remove federal officers as factors contributing to the Defendants' lack of independence. *See* Sanctions Order at 19–21. The Court also cited the Supreme Court's recent decision in *Trump v. Slaughter*, 146 S. Ct. 2283 (2026), which held that "[s]ubordinates who exercise the President's power are subject to removal by him," because "[t]hen, and only then, can they remain accountable to the President, and the President to the people." Sanctions Order at 18 (quoting *Slaughter*, 146 S. Ct. at 2310). Read as a whole, however, the Court's analysis was contextual, and it did not rest on the President's constitutional or even statutory authority alone. The Court emphasized, among other factors, Executive Order 14215, which specifically expanded presidential control over legal positions taken by executive agencies, *see id.* at 21–22 (citing Exec. Order No. 14215, § 7, 90 Fed. Reg. 10447 (Feb. 24, 2025)); President Trump's asserted "right" to control the Department of Justice ("DOJ"), *see id.* at 26; and the DOJ's materially different approach in this case as compared with other Littlejohn cases, *see id.* at 23–24—all circumstances particular to this case or to policies imposed by the Trump Administration. The Court also considered the highly unusual conduct of DOJ in declining to enter an appearance to defend the interests of the United States or to make any adversarial filings; the participants in the settlement discussions; then-Acting Attorney General Blanche's unilateral repudiation of the Anti-Weaponization Fund; and the President's relationships with certain Executive

Branch lawyers. *See id.* at 24–38. Had the President's supervisory status alone been dispositive, substantial portions of the Court's analysis would have been superfluous.

Movants' additional critiques of the Court's adversity analysis likewise do not establish that the Court adopted a categorical approach, much less that it abused its discretion in finding a lack of adversity on the facts of this case. To the contrary, several of Movants' own objections appear to depend precisely on the sort of categorical approach Movants attribute to the Court.

Movants argue, for example, that the Court overlooked the distinction between official- and personal-capacity litigation, a distinction they contend should have been dispositive. *See* Mot. 8 ("Blackletter law distinguishes between an officeholder and the sovereign he serves. In an official-capacity action, the government is the real party in interest; in a personal-capacity action, 'the real party in interest is the individual, not the sovereign.'" (quoting *Lewis v. Clarke*, 581 U.S. 155, 162–63 (2017))). But as *amici* observed in their first submission, courts must look beyond such labels because even where the President (or another Executive Branch member) brings a suit in his personal capacity, that does not necessarily diminish his practical ability to dominate and control the proceeding through the exercise of his official powers. *See* Dkt. No. 45, at 12–13. The relevant inquiry is instead functional: whether a party is operating as the *dominus litis* of the suit and whether the purportedly adverse Parties possess sufficiently distinct interests. *See* Dkt. No. 45, at 4; *United States v. Nixon*, 418 U.S. 683, 697 (1974); *TVA v. EPA*, 278 F.3d 1184, 1192–93, 1197–98 (11th Cir. 2002).[6]

For similar reasons, the Court also does not appear to have collapsed the question of control into the question of whether the Parties possessed sufficiently adverse interests, as Movants assert. *Contra* Mot. 1. Rather, the Court made two findings—that the President controlled the government Defendants in this case, *see* Sanctions Order at 18–27, *and* that the Parties' conduct during and in

[6] Movants' cited cases do not suggest otherwise. Those decisions address immunity or liability in suits involving private litigants, and none considers whether nominally opposing parties possess the concrete adversity that Article III requires. *See* Mot. 8–9. *Lewis v. Clarke*, for example, concerned whether a tribal employee sued in his individual capacity was shielded by tribal sovereign immunity. 581 U.S. 155, 162–63 (2017). In *Hafer v. Melo*, a *former* state employee sued a state official. 502 U.S. 21, 25 (1991). In *Clinton v. Jones*, a private plaintiff brought a damages action against President Clinton based on alleged unofficial conduct predating his presidency. 520 U.S. 681, 684 (1997). And in *Alexander v. Trump*, President Trump sued private members of the Pulitzer Prize Board—not a government officer or entity subject to presidential supervision or control. 413 So. 3d 795, 800 (Fla. Dist. Ct. App. 2025).

connection with the proceeding, including DOJ's highly unusual failure to appear or defend the suit, demonstrated an absence of genuinely divergent interests, *see id.* 27–38. Movants' challenge is thus difficult to square with the two-part structure of the Court's analysis, which again, does not appear categorical in its treatment of executive control.

Movants also contend that the Sanctions Order gave insufficient attention to the fact that President Trump has a private right of action. They emphasize that Congress created a private cause of action under 26 U.S.C. § 7431 for unlawful disclosure of tax information, argue that the Sanctions Order "strip[s] the President or any other government officials of ordinary private rights," and suggest that its logic would bar a President from pursuing claims against federal agencies arising, for example, from a hypothetical collision with a U.S. Postal Service vehicle or misdiagnosis at Walter Reed. Mot. 7, 9. That is not accurate. Whether a plaintiff possesses a private right of action and whether the parties are sufficiently adverse to present an Article III controversy are distinct questions. The Court's ruling rested on the latter—the separate constitutional requirement that a federal case must present an "actual controvers[y] arising between adverse litigants," even where the plaintiff possesses an otherwise valid private right of action. *Muskrat v. United States*, 219 U.S. 346, 361 (1911).

Moreover, the Sanctions Order does not appear to categorically foreclose the possibility of suits by Presidents, their associates, or other government officials against Executive Branch entities so long as the circumstances demonstrate that the parties are sufficiently independent and possess genuinely distinct interests. *Contra* Mot. 9. Indeed, the Sanctions Order expressly recognized that 26 U.S.C. § 7431 "confers a private right of action," *see* Sanctions Order at 4, and that "President Trump had a legal right to bring a suit for the unlawful disclosure," *id.* at 37. The Court further noted that the President could have exercised that right, for example, by bringing his statutory claims before returning to office. *Id.* Relatedly, the Sanctions Order also does not necessarily foreclose a finding of adversity where the Executive Branch has the *potential* to control both sides of the litigation, provided the record demonstrates that the Executive is in fact acting independently of the plaintiff and advancing positions adverse to the plaintiff's interests.[7] Had the DOJ entered an appearance (as it virtually always does when an Executive Branch agency is sued), raised

[7] *Contra* Mot. 8 ("The Sanctions Order's mistaken theory of sanctions rests entirely on a proposition that Article III does not recognize: That President Trump's supervision of the Executive Branch made him legally incapable of maintaining an adverse claim against Defendants.").

available defenses that it has pressed in comparable circumstances, or entered into a settlement proportional to Plaintiffs' claims and the United States's likely exposure, there would have been little reason to question adversity.

Movants also contend that the Court erred by giving insufficient weight to the presence of Donald Trump Jr., Eric Trump, and The Trump Organization as additional plaintiffs in the adversity analysis. *Cf.* Mot. 10. They emphasize that those plaintiffs asserted independent claims and exercised no authority over the IRS or Treasury. *Id.* at 1, 9. In their view, the Court's ruling threatens to "disable all Presidents' family, friends, former colleagues, and affiliated businesses from asserting private rights against the Executive Branch whenever their interests align with the Executive Branch." *Id.* at 9.

As *amici* observed in their prior submission, the additional plaintiffs in this suit are indeed relevant to the adversity inquiry. Dkt. No. 45, at 13. Their presence, however, does not itself guarantee a "vigorous[] defen[se]" as a practical matter, as *amici* pointed out previously, Dkt. No. 45, at 13–14, and as the events that have transpired thus far appear to bear out. As with the factors above, courts must instead examine whether the Parties are in fact independent and possess divergent interests in the context of the suit. And in doing so here, the Court ultimately concluded that the additional plaintiffs were not sufficiently independent based, again, on the specific facts of the case. Sanctions Order at 22 n.29 ("Donald J. Trump, Jr., Eric Trump, and the Trump Organization, LLC . . . share the same attorney, the same parent company, and the same parent and have not espoused any different or distinct view of this matter or this 'Settlement.' Accordingly, the Court will treat their role as parenthetical to that of Lead Plaintiff President Trump."); *see also* Dkt. No. 45, at 13 ("The complaint does not distinguish among their interests or present separate claims capable of clear division.").[8] Those findings were thus not categorical or based merely on the

[8] Movants also point to Hunter Biden's suit against the IRS during the Biden Administration. Mot. 9 (citing *Biden v. IRS*, No. 1:23-cv-2711 (D.D.C. filed Sep. 18, 2023)). There, however, the DOJ actively defended the IRS against Hunter Biden's claims of unauthorized disclosure of his tax information. *See, e.g.*, Partial Mot. to Dismiss by U.S. Internal Revenue Service, *Biden* (D.D.C. Jan. 16, 2024), Dkt. No. 13. Its conduct was also consistent with public statements by the Biden Administration describing the DOJ as independent, including with respect to matters involving Hunter Biden. *See, e.g.*, Press Briefing by Press Secretary Jen Psaki (Apr. 5, 2022), https://bidenwhitehouse.archives.gov/briefing-room/press-briefings/2022/04/05/press-briefing-by-press-secretary-jen-psaki-april-5-2022/ ("[T]he President has never had a conversation with the Department of Justice about any investigations into any member of his family. . . . They would make those decisions independently."). Here, by comparison, no DOJ attorneys entered appearances or filed

presence of President Trump in the suit but were instead based on the lack of record evidence as to the independence of any of these other plaintiffs.

**2. The Connection Between the Court's Adversity Findings and Sanctions**

Having concluded that this proceeding lacked adversity, and that the Parties pursued it for purposes other than obtaining judicial resolution of a genuine controversy between them, the Court had ample authority under settled Article III principles to impose sanctions for that misuse of the judicial process. As the Supreme Court observed in *Lord*, using a "mere colorable dispute" to obtain a court's opinion where "there is no real and substantial controversy" constitutes an abuse of the courts and may be "treated as a punishable contempt of court." Sanctions Order at 14 (quoting *Lord*, 49 U.S. at 255).

Several cases also reiterate courts' authority to protect their jurisdiction against so-called "friendly suits"—suits that lack an honest and actual antagonistic assertion of rights—even if they do not involve outright fraud or collusion. *See* Dkt. No. 45, at 6–7; *contra* Mot. 2 ("But the Sanctions Order identified no pre-filing *sub rosa* agreement, no false allegation, and no specific direction by President Trump controlling Defendants' litigation decisions."). Rule 11 reaches filings made for an improper purpose, which may be inferred from circumstantial evidence, and the Court may impose inherent power sanctions upon a finding of bad faith in using the judicial process. Sanctions Order at 42–43; *see Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 665 (11th Cir. 2010) (Tjoflat, J., concurring in part and dissenting in part); *Cohen v. Burlington, Inc.*, 2020 WL 1033349, at *8 (S.D. Fla. Mar. 3, 2020); *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1224–25 (11th Cir. 2017) ("[I]n the absence of direct evidence of subjective bad faith, [the inherent power] standard can be met if an attorney's conduct is so egregious that it could only be committed in bad faith.").

The Parties' voluntary dismissal did not eliminate the basis for sanctions. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 398 (1990) ("[A] voluntary dismissal does not eliminate the Rule 11 violation."). That principle applies with particular force here, where the Court found that Plaintiffs did not merely advance meritless legal positions, but brought the action itself—and voluntarily dismissed it—"to gain the imprimatur of judicial legitimacy" for the settlement. Sanctions Order

---

papers opposing Plaintiffs' claims, and President Trump has asserted an "absolute right" to control the DOJ. *See* Sanctions Order at 26.

at 38 (citing *Trump v. Clinton*, 653 F. Supp. 3d 1198, 1219 (S.D. Fla. 2023), *aff'd*, 161 F.4th 671 (11th Cir. 2025)).

### B. Factual Considerations Bearing on the Court's Findings

In reaching its conclusions on adversity and the appropriateness of sanctions, the Court relied on sufficient factual evidence. At the time of *amici*'s first submission, the full extent of facts bearing on the lack of adversity was not yet clear. *See* Dkt. No. 45, at 14 ("Because Defendants have not yet indicated whether they will defend against this suit and how, any effort to conclusively evaluate whether this Court can enter a meaningful order would be premature."); *see also id.* ("If [Defendants] refuse [to pay damages], that would leave the Court with an issue to adjudicate[.]"). The circumstances surrounding the subsequent voluntary dismissal, however, confirmed those concerns. On the record ultimately before it, the Court was therefore entitled to reach its conclusion that these proceedings were not adverse and were initiated for an improper purpose.

Movants now challenge the Sanctions Order on the grounds that it lacks a sufficient factual basis. Mot. 11. Again, however, the standard Movants must meet to overcome the Court's discretion is onerous. Movants must show that the Court's assessment of the record was "clearly erroneous." *Sciarretta v. Lincoln Nat'l Life Ins. Co.*, 778 F.3d 1205, 1212 (11th Cir. 2015); *Gulisano v. Burlington, Inc.*, 34 F.4th 935, 941 (11th Cir. 2022).

Here, the Court relied on a substantial body of evidence:

- <u>Presidential control over Defendants.</u> The President possesses constitutional and statutory authority to control Treasury Secretary Scott Bessent and IRS Chief Executive Officer Frank Bisignano. Secretary Bessent is "'the President's alter ego' in the matters of the Treasury Department" and removable at will, while the IRS Commissioner "may be removed at the will of the President." Sanctions Order at 20 (quoting *Myers v. United States*, 272 U.S. 52, 133 (1926); 26 U.S.C. § 7803(a)(1)(D)). Likewise, because Bisignano reports directly to Secretary Bessent, the President can also "control Bisignano through [Bessent's] oversight." *Id.* at 21. Executive Order 14215 further reinforces that control by rendering the President's and Attorney General's legal interpretations controlling within the Executive Branch and by forbidding contrary positions. *Id.* at 21–23. As *amici* noted in their earlier submission, Dkt. No. 45 at 11, there is reason to believe that President Trump is, in fact, exercising his control over the Defendants in

this litigation because his own statements suggest that he believes he has control over the Defendants and the DOJ lawyers charged with defending this case. On January 31, 2026, two days after President Trump filed the Complaint, a reporter asked him "what it's like to be on both sides of a lawsuit."[9] He responded, "It's very interesting. I have another one where, you know, I virtually won the Mar-a-Lago break-in suit, and, you know, I have to work out some kind of a settlement. I'm supposed to work out a settlement with myself."[10] When asked on February 4, 2026 whether he could direct the Attorney General and the Treasury Secretary to pay him, President Trump responded, "[W]hat I would do, tell 'em to pay me, but I'll give 100% of the money to charity. I don't want any of that money."[11]

- Absence of an adversarial defense. During this proceeding's 109-day pendency, no lawyer appeared for Defendants, no responsive pleading was filed, and no defense was asserted. *See* Sanctions Order at 29. DOJ also declined to raise facially available and potentially dispositive defenses, including those it raised in two comparable cases. *See id.* at 4–5, 23–24.
- Timing and participants. The Court emphasized that President Trump "did not pursue his claims until he once again occupied the White House" and had appointed his former lawyer and a former lawyer for other putative Anti-Weaponization Fund beneficiaries to senior DOJ positions. Those lawyers in turn signed the settlement agreement. *Id.* at 37.
- Settlement terms and subsequent conduct. The $1.776 billion settlement was executed before jurisdictional briefing and "before any litigation occurred." *Id.* at 7, 24. Multiple

---

[9] Forbes Breaking News, *'I'm Supposed To Work Out A Settlement With Myself': Trump Addresses Lawsuit Against IRS*, at 00:20–00:23 (YouTube, Feb. 1, 2026), https://youtu.be/wxyTtLB1USY.

[10] *Id.* at 00:23–00:34; *see also* Devlin Barrett & Tyler Pager, *Trump Said to Demand Justice Dept. Pay Him $230 Million for Past Cases*, N.Y. Times (Oct. 21, 2025), https://www.nytimes.com/2025/10/21/us/politics/trump-justice-departmentcompensation.html [https://archive.ph/8YS9I] (describing President Trump's claims against DOJ).

[11] *Read the full transcript: President Donald Trump interviewed by 'NBC Nightly News' anchor Tom Llamas*, NBC News (Feb. 4, 2026), https://www.nbcnews.com/politics/trumpadministration/trump-interview-nbc-news-extend-transcript-tom-llamas-super-bowl-2026-rcna257410 [https://perma.cc/T4SR-KVZH].

provisions of the settlement, including the Anti-Weaponization Fund, blanket releases extending to "Lawfare and/or Weaponization," and restrictions on future IRS audits were unusual and bore little relationship to the statutory remedy. *See* 26 U.S.C. § 7431(c)(1); Sanctions Order at 7–9, 34–35. Further, the applicable statute of limitations would normally circumscribe any remedy. *Id.* at 37.

- Professional relationships. The Court identified potential conflicts of interest, including that then-Acting Attorney General Blanche served as President Trump's personal criminal-defense attorney and did not recuse despite a prior recusal directive. *Id.* at 31, 33 n.48. In addition, the settlement agreement was signed on Plaintiffs' behalf by a former White House counsel who never sought *pro hac vice* admission. *See id.* at 30–33.
- Unilateral repudiation. Then-Acting Attorney General Blanche unilaterally renounced the Anti-Weaponization Fund, without any indication of Plaintiffs' consent, which the Court found demonstrated "his confidence that he could speak for, and bind, both sides of this matter." *See id.* at 36.

Against this backdrop, Movants now contend in their stay motion that the suit was not controlled by President Trump, and that the Parties litigated for three months before settling. *See* Mot. 11 ("But the case did not settle overnight; the parties litigated and negotiated for more than three months, openly disclosed those discussions, and reached a compromise rather than a complete capitulation by either side."). However, the absence of any appearance for Defendants, the failure to assert any defense, and the additional evidence described above provided a sufficient factual basis for the Court's findings and resulting sanctions. The Court was thus entitled to reject Movants' characterization of the record in its Sanctions Order.

## III. Movants' Challenges to the Court's Sanction Concerning Future Official Proceedings

Movants further object to the Court's sanction prohibiting the Parties from "referring to the purported 'settlement agreement' . . . as evidence of a 'settlement' reached in this matter," or "using, offering, admitting, or citing any of its provisions in any . . . official proceeding as evidence of a 'settlement' reached in this matter." Sanctions Order at 47. Movants contend that this provision constitutes a "content-based prior restraint" in violation of the First Amendment and is unlikely to survive appeal. Mot. 14–15. Movants also contend that this provision unduly burdens their right

to petition. *Id.* at 15. To assist the Court, *amici* set out in the analysis below the First Amendment principles and key considerations relevant to assessing Movants' objections.

### A. First Amendment Principles

Because the challenged provision of the Sanctions Order restricts what Plaintiffs, their affiliates, and their counsel may say or submit in future official proceedings, it implicates both the Speech and Petition Clauses.

#### 1. Speech Clause Principles

Turning first to the Speech Clause, Movants principally characterize the Court's sanction as both a prior restraint and "content-based." Mot. 2, 14, 15. They argue that, by "singl[ing] out one subject—the Settlement Agreement," the sanction "suppresses one message," namely, "that the Settlement Agreement exists and may carry legal effect." *Id.* at 14.

Prior restraints bear a heavy presumption against their constitutional validity under First Amendment principles. *Id.*; *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1223 (11th Cir. 2017) (observing that "court-ordered injunctions that forbid speech can also be considered prior restraints" (citation omitted)). It is relevant, however, that the injunction is not inherently viewpoint-based, and thus not *per se* invalid, merely because it "suppresses" only the "one message" that it specifically identifies. The Supreme Court rejected this contention in *Madsen v. Women's Health Center, Inc.*, reasoning that to accept it "would be to classify virtually every injunction as content or viewpoint based. An injunction, by its very nature, applies only to a particular group (or individuals) and regulates the activities, and perhaps the speech, of that group." 512 U.S. 753, 762–63 (1994); *see also Kingsley Books, Inc. v. Brown*, 354 U.S. 436, 441 (1957) ("The phrase 'prior restraint' is not a self-wielding sword. Nor can it serve as a talismanic test.").

Accounting for the risks posed by injunctions targeting speech, the Supreme Court in *Madsen* upheld parts of an injunction against speech and struck down other parts, applying the test that such an injunction must "burden no more speech than necessary to serve a significant government interest." 512 U.S. at 765; *see also Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 390 (1973) (distinguishing an injunction after an adequate determination concerning the character of the speech at issue from a prior restraint imposed before such a determination). The

Supreme Court has not since clarified the legal standard applicable to speech injunctions despite the opportunity to do so.[12] The Eleventh Circuit does not appear to have ruled on the issue.

Relevant to the question of how a speech injunction might serve a significant government interest, courts possess substantial authority to regulate proceedings before them and to generally prevent abuse of the judicial process. That interest may be weighed in a First Amendment analysis. As the Supreme Court has observed, "[a]lthough litigants do not 'surrender their First Amendment rights at the courthouse door,' those rights may be subordinated to other interests that arise in this setting." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 n.18 (1984) (citation omitted). Indeed, by initiating and prosecuting a case, parties and their counsel routinely become subject to a variety of restrictions on what they may say or submit. *See Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1206 (11th Cir. 1985) ("In the realm of litigation, a fair and just result often presupposes restraints on the speech of the parties."); *see also Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1071 (1991) ("It is unquestionable that in the courtroom itself, during a judicial proceeding, whatever right to 'free speech' an attorney has is extremely circumscribed.").

Rule 11 illustrates the point. It restricts the representations that parties and attorneys may make to a court, requiring, among other things, that a filing not be presented for an improper purpose and that its factual and legal contentions have evidentiary support. *See* Fed. R. Civ. P. 11(b)(1)–(3). Accordingly, because those requirements are directed at the integrity of the judicial process, rather than at suppressing a particular viewpoint or idea, courts have rejected the proposition that the First Amendment supplies a defense to sanctions for filings and other speech that violate those requirements. *See, e.g.*, *Cordova v. Univ. Hosp. & Clinics, Inc.*, 92 F.4th 266, 274 (5th Cir. 2024) ("[T]here is no First Amendment exception to a Rule 11 violation."); *King v. Fleming*, 899 F.3d 1140, 1151 n.17 (10th Cir. 2018) ("[T]he First Amendment is in no way a defense to Rule 11 violations"); *accord In re Gleason*, 492 F. App'x 86, 87 (11th Cir. 2012) (rejecting attorney's argument that inherent power sanctions for professionally improper statements in filings and proceedings were invalid because "First Amendment rights supersede the rules that regulate attorney conduct"); *Thomas v. Tenneco Packaging Co.*, 293 F.3d 1306, 1317–29 (11th Cir. 2002)

[12] In *Tory v. Cochran*, the Supreme Court appeared poised to decide whether a court may issue a permanent injunction after finding defamation, but ultimately resolved the case on narrower grounds. 544 U.S. 734, 737–38 (2005).

(affirming inherent power sanctions for abusive statements in documents filed with the court despite First Amendment objection).

While these cases do not address prior restraints on speech and thus do not on their own resolve the question presented here, they make clear that an assessment of restrictions on speech made in connection with judicial proceedings must account for the significant government interests in protecting the integrity of judicial and other official proceedings.[13] That interest may be even more salient in relation to speech involving false or misleading representations, which the rules prohibit due to the specific harm they can cause to the judicial process, a purpose which remains permissible notwithstanding that false speech is not categorically exempt from the First Amendment. *See generally Carter v. Allen*, 762 F. App'x 827, 834 (11th Cir. 2019) ("[F]alse statements are not immunized by the First Amendment right to freedom of speech." (quoting *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 743 (1983))); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40 (1974) ("Under the First Amendment there is no such thing as a false idea[,] . . . [b]ut there is no constitutional value in false statements of fact."); *Kleiner*, 751 F.2d at 1204 ("[U]ntruthful or misleading speech has no claim on [F]irst [A]mendment immunity."); *compare United States v. Alvarez*, 567 U.S. 709, 718 (2012) (plurality opinion) (rejecting "any general exception to the First Amendment for false statements."); *id.* at 733 (Breyer, J., concurring in the judgment) (same).

**2. Petition Clause Principles**

Movants also challenge the sanction as an undue burden on their right to petition the courts. *See Bank of Jackson Cnty. v. Cherry*, 980 F.2d 1362, 1370 (11th Cir. 1993) ("The First Amendment right to petition the government for a redress of grievances includes a right of access to the courts." (citations omitted)). Here too, however, the context of sanctions is significant.

As the Supreme Court has recognized, the right to petition is not absolute; it does not immunize baseless litigation, and courts retain substantial authority to regulate how litigants invoke the judicial process. *See McDonald v. Smith*, 472 U.S. 479, 484 (1985) ("[B]aseless litigation is

[13] Other relevant considerations include the principle that lawyers may be subject to greater regulation of their professional speech than the general public. *See Gentile*, 501 U.S. at 1072 ("We expressly contemplated that the speech of *those participating before the courts* could be limited." (emphasis in original)); *id.* at 1074 (recognizing that "speech of lawyers representing clients in pending cases may be regulated under a less demanding standard than that established for regulation of the press").

not immunized by the First Amendment right to petition." (quoting *Bill Johnson's*, 461 U.S. at 743)); *Procup v. Strickland*, 792 F.2d 1069, 1073–74 (11th Cir. 1986) (en banc) (setting out numerous measures courts may use to prevent abuses in future litigation and explaining that a plaintiff "can be severely restricted as to what he may file *and how he must behave in his applications for judicial relief*" (emphasis added)). The same principle permits sanctions for filings that violate Rule 11 notwithstanding the right to petition.[14]

Consistent with that authority, courts may impose prospective restrictions tailored to litigation abuses, including prefiling restrictions and measures designed to prevent the relitigation of matters already resolved. *See Johnson v. 27th Avenue Caraf, Inc.*, 9 F.4th 1300, 1317–18 (11th Cir. 2021) (explaining that courts may protect their dockets from abuse so long as the measures imposed are a reasonable response to the abuse and access to the courts is not entirely foreclosed); *Traylor v. City of Atlanta*, 805 F.2d 1420, 1422 (11th Cir. 1986) (upholding sanction aimed at preventing plaintiff from attempting to "relitigate specific claims arising from the same set of factual circumstances that have been litigated and adjudicated in the past"); *Swanson v. United States*, 2025 WL 1027399, at *1 (11th Cir. 2025) (upholding a similar sanction because the pre-filing injunction did not deny access to the courts, the measure was "tailored to enjoin only [the] abusive litigation," and the individual could still sue "so long as he does not repeat arguments previously determined to be frivolous"). Provided that the restriction is tailored to redress past violations and does not prevent a plaintiff from accessing the courts entirely, the Petition Clause is not violated.

### B. Considerations Relevant to Applying Those Principles

The Court's interest here was significant—even compelling—and its restriction is narrowly tailored to remedy abusive conduct. *Madsen*, 512 U.S. at 765. The Court has a strong interest in addressing and deterring what it found to be a bad faith attempt to misuse the court's jurisdiction to lend official imprimatur to a "collusive settlement," Sanctions Order at 43, between non-adverse

---

[14] *See Lake v. Gates*, 130 F.4th 1054, 1059 (9th Cir. 2025) (per curiam) (upholding Rule 11 sanctions against attorney who filed a complaint containing false or unsupported allegations because "the right to petition protected by the First Amendment does not include the right to maintain groundless proceedings" (citation and internal quotation marks omitted)); *Greer v. Moon*, 2025 WL 3062749, at *3 (D. Utah Oct. 31, 2025) (addressing Petition Clause argument and holding that "sanctionable behavior under Rule 11 falls outside the scope of the First Amendment when it involves false statements or baseless litigation" (citing *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 530–31 (2002)), *reconsideration denied*, 2025 WL 3459794 (D. Utah Dec. 2, 2025).

parties. *See Procup*, 792 F.2d at 1073 ("Federal courts have both the inherent power and the constitutional obligation to protect their jurisdiction from conduct which impairs their ability to carry out Article III functions." (citation omitted)); *see also Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1298 (11th Cir. 2002) (upholding a sanction prohibiting plaintiff and anyone acting on his behalf from filing certain actions against the defendant and its agents "in any court, forum, tribunal, self-regulatory organization or agency . . . whether judicial, quasi-judicial, administrative, federal, state or local . . . without first obtaining leave of [the] [c]ourt" (internal quotation marks omitted)); *Barnes v. Dalton*, 158 F.3d 1212, 1215 (11th Cir. 1998) ("Where, as here, the district court fashions a sanction which is a direct response to the harm that the bad faith conduct of the attorney causes, it is clearly acting within its discretion.").

Movants' argument to the contrary appears to turn primarily on an over-reading of the sanction the Court actually issued. The challenged provision does not prohibit Plaintiffs or their counsel from discussing their Settlement Agreement generally. It applies only in official proceedings and only to the specific and misleading invocation of the Agreement as "evidence" of a legitimate settlement reached by adverse parties. Sanctions Order at 47. As such, it enjoins only fixed and specific speech closely connected to the Court's findings of abuse; it is clearly defined and does not contain general prohibitions on categories of speech that may be open to subjective determination or create a risk of vagueness. It does not prohibit speech in other forums, leaving open ample alternative channels of communication and remaining focused on what is necessary to address the specific abuse adjudicated. In relation to the Petition Clause interest, it imposes only a limited burden on Movants' right to petition; it restricts only a specific litigation position closely connected to the abuse the Court found and one that is not defensible given the Court's findings on abuse.

Both the strength of the Court's interest in addressing the specific abuse found here and the tailored nature of the injunction set this case apart from cases where courts have rejected or criticized general prohibitions on future speech that seek to address only private interests, e.g., a defamation judgment. *See, e.g.*, *Sindi v. El-Moslimany*, 896 F.3d 1, 35 (1st Cir. 2018) (injunction was neither forum- nor purpose-specific and did not leave open alternative channels of communication); *McCarthy v. Fuller*, 810 F.3d 456, 462 (7th Cir. 2015) (Posner, J.); *Lothschuetz v. Carpenter*, 898 F.2d 1200, 1208–09 (6th Cir. 1990). Thus, while open questions may remain about the scope of

permissible injunctions against speech, this case does not appear to implicate any such difficult questions.

Nor does the fact that the restriction here extends beyond this particular Court necessarily make it overbroad; in appropriate circumstances, courts may impose restrictions governing abusive litigation conduct in other adjudicatory forums. *See, e.g.*, *Riccard*, 307 F.3d at 1295. Instead, as in other cases in which courts have regulated speech within the judicial process, the Court found a serious misuse of its jurisdiction and issued a deterrent sanction with a direct relationship to that abuse, both in terms of the speech constrained and in its limitation to judicial or other official proceedings. The Sanctions Order does not curtail "novel" or "creative" legal arguments. *Cf. BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 531–32 (2002) (recognizing that restraints may be imposed on certain forms of "baseless" litigation). Rather, it reinforces the Parties' existing obligations in the face of the Court's finding that the proceeding was initiated for an improper purpose and without Article III jurisdiction.

Movants suggest that the conduct needing deterrence here is only the filing of the Complaint. *See* Mot. 15. But the Court's findings describe the abuse more broadly than the filing of the Complaint alone. The Court found that Plaintiffs acted in bad faith and for an improper purpose: "to provide cover for a collusive settlement." Sanctions Order at 43 (citation and internal quotation marks omitted). In the Court's view, "[t]he Parties used the existence of federal litigation as a means of conferring legitimacy upon a course of action that they were unwilling to subject to judicial review." *Id.* at 52. Continued reliance on the Settlement Agreement as evidence that this federal case produced a valid (rather than "collusive") settlement would perpetuate identical misuse of the judicial process. Sanctions Order at 43. The Court was entitled to use sanctions to prevent this harm.

Movants also suggest that the Court, which did not have jurisdiction to determine the legal effect of the Settlement Agreement, could not "accomplish the same result by forbidding reference to the agreement." Mot. 15. But the challenged provision does not amount to a determination of the Agreement's legal effect in future litigation. The provision is directed narrowly to *how* the Agreement may be characterized and used in official proceedings related to a case before this Court—it does not prohibit discussion of the Agreement generally or all assertions concerning its possible legal significance. Rather, it prohibits reliance on the Agreement in official proceedings

specifically "as evidence of a 'settlement' reached in this matter." Sanctions Order at 47. The sanction thus tracks the conduct the Court found abusive and prevents it from happening again.

Finally, the scope of the sanction appears consistent with Rule 65, to the extent it applies.[15] Rule 65(d)(2) provides that an order "binds only" the following persons who receive actual notice of it: "(A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B)." The Eleventh Circuit has further recognized that this framework preserves the common-law doctrine under which an injunction binds not only the parties, but also persons "identified with them in interest, in 'privity' with them, represented by them or subject to their control." *See United States v. Robinson*, 83 F.4th 868, 878 (11th Cir. 2023).

Here, the Sanctions Order additionally refers to "agents, representatives, officers, directors, employees, partners, corporate agents, subsidiaries, affiliates," and "any other person acting in concert with the party or under the party's control, whether directly or indirectly." Sanctions Order at 47. Those descriptive terms, however, do not independently determine which nonparties are bound. Whether a particular person or entity described by one of those labels is subject to the Order instead turns on whether that person or entity satisfies Rule 65(d)(2) or one of the traditional common-law grounds recognized in *Robinson*, such as privity. *Cf. Comput. Scis. Corp. v. Tata Consultancy Servs. Ltd.*, 159 F.4th 429, 454 (5th Cir. 2025) (directing modification of an injunction whose intermingling of terms such as "affiliates," "directors," and "consultants" with the categories expressly listed in Rule 65(d)(2)(B) risked conflating categories governed by different Rule 65 standards). The Order's reference to persons acting "under the party's control, whether directly or indirectly," *see* Sanctions Order at 47, should similarly be understood in this more limited manner, *see Robinson*, 83 F.4th at 878–79 (recognizing that an injunction may bind persons "subject to [a party's] control" but also observing that requirements of actual notice and a sufficient factual basis continue to govern whether a particular nonparty is properly bound); *ADT LLC v. NorthStar Alarm Servs., LLC*, 853 F.3d 1348, 1352 (11th Cir. 2017).

At the same time, and recognizing that the Court has not yet ordered monetary sanctions, the Court may choose to clarify the extent to which the provision is intended to reach indirectly

[15] *See supra* Part I; *Mamma Mia's Trattoria, Inc. v. Original Brooklyn Water Bagel Co., Inc.*, 768 F.3d 1320, 1326 n.5 (11th Cir. 2014) ("Though the court did not specifically label its proscription as an injunction, the functional effect of the order controls." (citations omitted)).

controlled entities. Doing so may not be necessary to find the sanction narrowly tailored, but it underscores the fit between the sanction and the specific harm addressed and may also help reduce the potential for any Rule 65 or due process challenge. *Cf. id.* at 1351–55; *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1136 (D.C. Cir. 2009) (holding that an injunction's reference to defendants' "subsidiaries" could not expand the injunction beyond Rule 65(d) and recognizing that subsidiaries may be bound where they are agents of or in privity with the enjoined defendants).

## IV. Movants' Due Process Arguments

Movants contend that their due process rights were violated because they did not receive sufficient notice that sanctions were under consideration, the Court failed to make individualized findings of bad faith, and the Court improperly relied on judicially noticed documents to make its factual findings. To assist the Court, *amici* address the relevant principles and considerations in turn.

### A. Whether the Court's Sanctions Order Provided Due Process to Movants

Sanctioned attorneys must receive due process "in the Anglo–American tradition," consistent with the Fifth Amendment. *United States v. Shaygan*, 652 F.3d 1297, 1318 (11th Cir. 2011). That means "regardless of whether the Court invokes Rule 11 . . . or its inherent authority, it must provide a lawyer (or a party) notice of the possibility of sanctions, the reasons why the court is contemplating sanctions, and an opportunity to respond." *In re Engle Cases*, 283 F. Supp. 3d 1174, 1204 (M.D. Fla. 2017) (collecting cases). "An attorney charged with misconduct is entitled to notice of the charge: that is, the attorney is entitled to know the precise rule, standard, or law that he or she is alleged to have violated and how he or she allegedly violated it." *Shaygan*, 652 F.3d at 1319 (addressing inherent power sanctions); *see also Donaldson v. Clark*, 819 F.2d 1551, 1559–60 (11th Cir. 1987) (en banc) (same due process requirements for Rule 11 sanctions).

The Rule 11 and inherent power sanctions at issue in the Court's Sanctions Order are presented in different procedural postures. *See supra* Part I. *Amici* thus address this Court's Rule 11 and inherent powers separately before addressing Movants' procedural arguments applicable to both.

**1. Notice of Rule 11 Sanctions**

The procedural requirements for notice of Rule 11 sanctions issued on a court's initiative are embedded in Rule 11(c)(1) and (c)(3). Those provisions require "notice and a reasonable opportunity to respond" and further that a court must issue an order to "show cause why conduct specifically described in the order has not violated Rule 11(b)" before sanctions may be imposed. Fed. R. Civ. P. 11(c)(1), (c)(3); *see Mitchell v. Nobles*, 873 F.3d 869, 875 (11th Cir. 2017) ("In keeping with this Rule 11 requirement, this Court has held that the Due Process Clause requires notice and an opportunity to respond before Rule 11 sanctions are imposed."). Movants contend that the Court's May 29 Order did not comply with Rule 11(c)(3) or the Due Process Clause because "[i]t never ordered Mr. Brito or Mr. Epstein to show cause" and "never identified any act by either Attorney as sanctionable." Mot. 12.

The Eleventh Circuit applies a flexible standard to Rule 11(c)(3)'s show-cause requirement. *See Donaldson*, 819 F.2d at 1558 ("No set rule can be stated to govern all Rule 11 cases; the standard is necessarily flexible to cover varying situations."). This standard is thus satisfied even without entering an order formally titled "order to show cause," so long as a court gives notice of the prospect of Rule 11 sanctions, identifies the conduct that could warrant sanctions, and allows the noticed party to respond orally or in writing. *See, e.g.*, *Danubis Grp., LLC v. Landmark Am. Ins. Co.*, 685 F. App'x 792, 801–02 (11th Cir. 2017); *Engle Cases*, 283 F. Supp. 3d at 1204.

Regarding the sufficiency of the notice itself, the Court should assess whether, as a practical matter, all Movants had "fair notice of the possible imposition of Rule 11 sanctions and of the reasons for their imposition." *Donaldson*, 819 F.2d at 1559–60. More specifically, the Court should consider whether the Court's May 29 Order—and the Movants' litigation conduct and the motion for relief from judgment referenced therein—gave Movants sufficient notice of the grounds on which it sanctioned them, and whether the Court's Sanctions Order rested on grounds that Movants were made aware they would have to defend. "[T]he timing and content of the notice . . . will depend upon an evaluation of all the circumstances and an appropriate accommodation of the competing interests involved." *Id.* at 1558.

To the extent Movants argue, *see* Mot. 12, that the May 29 Order was unclear that Plaintiffs' counsel (rather than Plaintiffs themselves) could be sanctioned, it is relevant that "Rule 11 itself constitutes a form of notice that sanctions can be imposed for a baseless [filing] because the rule imposes an affirmative duty on an attorney to conduct a reasonable inquiry into the viability of a

pleading before it is signed." *Riccard*, 307 F.3d at 1294 n.14 (citation and internal quotation marks omitted). An attorney therefore cannot "assert that he had no notice or knowledge of the standards of conduct that the rule itself provides." *Id.* The Eleventh Circuit has explained that "questions of whether an attorney made a good faith argument under the law or whether an attorney interposed a pleading, motion, or other paper for an improper purpose are more ambiguous and may require more specific notice of the reasons for contemplating sanctions." *Donaldson*, 819 F.2d at 1560.[16] Regardless, "'due process will demand more specific notice' for a client than for an attorney." *Dial HD, Inc. v. ClearOne Comm'cns*, 536 F. App'x 927, 929 (11th Cir. 2013) (citing *Donaldson*, 819 F.2d at 1560).

Movants do not deny that Plaintiffs' counsel were on notice of the reasons that the Court was considering for whether the litigation conduct here was sanctionable. And Movants have had ample opportunity to defend their actions before this Court. After Plaintiffs informed the Court that they were engaged in discussions to resolve this matter, the Court explained its concerns about the potential lack of adversity in this case and asked the parties to address those concerns. Dkt. No. 41. Movants chose not to do so before voluntarily dismissing this case. A motion to reopen was then filed by 35 former federal judges, which asserted that the purported "settlement" reached in this matter "raises profound questions about the parties' candor toward the Court and manipulation of the judicial system." Dkt. No. 63 at 1. The Court's May 29 Order ordered Movants to respond to that motion and made several references to misconduct by attorneys that could lead to sanctions, including the type of misconduct that the Court ultimately did find sanctionable—filing a claim for an improper purpose. May 29 Order at 1 (noting that the Court was "empowered to . . . determine whether *an attorney* has abused the judicial process" (internal quotation marks omitted) (emphasis added)); *id.* at 2 (explaining that Rule 11 "requires that *an attorney* . . . filing a pleading certify that the filing is not presented for any improper purpose" (emphasis added)); *id.* ("Under Rule 11, a court may impose sanctions on a lawyer for advocating a frivolous position, pursuing an unfounded claim, or *filing a lawsuit* for some improper purpose." (internal quotation marks omitted)). These references support a conclusion that Plaintiffs' lawyers had notice that the Court believed their conduct implicated Rule 11.

---

[16] *Riccard* addressed sanctions imposed for a motion that the district court found lacked both a reasonable factual basis and was brought in bad faith. 307 F.3d at 1284.

To be sure, the Court directed only "Plaintiffs" to respond to the Motion for Relief from Judgment and to "detail[] their position on the matters set forth in the Motion." *Id*. at 3. Movants themselves invoked Rule 11 in responding to that Order, however, explicitly arguing that the former judges' failure to "invoke[] Rule 11" signified that there was no "genuine concern about attorney misconduct." Dkt. No. 89 at 6. This response—that Rule 11 sanctions against Plaintiffs' counsel were inappropriate—undercuts Movants' position that they lacked notice the Court was considering Rule 11 sanctions against Plaintiffs' counsel for the misconduct identified by the Court in its May 29 Order. *See also Devaney v. Cont'l Am. Ins. Co.*, 989 F.2d 1154, 1160 (11th Cir. 1993) (holding, in the Rule 37 context, that "a motion for sanctions . . . , even one which names only a party, places both that party and its attorney on notice that the court may assess sanctions against either or both unless they provide the court with a substantial justification for their conduct").

Movants also contend that the May 29 Order did not sufficiently warn the parties and counsel of the Court's contemplated grounds for sanctions and did not advise them of the specific penalties the Court might impose. Mot. 12. "The adequacy of notice and [an opportunity to respond] depends, to some extent, on the knowledge the party has of the consequences of his own conduct." *Riccard*, 307 F.3d at 1294 n.14 (quotation omitted). That analysis turns on whether the Court has made Movants aware "of the possible imposition of Rule 11 sanctions and of the reasons for their [possible] imposition." *Donaldson*, 819 F.2d at 1559–60. Movants cite no authority for the proposition that a court must give notice of the specific sanctions the court is considering in order to comply with Rule 11 or the Due Process Clause, and the Eleventh Circuit has consistently affirmed sanctions where the notice did not specifically state the nature of the sanctions being considered. *See, e.g.*, *Johnson*, 9 F.4th at 1312.[17]

---

[17] *Amici* note that other courts have come to different conclusions as to whether due process requires notice of the specific types of sanctions a court is contemplating. *Lasar v. Ford Motor Co.*, 399 F.3d 1101, 1113–14 (9th Cir. 2005); *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 278 F.3d 175, 192–93 (3d Cir. 2002); *see also In re Sanford L. Firm*, 106 F.4th 706, 717 (8th Cir. 2024) (requiring notice of "the nature of a potential sanction" before a district court "impos[es] the most severe sanctions") (cleaned up); *but see In re Markus*, 78 F.4th 554, 568 (2d Cir. 2023) ("[T]he notice requirement mandates that the subject of a sanctions motion be informed of: (1) the source of authority for the sanctions being considered; and (2) the specific conduct or omission for which the sanctions are being considered so that the subject of the sanctions motion can prepare a defense." (citation omitted)); *New Pac. Overseas Grp. (USA) Inc. v. Excal Int'l Dev. Corp.*, 2000 WL 377513, at *4 (S.D.N.Y. Apr. 12, 2000) ("A party is entitled to notice of the source of authority for any sanctions being considered and of the specific conduct that is alleged to be

The Court's May 29 Order may reasonably be seen as providing the same level of detail as other court-initiated notices of potential Rule 11 sanctions that the Eleventh Circuit has approved. In *Johnson*, for example, the district court held a hearing on a default motion and found "red flags" that the plaintiff's counsel was filing lawsuits it knew to be frivolous. *Id.* at 1307, 1312. The district court therefore orally ordered the plaintiff at the hearing to "show cause why sanctions shouldn't be entered against you and your client for [the] things that [the court] discussed" at the hearing, including "continually filing claims under the Florida Civil Rights Act, when you know that they have been dismissed either by the Court or voluntarily dismissing those because there's been no exhaustion of administrative remedies . . . [and] for what [the court] consider[s] to be grossly over-billing for this case." *Id.* at 1311–12. The Eleventh Circuit explained this notice satisfied Rule 11 and the Due Process Clause because it "provided notice regarding the possibility of future sanctions and the reasons underlying that possibility." *Id.* at 1311.

As *Johnson* shows, the specificity of notice must take into account other hearings or submissions referenced in the order or motion giving notice. *Cf. Miller v. Felix* (*In re Miller*), 414 F. App'x 214, 218 & n.5 (11th Cir. 2011) (adequate notice was not provided for sanctions imposed for baseless filing because the "Motion for Sanctions did not reference the [purportedly baseless filing] at all"). In the May 29 Order, the Court repeatedly raised Rule 11, explained that attorneys and parties could be sanctioned under it, and identified "[a] party's decision to file a frivolous lawsuit for the sole purpose of forcing a settlement" as sanctionable conduct. May 29 Order at 2. The Court then explained that the basis for its concern that this suit had been brought for an improper purpose was the motion filed by 35 former federal judges, which "advance[d] grievous allegations that Plaintiffs voluntarily dismissed this litigation solely to avoid judicial scrutiny of a lawsuit that 'was collusive from the start' and was only filed to provide the imprimatur of legality for an unlawful settlement." *Id.* at 3 (quoting Dkt. No. 63 at 16). The Court then proceeded to summarize the evidence that the former judges pointed to in support of their allegations before requiring Plaintiffs to respond to those allegations. *Id.* Under *Johnson*, this was likely sufficient to "provide[] notice regarding the possibility of future sanctions and the reasons underlying that possibility." 9 F.4th at 1311.

---

sanctionable. This does not include a requirement that all possible relief that may be granted pursuant to the specified legal authority be itemized.").

The authorities cited by Movants, *see* Mot. 12–13, are inapposite. In *Kaplan v. DaimlerChrysler, A.G.*, the Eleventh Circuit held that the district court provided insufficient notice because its oral show-cause order identified one specific motion as objectionable and the court later imposed sanctions for filing different, unrelated motions. 331 F.3d 1251, 1257 (11th Cir. 2003). The Court's May 29 Order stated its concern that this suit was filed for an improper purpose, which was the ultimate basis for the Rule 11 sanctions it imposed. In *Mitchell v. Nobles*, the Eleventh Circuit reversed a district court's dismissal as a Rule 11 sanction because it provided no notice at all before doing so. 873 F.3d at 875. Similarly, in *Shaygan*, the Eleventh Circuit held that the district court had denied two prosecutors "notice of any charges of misconduct" because the only previous mention of the court's potential sanctions authority occurred at a hearing while the prosecutors were sequestered outside the courtroom. 652 F.3d at 1301–02, 1318. No similar argument can be made here.

**2. Notice of Inherent Power Sanctions**

With respect to inherent power sanctions, the Court found that Movants had acted in bad faith and concluded that an appropriate monetary sanction would have included the fees incurred by Court-appointed *amici* had they not declined compensation. Sanctions Order at 52–53. And it suggested that an appropriate monetary sanction might include fees incurred by other *amici*. *Id.* at 53. The Court then invited the other *amici* to submit briefing on "any appropriate reimbursement" and allowed Movants to respond. *Id.* Because the Court has not yet resolved whether any fees sought by the other *amici* are a viable benchmark for sanctions or ordered any sanctions pursuant to its inherent authority, the process surrounding the exercise of the Court's inherent power to sanction has not concluded and there is no basis to challenge those potential inherent power sanctions as a violation of due process. *See Morillo-Cedron*, 452 F.3d at 1256; *accord Clawson v. Thornell*, 2025 WL 2938798, at *3 (D. Ariz. Sep. 26, 2025) ("[I]t does not appear . . . that any of the identified sanctions have been imposed yet. Plaintiff cannot state a due process claim based on sanctions that he has not received.").

The Court's process to date mirrors established procedure in the Eleventh Circuit. In *Riccard*, the district court denied a Rule 11 motion filed by the plaintiff and found "that the motion was brought in bad faith" and "an award [of attorney's fees] is appropriate." Order Denying Motion for Sanctions at 1, *Riccard v. Prudential Ins. Co.*, No. 6:97-cv-1390 (M.D. Fla. May 17, 2000), Dkt. No. 56. The court invited the defendant to seek attorney's fees and allowed the plaintiff to file

a response to the application. *Id.* at 2. Thereafter, the court ordered sanctions against the plaintiff and his counsel and held a hearing on their ability to pay, requiring the parties to also "address the issue of whether non-monetary sanctions . . . would suffice to deter repetition of such conduct, either in place of or in addition to whatever monetary sanction this Court might order." Order Granting in Part Mot. for Attorney Fees, Motion for Costs at 7, 8, *Riccard* (M.D. Fla. Nov. 30, 2000), Dkt. No. 116. Following the hearing, the district court fined the plaintiff's counsel $10,000 and enjoined the plaintiff himself from filing any action against the defendant without leave of court. Order Imposing Sanctions at 3, *Riccard* (M.D. Fla. Feb. 26, 2001), Dkt. No. 146. The Eleventh Circuit rejected the sanctioned parties' argument that "the district court did not give them sufficient notice and an opportunity to be heard on whether sanctions should be imposed." *Riccard*, 307 F.3d at 1294 n.14.

> [T]hough the district court did state in its order denying Riccard's motion for sanctions against Prudential that it thought an award of attorney's fees incurred in opposing the sanctions motion was appropriate, it gave Riccard eleven days to respond to Prudential's motion for such fees. Later, the court also gave him notice and a hearing prior to the imposition of the particular sanctions of the injunction and monetary levy.

*Id.*

As in *Riccard*, the Court here found that "Plaintiffs acted in bad faith," invited fees motions, and allowed Plaintiffs to respond to those motions. Sanctions Order at 52–53. Those motions have now been filed, as have Plaintiffs' respective responses. Dkt. Nos. 111, 112, 116, 119. The Court is now poised to adjudicate those motions. In doing so, the Court has the authority, either on its own initiative or on request, to conduct a hearing to solicit evidence on the appropriateness of fees and whether non-monetary or other sanctions might be appropriate. But the Court is under no obligation to do so unless and until Movants request a hearing. *See Trump v. Clinton*, 161 F.4th 671, 688–89 (11th Cir. 2025) (finding argument that due process required a hearing before issuing inherent authority sanctions forfeited because plaintiffs had failed to request a hearing at the district court); *Glatter v. Mroz* (*In re Mroz*), 65 F.3d 1567, 1575–76 (11th Cir. 1995) ("[T]he accused must be given an opportunity to respond, orally *or in writing*, to the invocation of such sanctions and to justify his actions." (emphasis added)). To the extent that the Court is considering further process, whether or not any additional process is necessary to comply with the Due Process Clause, the Court has the authority to treat its Sanctions Order as an order to show cause why inherent

power sanctions should not be issued and invite additional responses from Movants, including a hearing if they so request or the Court so chooses.

*Amici* believe that this Court retains jurisdiction over the pending fees motions and to decide what sanctions to impose on Movants (if any) under its inherent powers because, as noted above, the Court has issued no final orders with respect to any inherent powers sanctions. *See United States v. Khoury*, 901 F.2d 948, 969 n.20 (11th Cir.), *modified on denial of reh'g*, 910 F.2d 713 (11th Cir. 1990) ("[T]he filing of a notice of appeal from a non-appealable order does not divest the district court of jurisdiction."). However, to the extent that the Court has any concerns over its jurisdiction, it may still issue an indicative ruling under Rule 62.1 on how it would rule on the fees motions (or how it would supplement its findings, if it wishes to, *see supra* Introduction). *See, e.g.*, *White v. Hopkins*, 2024 WL 3924606, at *1–2 (E.D. Mo. Aug. 23, 2024) (issuing indicative ruling on how a district court would address merits of sanctions motion upon remand).

Even if the inherent power sanctions were considered final and reviewable on appeal, Movants are unlikely to prevail on their argument that the Court failed to provide due process. Movants argue that they lacked adequate notice of inherent power sanctions because the Court's May 29 Order referenced only Rule 11 sanctions and did not mention the use of the Court's inherent powers. Mot. 12.

The Eleventh Circuit has not squarely addressed whether or under what circumstances due process is violated where inherent power sanctions are issued following a notice that mentioned only Rule 11, but the case law suggests that the Circuit would follow the same practical approach it has taken generally with regard to assessing due process in this context. As explained above, adequate notice must allow a party facing sanctions "to know the precise rule, standard, or law that he or she is alleged to have violated and how he or she allegedly violated it." *Shaygan*, 652 F.3d at 1319. Unlike Rule 11 sanctions, which are governed by an objective reasonableness standard, "the inherent-powers standard is a subjective bad-faith standard." *Purchasing Power*, 851 F.3d at 1223. A party notified only of potential Rule 11 sanctions thus may not always be made aware that her subjective bad faith is in question and consequently may lack a reasonable opportunity to defend herself on that issue.

Other circuits have held that "[n]otice of possible Rule 11 sanctions does not necessarily . . . constitute notice of sanctions under the court's inherent powers" and reversed sanctions awards where the first mention of the specific authority relied on for sanctions is in the sanctions order

itself. *Wright v. CompGeeks.com*, 429 F. App'x 693, 698 (10th Cir. 2011); *see Ted Lapidus, S.A. v. Vann*, 112 F.3d 91, 97 (2d Cir. 1997) (reversing sanctions issued pursuant to 28 U.S.C. § 1927, which also requires bad faith, because the party was alerted only to the possibility of Rule 11 sanctions); *Zuk v. E. Pa. Psych. Inst. of the Med. Coll. of Pa.*, 103 F.3d 294, 298 (3d Cir. 1996) (same). In *Vann*, for example, the Second Circuit held that an attorney was denied due process where he "was notified only that Rule 11 sanctions were being sought." 112 F.3d at 97. "The issue of bad faith was not explicitly raised during th[e] [sanctions] hearing, [so] Vann therefore was not sufficiently put on notice that this was his opportunity to defend himself against that charge." *Id.*

There is persuasive authority that even when notice is issued only under Rule 11, imposition of inherent power sanctions does not violate due process where the sanctioned party was otherwise on notice that bad faith was at issue. In *Fellheimer, Eichen & Braverman v. Charter Technologies*, a bankruptcy court sanctioned a law firm under Rule 11 and Bankruptcy Rule 9011. 57 F.3d 1215, 1220 (3d Cir. 1995). The district court on appeal concluded that neither of the two Rules, as then written, authorized the sanctions but sustained them as a proper exercise of the bankruptcy court's inherent power. *Id.* at 1222–23. Even though "the bankruptcy court never indicated that it was acting under its inherent sanction power," the Third Circuit affirmed the district court because both the movant and the bankruptcy court had "made it clear that [they] suspected [the attorney] of having acted in bad faith," so the law firm's ability to mount a meaningful defense was not prejudiced. *Id.* at 1225–26;[18] *see also Miller v. Cardinale* (*In re DeVille*), 361 F.3d 539, 550 (9th Cir. 2004) (because sanctioned parties knew "that the bankruptcy court deemed the charged conduct to have been pursued in bad faith[,] . . . the bankruptcy court's failure to specify, in advance of the disciplinary proceedings, that its inherent power was a basis for those proceedings, did not" violate due process); *accord Precision Specialty Metals, Inc. v. United States*, 315 F.3d 1346, 1354 (Fed. Cir. 2003) (finding notice sufficient where the trial court imposed Rule 11 sanctions after issuing a show-cause order that mentioned only contempt) (cited approvingly by *Kaplan*, 331 F.3d at 1257).

[18] The Eleventh Circuit has cited *Fellheimer* favorably for the proposition that it could affirm sanctions that it found were improper under Rule 11 if it found that the record contained evidence of bad faith such that the sanctions could have been imposed under the court's inherent powers. *Mroz*, 65 F.3d at 1575.

Here, Movants were ordered to respond to a motion to reopen the case under Rule 60, which "submit[ted] that the settlement 'is a product of collusion and is itself a fraud on the Court.'" May 29 Order at 1 (quoting Dkt. No. 63, at 9). The Court specifically ordered Movants to respond to "the question of whether the case should be reopened because the Court was the 'victim of a fraud.'" *Id.* at 3. That necessarily put bad faith at issue because "a fraud upon the court" under Rule 60(b) is "one way in which to demonstrate bad faith meriting [sanctions] pursuant to the court's inherent authority." *Tarasewicz v. Royal Caribbean Cruises Ltd.*, 2016 WL 3944178, at *4 (S.D. Fla. Mar. 17, 2016); *see also Ocon v. Equinamics Corp.* (*In re Ocon*), 2009 WL 405370, at *1 (11th Cir. Feb. 19, 2009) ("A court may exercise its inherent power to punish bad faith conduct. 'In this regard, if a court finds that fraud has been practiced upon it, . . . the court may impose sanctions against the responsible party." (cleaned up) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991)). Consequently, Movants likely were, or should have been, aware that bad faith was at issue when they responded to the Court's May 29 Order. Indeed, their response argued that fraud on the court required a showing of "an unconscionable *plan designed* to improperly influence the court in its decision." Dkt. No. 89 at 8 (emphasis added) (quoting *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1338 (5th Cir. 1978)). This further suggests that Movants were aware that they were being charged with bad faith conduct and afforded an opportunity to respond. *But see* Sanctions Order at 38 n.59 (declining to make "a final determination regarding any fraud perpetrated on the court" under Rule 60).

### 3. Propriety of Judicial Notice

Movants next argue that the Court violated their due process rights and Federal Rules of Evidence 201(b) and (e) because its sanctions order relied on materials of which the Court improperly took judicial notice. Mot. 13. As an initial matter, it is unclear whether the Rules of Evidence apply to sanctions proceedings at all. The Eleventh Circuit has yet to address the issue, but several courts have held that the Federal Rules of Evidence do not apply to such proceedings. *See, e.g.*, *Sentis Grp. v. Shell Oil Co.*, 559 F.3d 888, 901 (8th Cir. 2009); *Cook v. Am. S.S. Co.*, 134 F.3d 771, 774–75 (6th Cir. 1998); *Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*, 349 F. Supp. 3d 298, 307 (S.D.N.Y. 2018). If the Rules of Evidence do not apply, due process is satisfied if the Court determines that the evidence cited is reliable. *See Sentis*, 559 F.3d at 901 (noting that "evidence relied upon [to impose sanctions] must, at a minimum, bear indicia of reliability"); *see also United States v. Frazier*, 26 F.3d 110, 113–14 (11th Cir. 1994) (although the Federal Rules of Evidence do

not apply to supervised release revocation hearings, courts should not admit hearsay unless it is reliable and the defendant's interest in confrontation is outweighed).

Regardless, the Court should consider whether excluding facts not subject to judicial notice would alter its conclusions. Movants do not connect the judicially noticed materials to the Court's specific findings, and the Court stated in the Background section that it took "judicial notice of articles reporting on relevant events attendant to this case, dockets of other cases, and statements the Parties made . . . to provide an overview of the architecture of this litigation." Sanctions Order at 3 n.3.

The Court should also consider that statements of a party made in an individual capacity, for instance, are admissible. *See* Fed. R. Evid. 801(d)(2)(A); *see also, e.g.*, Sanctions Order at 33 n.47, 36 n.57 (relying on statements of President Trump). The same is true of government records, such as executive orders, *7020 Ent., LLC v. Miami-Dade County*, 519 F. Supp. 3d 1094, 1098 n.1 (S.D. Fla. 2021); executive branch reports, *Fleming v. United States*, 127 F.4th 837, 840 n.1 (11th Cir. 2025); testimony before Congress, *In re Jan. 2021 Short Squeeze Trading Litig.*, 584 F. Supp. 3d 1161, 1176 n.10 (S.D. Fla. 2022), *aff'd*, 76 F.4th 1335 (11th Cir. 2023); and filings in other cases, *Griffin v. Verizon Commc'ns Inc.*, 746 F. App'x 873, 876 (11th Cir. 2018).

Finally, the Court may wish to clarify whether Movants are now requesting a hearing "on the propriety of taking judicial notice." Fed. R. Evid. 201(e). Although Rule 201 expressly contemplates that the Court may "take[] judicial notice before notifying a party," that party remains "entitled to be heard" on the matter. *Id.* In the event that the Court engages in additional process as part of its final adjudication of the inherent powers sanctions, further proceedings under Rule 201(e) could take place at the same time.

**4. Individualization of Findings**

Movants continue by faulting the Court's Sanctions Order for failing to include individualized findings, which they contend are required to impose sanctions under both Rule 11 and the Court's inherent powers. Mot. 13.

Movants cite no case, nor are *amici* aware of any authority, suggesting that such sanctions require individualized findings. Movants do not appear to argue that court-imposed Rule 11 sanctions require subjective bad faith, an issue that the Eleventh Circuit has not resolved. *In re Office of Ala. Att'y Gen.*, 2023 WL 129438, at *3 (11th Cir. Jan. 9, 2023). Movants' litigation conduct has also been collective, not individualized; no Movant has taken any position not shared by the others.

*See* Sanctions Order at 22 n.29. Given those facts, *amici* are not aware of any basis to claim that individualized proof of "what any Plaintiff knew when suit was filed," "who supposedly entered a pre-filing arrangement," or who "knew an allegation was false" was required to determine that the lawsuit was brought for an improper purpose. Mot. 14.

Further, although it is true that "inherent power[] sanctions require subjective bad faith," mental states can be proven by circumstantial evidence. *Purchasing Power*, 851 F.3d at 1224 (noting that bad faith can be proven even "in the absence of direct evidence"). Putting aside the fact that the Court has not awarded any sanctions under its inherent power, Movants do not provide any authority showing that circumstantial evidence must be individualized. Moreover, the Court identified several facts in support of its finding of bad faith, including "[t]he context of the 'settlement,' the relationships of the people involved in negotiating and approving it, the ethical implications of their conduct, and the Parties' swift efforts to dismiss this case after the Court raised fundamental jurisdictional questions." Sanctions Order at 52; *see also Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1090 (9th Cir. 2021) ("Bad faith may also be found in the conduct of the litigation.").

## V. The Remaining Stay Factors

In addition to Movants' likelihood of success on the merits, the Court must evaluate whether Movants "will be irreparably injured" absent relief, whether a stay would "substantially injure the other parties interested in the proceeding," and "where the public interest lies." *Dem. Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1317 (11th Cir. 2019). As the party seeking the "extraordinary remedy" of a stay, Movants bear the burden of demonstrating that these factors justify relief. *GRACE, Inc. v. City of Miami*, 685 F. Supp. 3d 1365, 1369 (S.D. Fla. 2023). Movants have likely not satisfied that burden because they have failed to proffer any evidence of concrete irreparable harm or harm to the public interest—and they certainly have not established that any irreparable harm would be so immediately felt that a stay pending appeal (rather than, for instance, an expedited schedule) is necessary. *Amici* describe the principles and key considerations relevant to each factor.

### A. Irreparable Harm

Alongside Movants' likelihood of success on the merits, the risk of irreparable injury is the "most critical" consideration. *Nken v. Holder*, 556 U.S. 418, 434 (2009). Movants cannot carry

their burden on this factor by showing "some possibility" of harm. *Id.* (quotation omitted). Nor can they do so by raising "remote" or "speculative" concerns. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (per curiam) (preliminary injunctions); *see, e.g.*, *Koutoulas v. SEC*, 2024 WL 5483102, at *1 (S.D. Fla. Nov. 5, 2024) (applying *Siegel* to a stay motion). Instead, to obtain a stay, Movants must identify an "actual and imminent" risk of injury. *Siegel*, 234 F.3d at 1176.

The harm in question also must be truly irreparable. "Mere injuries, however substantial, in terms of money, time and energy necessarily expended" do not suffice. *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (citation omitted). If "adequate compensatory or other corrective relief will be available . . . in the ordinary course of litigation," that "weighs heavily" against a stay. *Id.*

Here, Movants claim harm from three aspects of the Court's sanctions orders. First, they maintain that Mr. Brito will suffer reputational and professional damage from this Court's referral to the Florida Bar. Mot. 17. Second, they argue that Mr. Epstein will suffer similar harm from the Court's determination that any *pro hac vice* application he files in the Southern District of Florida in the following year will be denied. *Id*. Finally, they contend that the bar against referencing their agreement as evidence of a settlement will chill their exercise of First Amendment rights. *Id*. at 16. *Amici* discuss each argument in turn.

*<u>Bar Referral</u>*. In evaluating Movants' attempt to establish harm based on Mr. Brito's referral to the Florida Bar, this Court should consider two issues.[19] The first is whether their claims of potential injury are overblown. The second is whether a stay could prevent those alleged injuries from occurring.

Mr. Brito's mere referral to the Florida Bar may not qualify as the sort of harm necessary to justify a stay. "[R]emote" concerns of injury are insufficient. *Siegel*, 234 F.3d at 1176; *see Nken*, 556 U.S. at 434. The professional consequences of a referral, in and of itself, are neither concrete nor immediate: Before the Florida Bar takes any disciplinary action, it must decide whether to open a disciplinary file and then conduct an inquiry.[20] Movants have provided no evident reason to think the referral will bear consequences any sooner than months from now.

---

[19] *Amici* assume, for purposes of this analysis, that Mr. Brito may appeal his bar referral. *But see Adkins*, 227 F. App'x at 806; *supra* Part I.

[20] The Fla. Bar, *The Lawyer Discipline Process* (last visited Aug. 14, 2026), https://www.floridabar.org/public/acap/acap002/ [https://perma.cc/22MU-42LZ].

Movants claim that consequences flow from the referral itself, but they have not provided this Court with any evidence to substantiate that contention. They assert that a bar complaint "triggers disclosure obligations" and "may create malpractice insurance consequences." Mot. 17. But they provide no further detail. They do not describe the nature of the disclosure obligations they claim Mr. Brito will face or identify their source. Without more specifics, it is impossible to evaluate whether the harm they claim would in fact be irreparable. *See Nken*, 556 U.S. at 434 ("showing some possibility of irreparable injury" is insufficient (citation and internal quotation marks omitted)). Similarly, Movants do not explain what form the malpractice insurance consequences will take. They do not even claim that Mr. Brito personally expects to experience said consequences—only that he "may." *Id.* This Court could reasonably find Movants' submission too vague and speculative to justify relief.

Moreover, "referral to a state bar disciplinary board for investigation is not considered a sanction or disciplinary measure," *In re Walker*, 532 F.3d 1304, 1311 (11th Cir. 2008) (citation omitted). And even if it were, courts have routinely held that disciplinary proceedings themselves do not give rise to irreparable harm. The asserted "hardship" of participating in the proceedings themselves does not qualify as irreparable harm. *Serpe v. FTC*, 2025 WL 4098300, at *12 (S.D. Fla. Oct. 30, 2025) (collecting cases); *see also FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 244 (1980). And any harm arising from discipline itself remains entirely speculative until the disciplinary body reaches a decision. Courts have therefore uniformly declined to stay in-progress disciplinary proceedings. *See, e.g.*, *Robinson v. Cal. State Bar*, 2015 WL 3486724, at *4 (N.D. Cal. May 28, 2015) ("While Plaintiff seems to insist that he will lose the disciplinary matter and have his license to practice law revoked[,] the result of an adversary proceeding is never a foregone conclusion."); *Silverberg v. DuPont de Nemours Inc.*, 2024 WL 1442164, at *8 (E.D. Pa. Apr. 2, 2024) (same); *see also, e.g.*, *Fort v. AFSCME*, 375 F. App'x 109, 111 (2d Cir. 2010) (same for a union disciplinary proceeding).

For the same reasons, Movants cannot establish irreparable harm based on their undeveloped assertion that the referral will damage Mr. Brito's "professional reputation" or interfere with his ability to "retain" and "attract" clients. Mot. 17. The referral is just a preliminary pre-investigative step. *See Noakes v. Case W. Reserve Univ.*, 2021 WL 4441608, at *11 (N.D. Ohio Sep. 28, 2021) (rejecting claim of reputational harm where investigation was "in the very early stages" and the university had not yet made "findings of wrongdoing"). Movants have proffered no concrete

evidence of reputational harm. Indeed, if the speculative reputational injury arising from a referral, without more, were sufficient to show irreparable harm, every referral would be subject to immediate appeal, yet they are not. *See Adkins*, 227 F. App'x at 806; *see also Gerber v. Bd. of Regents of the Univ. Sys. of Ga.*, --- F.Supp.3d ----, 2026 WL 1068679, at *10 (M.D. Ga. Apr. 20, 2026) (rejecting claim of "ongoing reputational damage" where professor who resigned in the wake of allegations that he misappropriated funds provided no specifics supporting claimed reputational harm).[21]

In any event, even if a referral alone would inflict injury, this Court should also consider whether a stay would make any difference as a practical matter. If an injury is "irremediable," equitable relief is "inappropriate." *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1133 (11th Cir. 2005). And here, any harm has arguably already occurred. On July 13, the Clerk of Court filed a notice indicating it had complied with the Court's Sanctions Order, Dkt. No. 107, which instructed the Clerk to mail the ruling to the Florida Bar, Sanctions Order at 46–47. According to Movants, the consequences of that referral were "immediate and irreversible." Mot. 17. As a result, staying the relevant portion of the Sanctions Order would have no effect, rendering such relief inappropriate. *See also Koji IP, LLC v. Renesas Elecs. Am., Inc.*, 2026 WL 793025, at *18 (N.D. Cal. Mar. 20, 2026) ("As to the required self-reporting to bars of which they are members, all three sanctioned attorneys have already complied. . . . Thus, a stay of those portions of the Court's Orders is moot.").

<u>*Pro Hac Vice Ban*</u>. This Court's one-year ban on Mr. Epstein's *pro hac vice* admission has more immediate consequences than Mr. Brito's referral, but once again Movants have not substantiated the harm that will result. The ban took effect right away. But it applied only to "future applications" by Mr. Epstein. Sanctions Order at 47. As a result, it did not disqualify him from any existing representations or implicate his clients' interests in proceeding with the counsel of their choice. And, critically, Movants do not suggest that the ban immediately prevents Mr. Epstein from imminently undertaking prospective representations he would otherwise be positioned to

[21] *Kleiner v. First National Bank of Atlanta*, 751 F.2d 1193 (11th Cir. 1985) is not to the contrary. Although Movants cite that case for the proposition that "the ***potential*** for disciplinary proceedings before the bar" will have "adverse effects upon counsel's careers and public image," Mot. 17 (emphasis added), *Kleiner* did not concern "potential" proceedings. There, the attorneys in question were not only subjected to a "disciplinary action" but also "disqualified from further representation in the case." 751 F.2d at 1199, 1200 n.14.

undertake. As a result, there is no reason to think that Mr. Epstein has presented a sufficiently imminent or irreparable injury to justify a stay pending appeal.

Moreover, a ban on applying to appear *pro hac vice* in the Southern District of Florida for one year would at most prevent Mr. Epstein from representing litigants in three cases in this District in the following year—a very limited intrusion on his legal practice. *See* S.D. Fla. Rules Governing Attorneys r. 4(b)(2) (lawyers not admitted are not permitted to engage in general practice, which presumptively consists of more than three representations in a year). Particularly given Movants have not actually argued that Mr. Epstein expects to have new matters in this District over the course of the next year, the Court could conclude that Movants have failed to make a meaningful showing that a stay is necessary to prevent harm.[22]

Finally, as with Mr. Brito's referral, Movants' arguments about Mr. Epstein's *pro hac vice* ban rely on injuries that have already occurred—and that they themselves contend cannot be redressed. They submit that the ban "has already resulted in significant, unfounded public attacks on his reputation and professional standing that cannot be fully remedied through a later appellate victory." Mot. 17. But that is merely a contention that Mr. Epstein has *already* suffered irreparable injury—not that the stay will safeguard against a future threat of such harm. As explained above, this Court may choose to disregard Movants' claims for that reason.

*Bar on Referencing Agreement as Evidence of a Settlement*. There are also reasons to be skeptical of Movants' argument that they will suffer irreparable injury from the provision of the Sanctions Order that prevents them from relying on their agreement as evidence of a settlement. Although impingement on First Amendment rights generally constitutes irreparable injury, Movants still must show that they are experiencing an "ongoing deprivation" of their First Amendment rights in the first place. *Assoc. Builders & Contractors Fla. First Coast Chapter v. GSA*, 174 F.4th 26, 34 (11th Cir. 2026). And, as explained above, Plaintiffs' First Amendment claim has flaws. *See supra* Part III.B. As a result, just as they struggle to demonstrate that they are likely to succeed on that challenge, they also may fall short of establishing irreparable harm.

---

[22] Mr. Epstein can also participate in litigation in the Southern District of Florida to some extent without filing a *pro hac vice* application, as he appears to have done in this case. *See* Sanctions Order at 30 (noting that Mr. Epstein signed the "settlement agreement" in this case but never filed a *pro hac vice* application or entered an appearance).

### B. Effect on Interested Parties and the Public Interest

The final two stay factors require less discussion. That is partly because they carry less weight in the stay inquiry. Likelihood of success on the merits and irreparable harm are the "most critical" factors in the analysis, *Nken*, 556 U.S. at 434, and if the Court concludes that Movants have not made a sufficient showing as to "one of the two," it may decline to consider the others. *Florida v. United States*, 2023 WL 3813774, at *3 (11th Cir. June 5, 2023).[23]

With respect to the public interest, the public unquestionably has an interest in the enforcement of appropriate sanctions, which serve the vital purpose of deterring abusive and bad-faith litigation tactics. *See Chambers*, 501 U.S. at 45–46. Such misconduct undermines public welfare—misuse of the courts wastes judicial resources, causes delay and expense, and undermines the integrity of the system as whole. *See Donaldson*, 819 F.2d at 1556. And staying the Sanctions Order arguably would undermine its deterrent effect against that sort of behavior, diminishing the efficacy of a tool designed to safeguard the integrity of the judicial system. *See Ala. Aircraft Indus., Inc. v. Boeing Co.*, 2018 WL 6220075, at *2 (N.D. Ala. 2018) ("[T]o delay payment of the sanctions would dilute not only the punitive effect of the order, but also its deterrent effect.").

Movants' argument to the contrary essentially amounts to a contention that a stay would be in the public interest because the Sanctions Order should be vacated. *See* Mot. 18 ("*First*, the public has a compelling interest in ensuring that sanctions . . . remain confined by Rule 11."); *id.* ("*Second*, the public interest in a stay is stronger still because the injunction directly restrains speech and petitioning in future proceedings."); *id.* ("*Third*, the public has a fundamental interest in the faithful application of due process."); *id.* ("The public interest thus decidedly favors a stay for the same reasons the merits favor reversal."). As a result, if this Court rejects Movants' argument that they are likely to succeed on the merits, it should likewise reject their argument that a stay would further the public interest.

---

[23] A weak showing on the merits does not necessarily defeat a motion for a stay. The Eleventh Circuit recognizes that a stay may issue even "upon a lesser showing of a substantial case on the merits" when the remaining factors "weigh[] heavily in favor" of relief. *Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986). But that result is appropriate only when the movant has made a powerful showing on the balance of the equities. Here, this Court may well conclude that the weaknesses in Movants' irreparable harm showing or their lack of a public-interest argument independent of the merits precludes them from relying on this alternate standard.

Finally, Movants argue that the public interest favors a stay because the appeal "presents questions of exceptional institutional importance." Mot. 19. That is irrelevant for present purposes. Whether or not the legal questions presented are of exceptional importance, they will be resolved by the appeal. This portion of the stay inquiry turns on a different question: whether Movants and the public interest will be irreparably harmed while the appeal is proceeding. The importance of the questions presented does not bear on that inquiry.

## VI. The Fee Proceedings

Separately, Movants ask this Court to hold the fee proceedings in abeyance pending appeal. Numerous considerations bear on whether such a stay would be appropriate, but the ultimate decision is within the Court's discretion. Accordingly, *amici* review certain relevant considerations below.

As an initial matter, *amici* note that Movants do not argue that they will suffer irreparable harm from this Court's statement that monetary sanctions are appropriate. This Court's order did not award any monetary sanctions. And in any event, even erroneously imposed monetary sanctions can be remedied later in litigation. *LaTele Tele., C.A. v. Telemundo Commc'ns Grp., LLC*, 2016 WL 6471201, at *5 (11th Cir. May 26, 2016) (finding no irreparable harm from sanctions order where sanctioned party made only "self-serving assertions" that it did not have "sufficient liquid assets to pay for the sanctions"). Movants confine their argument to the contention that the fee *proceedings* should be stayed.

To the extent Movants mean to argue that a stay is warranted under *Nken*, they have not carried their burden for the reasons discussed above. *See supra* Parts I–V. Beyond that, Movants argue that the *amici* who sought to reopen the case are not proper fee recipients. They stress that an *amicus* "is not entitled to attorney's fees and expenses as a prevailing party, because it is not a party." Mot. 20. But that argument misapprehends the role that fees play in this Court's order. This Court concluded that assessing attorney's fees may be an appropriate means of sanction, not that *amici* are entitled to compensation as a prevailing party. That is a fundamentally different determination. *See Chambers*, 501 U.S. at 45 ("[F]ederal courts have inherent power to assess attorney's fees against counsel even though the so-called 'American Rule' prohibits fee shifting in most cases." (citation omitted)).

Moreover, in making this argument, Movants ask this Court to evaluate the issues in a premature posture. This Court has not held that the *amici* who sought to reopen the case should

receive fees. The Court concluded that an appropriate monetary sanction would have included the fees incurred by Court-appointed *amici* if they had not declined compensation. Sanctions Order at 52–53. And it suggested that an appropriate monetary sanction might include the fees incurred by other *amici*. *Id.* at 53. But the Court then invited those *amici* to submit briefing on "any appropriate reimbursement." *Id.* It has not yet resolved whether the fees those *amici* might seek are a viable benchmark for sanctions. Movants should make (and have made, *see* Dkt. No. 116, at 4) their argument that no reimbursement would be appropriate in the fee proceedings in the first instance, rather than in a stay application before this Court has ordered fees.

Nor have Movants showed that the fee proceedings would inflict the sort of injury that *Nken* requires. As *amici* have explained, the "expense and disruption" of participating in "protracted adjudicatory proceedings" does not constitute irreparable harm. *Standard Oil*, 449 U.S. at 244. Movants identify nothing more severe than that here. *See* Mot. 19 (warning of the "waste[]" of potentially "unnecessary" proceedings).

*Nken* aside, however, this Court does have the authority to pause the fee proceedings if it so chooses. A district court has "broad discretion to stay proceedings as incident to its power to control its own docket." *Clinton v. Jones*, 520 U.S. 681, 706 (1997). Where a "related proceeding" may affect a pending case, a court's "inherent discretionary authority" to enter a stay "is not questioned." *Garcia v. Spruce Servs.*, 662 F. Supp. 3d 1245, 1246 (S.D. Fla. 2023) (quoting *CTI-Container Leasing Corp. v. Uiterwyk Corp.*, 685 F.2d 1284, 1288 (11th Cir. 1982)). It is also appropriate to enter a stay if it would conserve judicial resources, *Lozman v. City of Rivera Beach*, 2011 WL 13107422, at *4 (S.D. Fla. May 4, 2011), or otherwise "promote[]" the "public welfare or convenience," *Clinton*, 520 U.S. at 707.

This Court could conclude that such considerations favor a stay here. It is possible that the Eleventh Circuit could resolve Movants' appeal in a way that obviates the need for the fee proceedings. Pausing the fee proceedings until the appeal concludes would eliminate the risk that they are held unnecessarily. *See Garcia*, 662 F. Supp. 3d at 1246 (staying proceeding that could be affected by a pending decision from the en banc Eleventh Circuit).

At the same time, it is also within this Court's discretion to determine a stay is not appropriate. The fee proceedings have already begun, and this Court might determine it is most efficient to allow briefing to continue. This Court might also conclude that Movants' claim to appellate jurisdiction or their substantive objections to the Sanctions Order are not sufficiently meritorious

to make it "likely" that the appeal will have an "impact" on the fee proceedings. *Id.* at 1246. Ultimately, the determination about how to balance these various considerations is committed to this Court's discretion.

## CONCLUSION

*Amici* remain at the Court's disposal to provide additional analysis if requested.

Dated: August 17, 2026

Respectfully submitted,

SELENDY GAY PLLC

By: /s/ *Faith E. Gay*

Faith E. Gay (Fla. Bar #129593)
Philippe Z. Selendy* (N.Y. Bar #2630598)
Corey Stoughton* (N.Y. Bar #4152633)
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
fgay@selendygay.com
pselendy@selendygay.com
cstoughton@selendygay.com

John Gleeson* (N.Y. Bar #1820992)
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001
Tel: 212-909-6000
jgleeson@debevoise.com

David A. O'Neil* (D.C. Bar #1030615)
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Ave. NW
Washington, DC 20004
Tel: 202-383-8000
daoneil@debevoise.com

Donald B. Verrilli, Jr.* (D.C. Bar #420434)
MUNGER TOLLES & OLSON LLP
601 Massachusetts Ave. NW, Suite 500 E
Washington, DC 20001
Tel: 202-220-1100
donald.verrilli@mto.com

*Court-Appointed Amici Curiae*

* admitted *pro hac vice*